Gail P. Hunt, LCSW, BCD
Psychotherapy, Consultation and Assessment
Board Certified Diplomate in Clinical Social Work

3030 Ashby Avenue . Suite 111
Berkeley, California 94705
Phone 510-841-3002
Fax: 925-254-3741

Clinical Summary
Francisca Moralez
March 17, 2008

I. REASON FOR SUMMARY

Ms. Moralez's attorney, Michael Sorgen, Esq., for purposes pertaining to a pending lawsuit, requested a summary of my clinical work with Francisca Moralez.

II. TREATMENT DATES

- Date of First Visit: February 2, 2006
- Frequency of Sessions: Weekly
- Treatment is Ongoing

III. PRESENTING PROBLEM

Francisca presented herself for treatment due to problems she was having at work. A previous male district director and two past female district directors had made things difficult for her and for other disabled workers at her job site. Francisca was under a lot of stress at work and was looking for help dealing with the physical and emotional ramifications of her stress as well as for help in deciding what to do about her job. She had applied for "reasonable accommodation" at work in the form of, one: a motorized wheelchair to use at the office and, two: the ability to work from home. There were no signs that her employer(s) intended to respond positively to this request. Instead, she felt harassed, misunderstood, and frightened. Francisca was quite anxious, depressed and even suicidal at our first meeting.

IV. DSM IV-TR MULTI-AXIAL DIAGNOSIS

| | | |
|---|---|---|
| Axis 1: | 308.3 | Stress, Acute Situational Disturbance |
| | 296.22 | Major Depressive Disorder, Single Episode, Moderate (R/O Severe), w/Atypical Features |
| | V62.2 | Occupational Problem |
| Axis II: | V71.09 | No diagnosis on Axis II |
| Axis III: | 714.0 | Rheumatoid Arthritis |
| Axis IV: | | Occupational Problems |

**EXHIBIT B**

2

    Axis V:    53    GAF (2006)
                   72    GAF (Current)

## V. RELEVANT HISTORY

*Family Background:* Francisca grew up in rural Michigan. Her father worked blue-collar jobs, while her mother stayed home to care for the children. There were seven children. Francisca was the fifth child born.

Francisca grew up in a near-poverty environment. Nine people lived in a two-bedroom rented house. Tempers sometimes flared due to the stress of overcrowding, insufficient food, and an insecure financial future. Nevertheless, Francisca had a positive relationship with her mother and siblings growing up. Her father was home rarely, as he worked long hours. When he was home, he was usually sleeping.

*Education:* After graduating high school, Francisca left home at age seventeen. She knew she was bright, though academic achievement was never particularly encouraged in her household.

Francisca put herself through college and then through law school by virtue of working full time, grants, scholarships, and educational loans.

*Health:* Francisca was diagnosed with rheumatoid arthritis in January 2001. Before that, she describes herself as being in good to excellent health.

*Employment:* Francisca worked for OFCCP beginning in 1997. From approximately 1999 until 2004, Francisca worked from home three days per week.

In mid-2004, a new acting director was appointed. This director was apparently known to staff as a "hatchet-manager." Francisca experienced a lot of anxiety about the future of her job. At this time, she was walking with two canes.

Several instances occurred under this management that communicated to Francisca that she was not safe at her job.[1] She feared being fired. At least three disabled workers and veterans had asked for "reasonable accommodation" for various disabilities without success. Those workers and Francisca believed that the new acting director was looking for reasons to terminate their employment. During this director's tenure (06/2004 – 04/2005), Francisca wrote a letter asking for reasonable accommodation. During this time, she also filed an Unfair Labor Practice for egregious conduct on the part of this acting director. This manager also went to great lengths to publicly humiliate Francisca by criticizing her appearance and alleging that she had body odor.

---

[1] One example of this occurred almost immediately. The district director sent Francisca to assist in a compliance evaluation. However, upon arrival Francisca saw that there was no elevator and she needed to get to the second floor. Francisca informed the director that is was extremely difficult for her to get to the second floor and asked to be removed from the team, but the director refused. Two men had to assist her up the stairs each day

In approximately September 2004, two disabled workers who had requested reasonable accommodations were fired. Francisca felt increased anxiety as she assumed that a similar fate awaited her if she were to make a similar request.

A new acting district director was hired in April 2005. Francisca was optimistic that things might change under this new director. However, if anything, the situation worsened. Francisca experienced the new acting district director as being "rude, abusive and harassing" towards her and others[2]. Her arthritis symptoms, already increased under the tenure of the previous acting district director, worsened still.

Francisca began using a wheelchair full-time at work in 2005. Due to the amount of moving from place to place, she needed to do both inside the office and during onsite reviews, Francisca's hands, wrists, shoulders, knees, and arms ached and became quite painful at work. She began to wear thick gloves on her hands. After work, she placed alternating hot and cold packs on her hands and arms to help with the pain. She requested a motorized wheelchair as a reasonable accommodation.

Francisca had several altercations with this district director in 2005. In May 2005, she filed an informal complaint of discrimination. The next week, this acting district director threatened to not pay Francisca.[3] Francisca's symptoms continued to be stress-driven and much worse after work, particularly following any interaction with the acting director.[4]

In July of 2005, the Agency did not appear for a scheduled mediation regarding Francisca's request for accommodation and gave no advance notice of their intent to not appear. Requests for more medical documentation immediately followed, despite the fact that Francisca had already provided what seemed like more-than-adequate documentation.[5] In an effort to comply, however, Francisca provided additional documentation from her doctor, including a letter from the doctor documenting the need for an electric scooter.

A second mediation was scheduled for August 2005. This mediation lasted only ten minutes. One of the participants complained that he could not read the doctor's letter; Francisca read it aloud. In that same month, Francisca filed a formal complaint of disability discrimination. Two weeks later, she was asked yet again for more medical documentation regarding her need for a motorized scooter.

In December 2005, Francisca's case was dismissed. In January 2006, she sent a Notice of Appeal to the EEOC. She was having an extremely difficult time at work getting around. She began to feel frightened that she would not be able to continue to work without the accommodation requested.

The tenure of the male acting director ended in approximately October 2005. He was

---

[2] For example, during a staff meeting in May 2005, he said, "Nobody deserves the salary they are being paid and I wouldn't walk a case of anyone's across the street."
[3] In April 2005, he refused to sign the timesheet she prepared during her leave-time and forced her to retrieve her laptop from her van even though walking with two canes was extremely difficult. He did not offer to assist her
[4] Told to me by Francisca and confirmed during a phone call to her roommate in April 2006
[5] Francisca brought me a list of the documentation she provided

4

followed by an "abusive" female acting director who also targeted Francisca by means of "harassment and intimidation because of her disability." Francisca often noted that this director "repeatedly lied about conversations" between herself and Francisca and "used that to submit false documentation" against Francisca as a means to "harass, intimidate and undermine her job performance."

In May of 2006, Francisca took twelve weeks from work under the Family Medical Leave Act (FMLA). At the time, she submitted the appropriate forms to the agency regarding her need for medical leave under FMLA. The agency again demanded more medical documentation that was seemingly unnecessary and served to create more anxiety for Francisca. Eventually the agency re-evaluated their demands and Francisca remained on medical leave without providing further medical documentation. During that time, she filed for Disability Retirement. She did not return to work.

## VI. PSYCHOLOGICAL TESTING ADMINISTERED

REASON FOR ASSESSMENT: Clients who exhibit or have reported[6] high difficulty before or during treatment are routinely administered one or more test measurements. Not only does this give me a baseline number, it also helps to pinpoint focal points of difficulty.

The following tests were administered to Ms. Moralez:

- BECK DEPRESSION INVENTORY[7] on: *02/02/06, 02/16/06, 03/22/06, 04/24/06, 06/05/06, 11/13/06, 04/09/07, and 10/08/07.* Results follow:

---

[6] Before their first appointment, new clients receive a lengthy questionnaire which includes multiple self-report items re: mood state
[7] The BDI, one of the most widely used tools for measuring for depression, is a 21 item self-report rating inventory measuring characteristic attitudes and symptoms of depression *(Beck et al., 1961)*.

5

| RANGE | LEVEL OF DEPRESSION | FRANCISCA ||
|---|---|---|---|
| | | SCORE | DATE |
| | | | |
| | | | |
| | | | |
| 17 – 20 | BORDERLINE | 20 | 10/08/07 |
| 11 – 16 | MILD | | |
| 0 – 10 | NORMAL | | |

B. DASS–Depression/Anxiety/Stress Scale[8] on 02/02/06, 03/22/06, 06/12/06, and 10/08/07. Results follow:

---

[8] The DASS is a set of three self-report scales designed to measure the negative emotional states of depression, anxiety, and stress. Lovibond, S.H. & Lovibond, P.F., "Manual for the Depression Anxiety Stress Scales," 2nd Ed. Psychological Foundation, Sydney, 1995.

| SCALE FOR: | 1. DEPRESSION | Francisca Depression Score | 2. ANXIETY | Francisca Anxiety Score | 3. STRESS | Francisca Stress Score |
|---|---|---|---|---|---|---|
| INTERPRETATION: | SCORE RANGE | | SCORE RANGE | | SCORE RANGE | |
| Normal | 0 - 9 | | 0 - 7 | | 0 - 14 | |
| Mild | 10 - 13 | 10/08/07 score: 12 | 8 - 9 | | 15 - 18 | |
| Moderate | 14 - 20 | 06/05/06 score: 15 | 10 - 14 | 10/08/07 score: 11  06/05/06 score: 14 | 19 - 25 | 10/08/07 score: 21  06/05/06 score: 24 |
| Severe | 21 - 27 | 03/22/06 score: 25 | 15 - 19 | | 26 - 33 | |
| Extremely Severe | 28+ | 02/02/06 score: 30 | 20+ | 02/02/06 score: 24  03/22/06 score: 22 | 34+ | 02/02/06 score: 38  03/22/06 score: 36 |

VIII. DISCUSSION OF RESULTS

As evidenced by the above tables, Francisca entered treatment on February 2, 2006 with extremely high scores on both the Beck and the DASS. Her initial score on the Beck was 42 and the DASS, 30, both in the *Extreme Range* of Depression. People with scores of this type often evidence suicidal thoughts and feelings. Ms. Moralez reported such thoughts, but did not have a plan.

Also on 02/02/2006, the DASS evidences scores in the *Extremely Severe* range on both the Anxiety and Stress Scales. The Anxiety Scale assesses autonomic arousal, skeletal muscle effects, situational anxiety, and subjective experience of anxious affect. The Stress Scale is sensitive to levels of chronic non-specific arousal. It assesses difficulty relaxing, nervous arousal, and being easily upset/agitated, irritable/over-reactive and impatient.[9]

On 02/15/2006, one sees that scores on all of the Scales comes down by several points. This is a common result for people entering psychotherapy. The act of simply doing something about the problem coupled with the experience of being understood, reduces symptoms by some margin. Nevertheless, Ms. Moralez's scores remain in the *Severe* and *Extremely Severe Range* for all measures.

Results on the Beck and DASS on 03/22/06 demonstrate a minor drop, still leaving her in the *Extreme and Severely Extreme* Ranges. Beck testing on 04/24/06 remains in the *Extreme Range* for Depression.

Most significant, however, is the large drop in scores on June 05, 2006. Ms. Moralez took a twelve-week leave of absence from her employment in May 2006. By the first week of June, her scores on all of the Scales dropped considerably. Her score on the Beck dropped by 10 points, moving her into a low score on the *Moderately Depressed* Range. Her scores on the DASS

---

[9] http://www.psy.unsw.edu.au/Groups/Dass/

dropped similarly. The Depression Scale dropped by 7 points, moving her into the *Moderate Range*. Her score on the Anxiety Scale dropped by 8 points, moving her into the *Moderate Range* for Anxiety. Finally, her score on the Stress Scale also dropped by 8 points, moving her into the *Moderate Range* for Stress.

These changes are greater than one can usually expect from psychotherapy alone, particularly when testing done multiple times in the previous four months remained in the same range *(Extreme and Severely Extreme.)* The fact that Ms. Moralez's scores did not drop more than a few points in the first three months of psychotherapy is an indication, in this clinician's experience, that the stressor lays outside of the client's control. Given that the only significant change between April and June of 2006 was the change in employment status, the drop in scores is attributed to that.

Over the course of the next sixteen months, Ms. Moralez's scores continued to drop, albeit less dramatically. However, she moved from the *Moderate* to the *Borderline Range* of Depression on the Beck and into the *Mild Range* for Depression on the DASS. Her scores on the *Anxiety and Stress Scales* dropped as well, putting her on the cusp of mild for Anxiety and Stress.

The slightly higher scores on the *Anxiety* and *Stress Subscales* as compared to *Depression*, which by October 2006, was in the *Borderline Range,* are believed to be due to the lawsuit filed by Ms. Moralez.


IX. DISCUSSION

As previously mentioned, Ms. Moralez entered psychotherapy due to the problems she was experiencing at work. She was under tremendous stress at the time. She experienced the following symptoms:

- suicidal thoughts
- insomnia
- irritability
- poor concentration
- loss of memory
- increased pain
- apathy
- severe anxiety
- severe depression
- loss of interest in activities and friends
- difficulty getting up in the morning
- both increased and decreased appetite

Ms. Moralez's stress level at work had increased dramatically with the arrival of new acting district directors, beginning in 2004 and continuing through 2005. She reported higher than normal discomfort in her joints on days she interacted with these directors. When asked what her pain level was on those days, Ms. Moralez reported that it was sometimes as high as a nine on a scale of 0 to 10, with 10 being the highest.

Once Ms. Moralez left her employment and the stress level declined, her pain level decreased. She now reports a pain level of three to five on most days. Nevertheless, she misses working, including being actively engaged in helping people as well as the collegial atmosphere she enjoyed before 2004. She has plans to volunteer to do pro bono work once her lawsuit is settled.

Striking to this clinician is that in the two years she has been seeing her, Ms. Moralez has never once complained about her rheumatoid arthritis. Despite the sudden onset of arthritis inn 2001, rather late in life, Ms. Moralez appears to have accepted it; she works hard to make the best of her life. Even when she could no longer walk to my office with two canes, Ms. Moralez never complained. In discussions surrounding her physical disability, Ms. Moralez always remains optimistic. She strongly believes that she will overcome her arthritis and works hard to bring about that result (i.e. she exercises several times per week in a nearby pool, eats food that is healthy and nutritious, works hard to maintain a positive attitude, has regular massage appointments and maintains an active personal and social life, to name a few.)

Ms. Moralez is extremely independent and self-sufficient. Having grown up in such a large family, and one that included many hardships, Ms. Moralez learned to survive on her own. As mentioned, she put herself through both college and law school. She has repaid her educational loans. Ms. Moralez does not have a helper of any kind. Although she and her roommate are friendly, they go their separate ways and can go several days without seeing one another. Her roommate works full-time and Ms. Moralez rarely, if ever, asks her roommate for help, preferring to be completely independent.

Ms. Moralez now has an electric power chair and makes the most of it. In fact, she travels from her home in Castro Valley to my office in Berkeley via her electric scooter and BART, traveling over a mile to and from BART, no matter how inclement the weather. She always arrives on time and with a smile on her face. She manages to travel to multiple sites via her chair and BART and thoroughly enjoys her outings. She also maintains a small herb and vegetable garden on the deck of her apartment, reads voraciously, visits friends, and is becoming somewhat of a gourmet cook.

Ms. Moralez actively engages in her psychotherapy, as she does in her life. She reads, listens to tapes, and often brings me new and interesting material she has discovered. Her spiritual life and practice is important to her and she implements parts of a spiritual practice on a regular basis.

Ms. Moralez has overcome multiple, extreme hardship in her life. She is the consummate survivor, however, and will continue to work hard, no matter what life brings her way. She is the antithesis of a victim. Her enthusiasm, intelligence, motivation, and depth of spirit make her an ideal psychotherapy client.

Respectfully submitted:

Gail P. Hunt, LCSW, BCD