Exhibit A

1   Michael S. Sorgen (State Bar No. 43107)
    LAW OFFICES OF MICHAEL S. SORGEN
2   240 Stockton Street, 9th Floor
    San Francisco, CA 94108
3   Telephone:   (415) 956-1360
    Facsimile:   (415) 956-6342
4
    Attorney for Plaintiff
5   FRANCISCA MORALEZ

6
7                   UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                   C 07 3807 EDL

10  FRANCISCA MORALEZ,                    )  Case No.:
                                          )
11              Plaintiff,                )  **COMPLAINT FOR DISABILITY**
                                          )  **DISCRIMINATION, FAILURE TO**
                vs.                       )  **ACCOMMODATE, AND**
12                                        )  **CONSTRUCTIVE DISCHARGE**
                                          )
13  ELAINE L. CHAO, SECRETARY OF THE      )
    U.S. DEPARTMENT OF LABOR; U.S.        )
14  DEPARTMENT OF LABOR,                  )  JURY TRIAL DEMAND
    EMPLOYMENT STANDARDS                  )
15  ADMINISTRATION                        )
                                          )
16              Defendants.               )
                                          )
17
18
19                   **PROCEDURAL ALLEGATIONS**

20      1.      This is an action under Section 504 of the 1973 Rehabilitation Act, 29 U.S.C. §

21  705 *et seq.*, as amended by the Civil Rights Restoration Act of 1987 and the Americans with

22  Disabilities Act of 1990 (collectively referenced as "Rehabilitation Act"), which prohibits

23  discrimination on the basis of disability by the federal government, federal contractors, and other

24  entities that receive federal financial assistance.

25      2.      Defendant ELAINE L. CHAO is the Secretary of the UNITED STATES

26  DEPARTMENT OF LABOR ("DOL"), and as such, is responsible for all of its policies and

27  operations.

28  COMPLAINT FOR DISABILITY DISCRIMINATION, FAILURE TO
    ACCOMMODATE, AND CONSTRUCTIVE DISCHARGE                                    1

3.     Defendant DOL is a federal agency of the United States of America. Its principal place of business is in Washington, D.C. and at all relevant times it has maintained a district office in this judicial district.

4.     At all times mentioned herein, Plaintiff FRANCISCA MORALEZ was a resident of the State of California and was employed by defendants as an Equal Opportunity Specialist ("EOS") at the Oakland District Office ("ODO") of the Office of Federal Contract Compliance Programs ("OFCCP") of the Employment Standards Administration.

5.     The unlawful disability discrimination alleged herein was committed within the jurisdiction of the United States District Court for the Northern District of California.

6.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 1343. This action is authorized and instituted pursuant to the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 705 et seq.

### FIRST CAUSE OF ACTION
**(Disability Discrimination for Failure to Reasonably Accommodate)**

Plaintiff realleges paragraphs 1 through 6 and incorporates them herein as if fully set forth.

7.     Ms. Moralez began working as a GS-9 EOS for the Oakland District Office of the OFCCP in September 1997. Later, plaintiff was promoted to the GS-12 level and worked as an EOS at that level until September 2006. The essential functions of plaintiff's job as an EOS included investigating discrimination complaints, conducting compliance evaluations of federal contractors, and providing compliance assistance. Ironically, plaintiff herself began experiencing discrimination based on her disability.

8.     In or about January 2001, plaintiff was diagnosed with rheumatoid arthritis, a disease that causes chronic inflammation of her joints and that subsequently caused severe joint destruction. Plaintiff is a qualified individual with a disability under the Rehabilitation Act in that her rheumatoid arthritis is a physical impairment that substantially limits her ability to perform major life activities, including, but not limited to, working, walking, and performing

1    manual tasks. At all times mentioned herein, Plaintiff was qualified for her position and was

2    willing and able to perform the essential functions of her job if reasonable accommodation had

3    been provided by defendants.

4        9.    In 2001, Angel Luevano, the District Director of the ODO at the time, offered to

5    purchase a powerchair for Ms. Moralez as an accommodation for her disability. Luevano did not

6    request that plaintiff sign a medical release when he made his offer. Plaintiff declined his offer

7    because she did not feel that she needed a powerchair at that time. Luevano later provided

8    Moralez with other reasonable accommodation, such as a rolling briefcase and flexible time

9    management, without any medical documentation, and plaintiff accepted such accommodations.

10       10.    From 2002 to early 2005, Ms. Moralez and Dr. Alberto Rocha, Assistant District

11   Director at the ODO, engaged in a productive interactive process to reasonably accommodate

12   plaintiff's disability. Among other accommodations, Dr. Rocha often allowed plaintiff to work

13   from home three to four times per week, allowed her to maintain her assigned laptop at home,

14   allowed her additional time to commute, and assisted her with transportation for work-related

15   functions. Dr. Rocha never asked plaintiff to sign a medical release or to provide medical

16   documentation before providing these accommodations to plaintiff.

17       11.    Despite these accommodations, plaintiff's condition gradually became worse.

18   When her working conditions became extremely difficult and painful, plaintiff wrote a letter on

19   March 28, 2005 to former Deputy Regional Director Bill Smitherman (currently the Regional

20   Director) requesting an electric powerchair to use at work and permission to work at home for

21   two to three days per week. Plaintiff clearly explained that as a result of her rheumatoid arthritis,

22   she had difficulty "walking, sitting down, raising up from a sitting position, climbing stairs,

23   walking down stairs, and lifting/carrying over two pounds while at work." Plaintiff further

24   explained that a powerchair would increase her mobility and thus help her to perform the

25   essential functions of her job.

26       12.    Plaintiff also presented medical documentation from her physician, Dr. Marcey

27   Shapiro, who indicated that plaintiff had severe ongoing rheumatoid arthritis with degeneration

28

COMPLAINT FOR DISABILITY DISCRIMINATION, FAILURE TO
ACCOMMODATE, AND CONSTRUCTIVE DISCHARGE                                           3

1   in her knees, feet, and shoulders. Dr. Shapiro noted that plaintiff might have "flare" periods,

2   during which she might need to arrive late to work or miss work intermittently, depending on the

3   severity of the flares. Dr. Shapiro also indicated that she would need information from the

4   OFCCP about the essential functions of plaintiff's job in order to assess her ability to perform

5   them, but the OFCCP never provided this information.

6       13.    Plaintiff's requests for accommodation were reasonable. Plaintiff had been

7   allowed to work from home a few days per week for the previous six years, and the cost of a

8   powerchair for plaintiff would not have created an undue financial hardship for the OFCCP.

9   Defendants never asserted that plaintiff's requested accommodations would result in undue

10  hardship. The OFCCP had and continues to have a policy and practice of refusing to

11  accommodate qualified disabled employees.

12      14.    On May 3, 2005, Trent Williams, Acting District Director of the Oakland office,

13  sent a memo to plaintiff deferring her requests for reasonable accommodation. Williams stated

14  that the OFCCP would need to send her requests to the Public Health Service ("PHS"). Williams

15  asked plaintiff to sign a medical release form authorizing the PHS to review her medical files and

16  to provide documentation from her physician explaining the nature of her disability and how her

17  requested accommodations would assist her in performing the essential functions of her job.

18      15.    Plaintiff did not sign the medical release because she never before had been

19  requested to do so and believed that it was a form of harassment that violated her privacy rights.

20  Moralez also believed that additional medical documentation was unnecessary under the Equal

21  Employment Opportunity Commission ("EEOC") interpretive guidelines for the Rehabilitation

22  Act, because she was clearly disabled and had provided all the necessary medical information to

23  her supervisor. Furthermore, Moralez anticipated that her direct supervisor, Dr. Rocha, would

24  describe and explain her medical condition and reasonable accommodation needs to other agency

25  officials. However, agency officials never discussed plaintiff's needs with Dr. Rocha.

26      16.    Pending the result of the PHS review, Williams told plaintiff that he would relax

27  the agency's tardiness and absentee policies as a reasonable accommodation for her disability.

28

COMPLAINT FOR DISABILITY DISCRIMINATION, FAILURE TO
ACCOMMODATE, AND CONSTRUCTIVE DISCHARGE                                                    4

1   Williams did not request any medical documentation from plaintiff before offering her these

2   accommodations.

3        17.    Plaintiff's accommodation requests were never forwarded to the PHS.

4        18.    On May 19, 2005, plaintiff filed an informal complaint of disability

5   discrimination. In an effort to resolve the matter as quickly as possible, plaintiff agreed to

6   participate in two mediation sessions. However, defendants did not engage in these sessions in

7   good faith. No agency representative attended the first mediation session in July 2005 or even

8   bothered to tell plaintiff in advance that nobody would be there. The second session in August

9   2005 lasted for approximately ten minutes with essentially no negotiations.

10        19.    At that time, plaintiff provided additional medical documentation from her

11   physician indicating the nature of her disability and the need for her requested accommodations.

12   The handwritten note from Dr. Shapiro specifically indicated plaintiff's difficulties with standing

13   and walking and her need for a motorized scooter to help her to adequately perform her job

14   duties. The note also indicated that the most ideal work arrangement would be for plaintiff to

15   work from home three days per week, which would reduce her ambulation.

16        20.    Deputy Regional Director Smitherman complained that the note was illegible and

17   not signed by Dr. Shapiro, even though the note was written on Dr. Shapiro's letterhead.

18   Plaintiff then provided Smitherman the same note, typed and signed by Dr. Shapiro. However,

19   even with this additional documentation that clearly explained Moralez' need for

20   accommodations, Smitherman told plaintiff that the agency would not purchase a powerchair for

21   her but might let her work from home two days per week.

22        21.    On August 17, 2005, plaintiff filed a timely complaint of disability discrimination

23   for failure to reasonably accommodate. A true and correct copy of such complaint is attached

24   hereto as Exhibit A. On December 23, 2005, the DOL dismissed her claim as insufficiently ripe

25   for investigation. On June 16, 2006, the EEOC reversed the dismissal of plaintiff's case, finding

26   that she had a legitimate claim.

27        22.    As a direct and proximate result of OFCCP's discriminatory failure to

28

COMPLAINT FOR DISABILITY DISCRIMINATION, FAILURE TO
ACCOMMODATE, AND CONSTRUCTIVE DISCHARGE

1   accommodate plaintiff's disability, plaintiff has and continues to suffer general and special

2   damages, including, but not limited to, loss of employment, loss of earnings and benefits, future

3   livelihood, pain and suffering, and emotional distress, in an amount to be determined according

4   to proof.

5       23.     As a further direct and proximate result of defendants' acts, plaintiff has been

6   compelled to retain attorneys, and has and will continue to incur fees and costs in pursuing this

7   action.

## SECOND CAUSE OF ACTION
### (Constructive Discharge Based on Disability)

Plaintiff realleges paragraphs 1 through 23 and incorporates them herein as if fully set

forth.

24.     Plaintiff continued working in excruciating pain at the ODO without reasonable

accommodation for her disability.  As a result, her rheumatoid arthritis became worse, to the

point where she had to take medical leave on May 15, 2006.  Before taking her medical leave,

she informed her supervisor that she could not continue working at the office without her

requested accommodations.

25.     Plaintiff still had not heard anything from agency officials regarding any

accommodations for her disability.  Since she was incapable of returning to work without

accommodation, she was compelled to apply for disability retirement at the end of May 2006.

On September 29, 2006, her disability retirement was granted and plaintiff formally retired from

the federal workforce.  Fourteen months had passed between her initial request for a reasonable

accommodation and her application for disability retirement.

26.     Defendants' failure to reasonably accommodate her disability compelled plaintiff

to apply for disability retirement, because her extreme physical pain made her working

conditions intolerable.  These working conditions would be intolerable to any reasonable person

in plaintiff's position.  The lack of accommodations also made it virtually impossible for plaintiff

to perform the essential functions of her job.

27.    By willfully and intentionally failing to promptly accommodate plaintiff's disability, defendants ensured that she would be unable to continue working at the OFCCP.  If defendants had granted her accommodation requests, plaintiff would have still been able to continue working at the ODO.

28.    On November 16, 2006, Ms. Moralez filed a timely complaint alleging constructive discharge.  A true and correct copy of such complaint is attached hereto as Exhibit B.  In February 2007, the agency consolidated into a single case her complaints for disability discrimination and constructive discharge, but nonetheless has failed to issue a final agency decision within 180 days.

29.    As a direct and proximate result of defendants' discriminatory actions and failure to accommodate plaintiff's disability, plaintiff has and continues to suffer general and special damages, including, but not limited to, loss of employment, loss of earnings and benefits, future livelihood, pain and suffering, and emotional distress, in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief as follows:

1.    Damages compensating plaintiff for wages and benefits to which she would have been entitled had she not been adversely affected by defendants' discriminatory acts, including, but not limited to, back pay and front pay until plaintiff's retirement age of 65;

2.    Damages to plaintiff for her non-pecuniary losses, including, but not limited to, pain and suffering, emotional distress, and humiliation, in amounts to be determined at trial;

3.    Prejudgment interest;

4.    Reasonable attorney's fees pursuant to 42 U.S.C. §§ 2000e-5(k) and 1988;

5.    Such further relief as the court deems necessary and proper.

Dated: July 25, 2007                          By: _____

Michael S. Sorgen
Attorney for Plaintiff FRANCISCA MORALEZ

Exhibit B

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - - - - -

5    FRANCISCA MORALEZ,                    )

6              Plaintiff,                  )

7    vs.                                   )  Case No.

8                                          )  C 07 3807 EDL

9    ELAINE L. CHAO, SECRETARY OF THE     )

10   U.S. DEPARTMENT OF LABOR; U.S.        )

11   DEPARTMENT OF LABOR, EMPLOYMENT       )

12   STANDARDS ADMINISTRATION,             )

13              Defendants.                )

14   - - - - - - - - - - - - - - - - - -

15

16        DEPOSITION OF FRANCISCA MORALEZ

17          WEDNESDAY, JANUARY 23, 2008

18          PAGES 1 - 126; VOLUME 1

19

20

21        BEHMKE REPORTING & VIDEO SERVICES

22      BY:  SUZANNE I. ANDRADE, CSR # 10682

23            160 SPEAR STREET, SUITE 300

24        SAN FRANCISCO, CALIFORNIA 94105

25                  (415) 597-5600

1    A.    Approximately.

2    Q.    So when did you leave DOL?  And by that, DOL,

3  I mean Department of Labor.

4    A.    Yeah.  I believe it was May 15th of 2006.

5    Q.    And at that time you were a GS-12 equal

6  opportunity specialist; is that correct?

7    A.    Step 5.

8    Q.    And who was your supervisor?

9    A.    Dr. Alberto Rocha.

10    Q.    And which office were you located in?

11    A.    I was located in the Oakland district office.

12    Q.    Which it was in Oakland --

13    A.    Yes.

14    Q.    -- at the time?  Okay.

15          Are they still in Oakland?

16    A.    No.

17    Q.    Where are they now, if you know?

18    A.    They're in the new federal building.

19    Q.    In?

20    A.    San Francisco.

21    Q.    Are you working now, Ms. Moralez?

22    A.    No.

23    Q.    What income do you have, if you're not

24  employed?

25    A.    I have a disability annuity and Social

1  privacy.  I don't see why you need to know who my

2  insurance carrier is.

3  BY MS. FITZGERALD:

4     Q.    Well, I think it's important to know -- first

5  of all, you're claiming that you're entitled to damages

6  for expenses relative to your medical condition as a

7  part of this lawsuit.

8           The United States is entitled to know exactly

9  what you've paid for as a result of your alleged medical

10  condition and for which you claim the United States is

11  responsible.

12     A.    My insurance company covered my power chair a

13  hundred percent.

14     Q.    All right.  And what was the cost of your

15  power chair, if you know?

16     A.    Approximately $4,000.

17     Q.    And is your insurance company Medicare; are

18  you a Medicare or Medicaid recipient?

19     A.    No.

20     Q.    Do you have insurance as part of your

21  disability retirement package?

22     A.    Yes.

23     Q.    And is there a specific carrier that you're

24  insured under?

25     A.    Carrier.

38

1     Q.    Ms. Moralez, I believe before the break you

2   were telling me about Mr. Luevano's offer to purchase

3   you a power chair.

4         Is that correct; did he make that offer?

5     A.    Yes.

6     Q.    What was your response?

7     A.    I said, "Not at this time."

8     Q.    Did you have any other discussions with --

9   well, actually, let me back up.  I'm sorry.

10        Why did you tell him, "Not at this time"?

11    A.    I didn't feel I needed it then.

12    Q.    Why didn't you feel you needed it?

13    A.    I was able to get around.  I was able to walk.

14  It was difficult, but I was able to walk.

15    Q.    Were you using a cane at all at that time?

16    A.    What time?  I'm sorry.  Can you tell me when

17  you're referring to?

18    Q.    I'm referring to the time when Mr. Luevano

19  made the offer to purchase you a power chair.

20    A.    I don't believe I was using a cane, no.

21    Q.    And your response to him was, "Not at this

22  time"; is that correct?

23    A.    Yes.

24    Q.    Did you anticipate that, at some time in the

25  future, you'd require a power chair?

40

1       A.      Just call them up on the phone, schedule a

2    time, and ask them questions over the phone.

3       Q.      Were you able to interview witnesses in person

4    from home?

5       A.      No.

6       Q.      Any other types of work you did at home?

7       A.      Well, any business I needed to conduct over

8    the phone I did at home.  Talking with contractors,

9    making appointments.

10      Q.      Were you able to schedule on-site visits from

11   home?

12      A.      Yes.

13      Q.      So if I understood you correctly, from in or

14   about 2001 to June of 2004, you were working at home

15   three or four days a week?

16      A.      Approximately, yes.

17      Q.      And then how many days were you in the office

18   then; one or two days a week you were in the office?

19      A.      Yes.

20      Q.      How many days a week were you on-site?

21      A.      It varied.

22      Q.      Were there periods of time when you were

23   on-site for several days at a time?

24      A.      Yes.

25      Q.      How often did that happen?

43

1        I go, "Yes, you did."

2        In June of 2004 I reminded her of the incident

3    with the elevator.  And she had conveniently forgotten

4    that.

5        So she threatened to write me up, to write me

6    a memorandum.

7    Q.    For what?

8    A.    For usage of my leave.  And I told her, "You

9    can't write me up for that because it's protected leave

10   that I'm using."

11   Q.    Mm-hmm.

12   A.    She didn't like that at all.

13   Q.    Did she write you up?

14   A.    No.

15   Q.    Were you able to use FMLA leave?

16   A.    Yes.

17   Q.    How much FMLA leave did you take?

18   A.    I don't remember.

19   Q.    In 2005, do you recall how much you took?

20   A.    I don't remember.  All leave that was -- that

21   I took was FMLA-related.

22   Q.    Was there ever a time when the department

23   denied your request for FMLA leave?

24   A.    No.

25   Q.    In March of 2005, I think you've already

1    testified that you requested accommodation; is that

2    correct?

3         A.    Yes.

4         Q.    What accommodations exactly did you request at

5    that time?

6         A.    I asked to be provided with a motorized

7    scooter and the ability to work at home two or three

8    times a week.

9         Q.    How did you intend to use a motorized scooter?

10        A.    I would use it instead of walking.

11        Q.    Would you use it to -- I guess what I'm not

12   clear on is you would keep the scooter at the office;

13   was that the intention?

14        A.    Yes.

15        Q.    And how would you use the scooter when you --

16   you would drive to work?

17             How would you normally get to work?

18        A.    I just planned on using the scooter just for

19   my work and leaving it there.

20        Q.    And you would use it just around the office?

21        A.    (Witness nods head.)

22        Q.    Would you use it on-site as well?

23        A.    That's what I was thinking.

24        Q.    How did you propose to get the scooter to an

25   on-site visit?

1    Q.    So it was either sick leave or annual leave?

2    A.    Or credit time.

3    Q.    But you never had to go on leave without pay.

4    A.    Not until I was -- when I had to leave my job.

5    Q.    Now, you mentioned the request -- or the

6    response from the Department of Labor in May of '05

7    referenced a request for more medical information.

8    A.    Yes.

9    Q.    And did they refer to a medical release --

10   A.    Yes.

11   Q.    -- in that?

12         Did you fill out that release?

13   A.    No.

14   Q.    Why not?

15   A.    Well, first, when they gave me the memo, they

16   said a medical release was attached, and there was

17   nothing attached.  So I wrote -- I believe I wrote an

18   e-mail to Trent Williams and told him, "You gave me this

19   memo, but there's no medical release attached."

20         And I don't think I got the medical release

21   until like a month after that.  And when I read the

22   medical release, I was very, very concerned because it

23   seemed like it really invaded my privacy and gave the

24   agency the ability to get my medical chart from my

25   doctor and just look at it all.

89

1            And I felt that that really invaded my

2    privacy.  I didn't sign it because I felt it was

3    invasive, and I felt that I had already provided them

4    enough information regarding the fact that I was

5    disabled.

6            The medical documentation said that I had

7    severe degeneration of my knees, ankles and other

8    joints.  I thought that was very clear and confirmed the

9    fact that I had rheumatoid arthritis.

10           And my joints were affected, my knees were

11   affected.  And I felt that it was very clear that I was

12   having difficulty walking, standing, getting up from the

13   sitting position.

14           My coworkers would look at me, and I think,

15   you know, it was clear that, you know, I was having a

16   lot of trouble.  And so I felt that they had enough

17   information.

18   Q.    Did you tell Mr. Trent Williams that you

19   weren't going to sign the release?

20   A.    No, I didn't tell him that.

21   Q.    Did you tell Mr. Smitherman that you weren't

22   going to sign the release?

23   A.    No.

24   Q.    How did you communicate with the department

25   that you weren't going to sign the release?

90

A.    I had discussions with Pam Gibbs.

Q.    What did you tell Ms. Gibbs?

A.    I told her that I didn't understand why they wanted me to sign that medical release.  I told her that I felt it invaded my privacy.  I told her that I felt that it was pretty clear that I needed reasonable accommodation, and I felt that I had let the agency know what I needed and why I needed it.

And I told her that I felt that I had already provided medical documentation that supported my need for reasonable accommodation.

Q.    What did she say?

A.    She told me that it wasn't clear.

Q.    What wasn't clear?

A.    It wasn't clear what I needed and why I needed it and that -- she told me that the medical documentation didn't address the questions that they had.

Q.    The documentation you had submitted?

A.    Right.

Q.    And what was your response to that?

A.    I told her I didn't agree.  And I told her that -- I told her that I didn't think it was right.  I reminded her what OFCCP did.  And I felt -- I told her that I felt that I was being harassed and mistreated

1    Q.    Did you ever talk to Mr. Smitherman about your

2    accommodation request?

3    A.    Yes.

4    Q.    What conversations did you have with him about

5    your accommodation request?

6    A.    They were at the mediation, at a mediation.

7    Q.    Tell me, other than the mediation, did you

8    have any other communications with him about your

9    accommodation request?

10    A.    About my accommodation request, no, I don't

11    think so.

12    Q.    About your disability, your rheumatoid

13    arthritis, did you ever discuss that with him?

14    A.    Yes.

15    Q.    What discussions did you have with

16    Mr. Smitherman about your rheumatoid arthritis?

17    A.    I talked with him -- after Sarah Nelson

18    counseled me on my leave usage, and I informed her that

19    I was disabled, and I felt it was improper and that the

20    leave was protected under medical leave, she also

21    counseled another coworker that I represented, Gregory

22    Hunt.  And he had asked for reasonable accommodation.

23        So after she counseled me and she counseled

24    Gregory Hunt, she actually wrote Gregory Hunt up.  And

25    we grieved that, and we won that.  And she had to

99

STATE OF CALIFORNIA                                )ss.

                                                   )

CITY OF COUNTY OF SAN FRANCISCO                    )

          I hereby certify that the witness in the

foregoing deposition, FRANCISCA MORALEZ, was by me duly

sworn to testify to the truth, the whole truth and

nothing but the truth, in the within-entitled cause;

that said deposition was taken at the time and place

herein named; that the deposition is a true record of

the witness' testimony as reported by me, a duly

Certified Shorthand Reporter and disinterested person,

and was thereafter transcribed into typewriting by

computer.

          I further certify that I am not interested in

the outcome of said action nor connected with, nor

related to, any of the parties in said action, nor to

their respective counsel.

          IN WITNESS WHEREOF, I have hereunto set my

hand this 4th day of February, 2008.


          _____

          SUZANNE I. ANDRADE, CSR 10682

          STATE OF CALIFORNIA

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3

4    - - - - - - - - - - - - - - - - - -

5    FRANCISCA MORALEZ,                    )

6                   Plaintiff,             )

7    v.                                    )   CASE NO.

8    ELAINE L. CHAO, SECRETARY OF THE )   C073807 EDL

9    U.S. DEPARTMENT OF LABOR; U.S.    )

10   DEPARTMENT OF LABOR, EMPLOYMENT   )

11   STANDARDS ADMINISTRATION,         )

12                   Defendants.           )

13   - - - - - - - - - - - - - - - - - -

14

15

16          DEPOSITION OF FRANCISCA M. MORALEZ

17             THURSDAY, JANUARY 31, 2008

18             PAGES 127 - 217; VOLUME 2

19

20

21          BEHMKE REPORTING & VIDEO SERVICES

22          BY:  ANNA STEINERT, CSR NO. 11202

23              160 SPEAR STREET, SUITE 300

24         SAN FRANCISCO, CALIFORNIA 94105

25                      (415) 597-5600

1          A.    A wonderful law school called University

2    of Wisconsin.

3          Q.    Are you a member of any Bar?

4          A.    Yes, I am.

5          Q.    Which one is that?

6          A.    The State Bar of Wisconsin.

7          Q.    Are you a member of the California Bar?

8          A.    No, I'm not.

9          Q.    Did you ever sit for the Bar exam in

10   Wisconsin?

11         A.    It's a mandatory Bar.  You're not

12   required to take the Bar exam.

13         Q.    So you don't sit for the Bar?

14         A.    No.  If you graduate from the University

15   of Wisconsin Law School, you're an automatic member

16   of the Bar.  You have mandatory fees.

17         Q.    And it was in 1994 that you were admitted

18   to the Bar?

19         A.    Yes, I believe so.  I'm pretty sure it

20   was '94.

21         Q.    I believe you testified earlier that

22   you're not working now.

23         A.    That's correct.

24         Q.    What income do you have then?

25         A.    I have a disability annuity through my

BEHMKE REPORTING & VIDEO SERVICES
(415) 597-5600

1    STATE OF CALIFORNIA        )   ss.

2    COUNTY OF CONTRA COSTA )

3

4         I hereby certify that the witness in the

5    foregoing deposition, FRANCISCA MORALEZ, was duly

6    sworn to testify to the truth, the whole truth, and

7    nothing but the truth in the within-entitled cause;

8    that said deposition was taken at the time and place

9    herein named; that the deposition is a true record of

10   the witness' testimony as reported by me, a duly

11   certified shorthand reporter and a disinterested

12   person, and was thereafter transcribed into

13   typewriting by computer.

14        I further certify that I am not interested

15   in the outcome of the said action nor connected with

16   nor related to any of the parties in said action, nor

17   to their respective counsel.

18        IN WITNESS WHEREOF, I have hereunto set my

19   hand this 11th day of February, 2008.

20

21

22

23        ANNA STEINERT, CSR 11202

24        STATE OF CALIFORNIA

25

217

Exhibit C

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4                      ---oOo---

5   FRANCISCA MORALEZ,

6        Plaintiff,

7   vs.                          No. CV 07-3807(EDL)

8   ELAINE L. CHAO, SECRETARY OF
    THE UNITED STATES DEPARTMENT
9   OF LABOR; UNITED STATES
    DEPARTMENT OF LABOR EMPLOYMENT
10  STANDARDS ADMINISTRATION,

11       Defendants.
    _____/

12

13

14

15          DEPOSITION OF WILLIAM SMITHERMAN

16

17

18

19          Taken before MARK CHILDRESS

20               CSR No. 7773

21             January 25, 2008

22

23

24                                 One Kaiser Plaza, Suite 505
                                   Oakland, California 94612
25                                 510/451-1580  Fax 510/451-3797

                                   Certified Shorthand Reporters

Aiken
AND
Welch

COPY

1          A.  It would have been on a daily basis whenever

2     she and I were in the office together possibly.

3          Q.  Did you ever have occasion to work with her on

4     any compliance issues?

5          A.  I reviewed her work on one or two occasions,

6     yes.

7          Q.  Were you her supervisor or her second-level

8     supervisor?

9          A.  I was her second-level supervisor as district

10    director, acting district director.

11         Q.  Did you ever participate in any evaluation of

12    her performance?

13         A.  Explain participation.

14         Q.  Did you ever review and sign off approval or

15    disapproval of a written evaluation of her performance?

16         A.  As acting, I would have.  If I did -- If my

17    signature is on her performance evaluation, then I would

18    have done that.

19         Q.  Do you specifically recall that you have?

20         A.  I'd have to see it.  If I was there and a

21    performance came up and my name is there, then I did.

22         Q.  Well, did you have occasion to know how well

23    she performed?

24         A.  Some, yes.

25         Q.  So could you tell me specifically what

1        Q.  Had you had any discussions with anyone from

2    OFCCP prior to March 28, 2005 about Francisca Moralez's

3    disability?

4        A.  Prior to?  I don't recall.  I may have, I could

5    have, but I don't recall.

6        Q.  Do you ever remember an incident in around 2002

7    when you were working in Oakland and Francisca Moralez

8    herself asked you to raise her desk as a reasonable

9    accommodation?

10       A.  Yes.

11       Q.  Did she ask that verbally?

12       A.  Yes.

13       Q.  Did you have any discussion with her about why

14   she wished to have her desk raised?

15       A.  As I recall, when we talked about it, she said

16   she was having difficulty working on her desk and doing

17   her work and she asked if something could be done about

18   raising her desk and other areas.  And I think she and I

19   or either -- I followed her out of the office and went

20   and looked at her work station.

21           I think some of the conversation we had about

22   her being able to work at her desk centered around some

23   other things that she wanted us to consider.  And it had

24   to do, I guess, with something maybe with the keyboard

25   or whatever else it was.

1          Because I remember now when I walked in her

2    office, in her desk area, cubicle more specifically, I

3    made the remark that -- and we laughed and chuckled --

4    how do you find anything in here?  Because it was full

5    of papers, cases that she had been working on I guess.

6          Q.  When she worked in this cubicle, did she work

7    sitting in a wheelchair?

8          A.  She probably did.  At some point in time, yeah.

9          Q.  At that point when you were both working in

10   Oakland in around 2002, did she have a wheelchair?

11         A.  She may have, she may have been working from

12   her wheelchair.

13         Q.  Do you recall any other discussion prior to

14   March 28, 2005 with regard to Francisca Moralez's

15   ability to work given her physical condition?

16         A.  State that again.

17         MR. SORGEN:  Could you read that back, please?

18               (Record read.)

19         THE WITNESS:  We may have talked about maybe

20   her difficulty in doing something on a particular day,

21   just casual conversation, or she might have talked to me

22   about something.  I don't recall any specific time

23   during that time that we did.

24   BY MR. SORGEN:

25         Q.  So other than raising her desk, do you recall

1    any request for reasonable accommodation that she made

2    prior to March 28, 2005?

3        A.  I don't recall.

4        Q.  Do you recall her ever telling you about any

5    difficulties she was having moving around the office?

6        A.  Oh, yes.

7        Q.  She told you directly that she was having some

8    difficulty moving around the office?

9        A.  Yeah.

10       Q.  On how many occasions before March 28, 2005?

11       A.  I don't know.  Maybe once.  At least once.

12       Q.  Okay.  So when you received this letter, did

13   you take any steps to help her get her desk raised?

14       A.  Definitely.

15       Q.  So she did in fact get her desk raised?

16       A.  Yes.

17       Q.  Do you remember anything else that was done for

18   her as a reasonable accommodation before March 28, 2005?

19       A.  Is that when the desk was raised?

20       Q.  Well, sometime prior to March 28, 2005, which

21   is the date of this letter, Exhibit 1.

22       A.  Yeah, but is that during the time that the desk

23   was raised?  At that time, do you know when that was?

24       Q.  Well, I thought that we had established it was

25   at a time when you and Francisca Moralez were both

1    it.

2    Q.  Do you recall what your discussion was?

3    A.  I asked Roz what was the procedure in making

4    this accommodation, because I had never done this

5    before, for a mechanized, motorized chair or a scooter,

6    and I said, "I'm not sure exactly what we do in this

7    case."

8    And her counsel was that we would have to

9    obtain information from her doctor, something like about

10   her disability.

11   Q.  So you recall you spoke with Roz Itelson on the

12   telephone about that?

13   A.  Yes.

14   Q.  Do you recall anybody else with whom you

15   discussed Francisca's request for an electric scooter?

16   A.  Pam Gibbs.

17   Q.  Who is Pam Gibbs?

18   A.  Pam Gibbs is the CRC representative in the

19   national office.

20   Q.  CRC, can you explain that, please?

21   A.  Yes.  It's another acronym that escapes me.

22   Q.  Civil Rights something?

23   A.  Yes.

24   Q.  Committee on Civil Rights or something like

25   that?

1    Q.  Did you ever tell Francisca Moralez that now

2  that you had the doctor's letter you'd go back to

3  Washington and see if that was sufficient?

4    A.  I could have said something like that, but not

5  those exact words.  I would have indicated to her,

6  "Based on what you've provided to me, I still can't make

7  a decision, and I'll pass this on," something like that

8  probably.

9    Q.  But I think you testified before that in your

10  position you did have the authority to make the decision

11  to grant her the reasonable accommodation.

12    A.  I also tagged with that based upon conclusions,

13  recommendations, concurrence, counsel with other

14  individuals who were professional experts in determining

15  whether or not this individual could be accommodated.

16    Q.  I think you testified that you were not under

17  any instruction from Washington to deny reasonable

18  accommodation unless it's approved by someone in

19  Washington.  Isn't that right?

20    A.  No.  What you just said back to me is not what

21  you asked me before.

22    Q.  Okay.  Were you under any such instruction from

23  Washington to deny reasonable accommodation unless they

24  approved it over there?

25    A.  No.  They never said deny anything.  Washington

1    said to me and to whomever else, on overseer of contact,

2    that we will look at the matter, we will weigh the

3    matter, we will pass it on to our medical experts, we

4    will look at these things, we will make a determination

5    and we will get back with you.

6              MR. SORGEN:  Okay.  Let's mark as Exhibit 11

7    two pages, 1404 to 1405.

8                   (Plaintiff's Exhibit 11 was marked for

9                    identification.)

10             MS. FITZGERALD:  Michael, are we going to stop

11   at 3:00 o'clock?

12             MR. SORGEN:  Yeah.  Maybe we should do that

13   right now.

14                   (Recess taken.)

15   BY MR. SORGEN:

16        Q.  We've already marked Exhibit 11?

17        A.  Yes, we have.

18        Q.  And so you remember this letter, sir, from

19   Francisca, September 9, 2005?

20        A.  I can't say.  I probably got it from her.  I

21   just can't say.  It looks new to me.  I'm reading it

22   like a new document now.

23        Q.  Do you remember getting a typewritten version

24   of the letter from Marcey Shapiro?

25        A.  That is this one?

147

1    STATE OF CALIFORNIA      )

2                             )

3    COUNTY OF ALAMEDA        )

4

5        I, MARK CHILDRESS, do hereby certify:

6        That WILLIAM SMITHERMAN, in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time and

9    place therein specified;

10       That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and

14   that the foregoing transcript constitutes a full, true

15   and correct report of said deposition and of the

16   proceedings that took place;

17       IN WITNESS WHEREOF, I have hereunder subscribed my

18   hand this 5th day of February 2008.

19

20

21

22

23

24       MARK CHILDRESS, CSR No. 7773
         State of California

25

Aiken & Welch Reporters    William Smitherman 1/25/08