Michael S. Sorgen (State Bar No. 43107)
Joyce Kawahata (State Bar No. 113159)
LAW OFFICES OF MICHAEL S. SORGEN
240 Stockton Street, 9th Floor
San Francisco, CA 94108
Telephone:    (415) 956-1360
Facsimile:    (415) 956-6342

Attorney for Plaintiff
FRANCISCA MORALEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCA MORALEZ, | Case No.: C 07-3807 (EDL) |
| Plaintiff, | |
| vs. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| ELAINE L. CHAO, SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR, EMPLOYMENT STANDARDS ADMINISTRATION | Date: October 10, 2008 Time: 2 p.m. Courtroom: E, 15th Floor |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.  PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  DEFENDANT NOT ONLY REFUSED TO REASONABLY ACCOMMODATE
      PLAINTIFF'S DISABILITY, BUT CREATED AND MAINTAINED A WORK
      ENVIRONMENT THAT WAS HOSTILE TO ALL DISABLED EMPLOYEES,
      COMPELLING HER CONSTRUCTIVE DISCHARGE . . . . . . . . . . . . . . . . . . . . . . . 9

      A.      By Erecting Insurmountable Bureaucratic Barriers, Defendant Refused
              to Provide Accommodation to Facilitate Plaintiff's Continued Employment. . . . 9

      B.      Defendant Acted in Bad Faith, Unreasonably Delaying and Obstructing the
              Interactive Process and Refusing to Communicate With Plaintiff . . . . . . . . . . . 11

      C.      Defendant Cannot Show that Its Employment Decisions Were Made For
              Legitimate, Non-discriminatory Reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.      Pursuant to EEOC Guidelines, an Employer Cannot Ask for Medical
              Documentation If Both the Disability and the Need for Reasonable
              Accommodation Are Obvious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.  DEFENDANT CONSTRUCTIVELY DISCHARGED PLAINTIFF BY EXACERBATING
     HER PHYSICAL DISABILITY AND BY CREATING AND MAINTAINING A
     HOSTILE WORK ENVIRONMENT THAT INFLICTED SEVERE EMOTIONAL
     DISTRESS, RENDERING HER UNABLE TO CONTINUE WORKING AND
     FORCING HER TO SECURE DISABILITY RETIREMENT BENEFITS. . . . . . . . . 14

V.  DEFENDANTS' FAILURE TO REASONABLY ACCOMMODATE PLAINTIFF WAS
    NOT A SINGLE INSTANCE BUT A SERIES OF FAILURES OVER THE COURSE
    OF SEVERAL YEARS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996) . . . . . . . . . . . . . . . . 11

*Benaugh v. Ohio Civil Rights Com'n*, 278 Fed.Appx. 501 (6th Cir. 2008) . . . . . . . . . . . . 19, 20

*Feliciano-Hill v. Principi*, 439 F.3d 31 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128 (9th Cir. 2001) . . . . . . . . . . . . . . . . 11

*Hurley-Bardige v. Brown*, 900 F. Supp. 567 (D. Mass. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kent v. Derwinski*, 790 F. Supp 1032 (E.D. Wash. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Mahon v. Crowell*, 295 F.3d 585 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Mitchell v. Vanderbilt University,* 389 F.3d 177 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 14

*Smith v. Henderson* 376 F.3d. 529 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 17, 18

## FEDERAL STATUTES

29 U.S.C. § 791 *et seq.* (Rehabilitation Act) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## FEDERAL REGULATIONS

29 C.F.R. §1630.2(o)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## OTHER AUTHORITIES

"Policy Guidance On Executive Order 13164: Establishing Procedures To Facilitate The Provision Of Reasonable Accommodation," Office of Legal Counsel, EEOC (October 20, 2000), *available at* http://www.eeoc.gov/policy/docs/accommodation_procedures.html.  . . . . 10, 12, 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I. PRELIMINARY STATEMENT

Francisca Moralez worked for the United States Department of Labor in the Office for Federal Contract Compliance Programs ("OFCCP") for nearly ten years, most recently as an Equal Opportunity Specialist in the Employment Standards Administration in Oakland, California. As such, Ms. Moralez was responsible for investigating discrimination complaints, conducting compliance evaluations, and providing compliance assistance to federal contractors. The OFCCP is the federal agency charged with ensuring that government contractors do not engage in employment discrimination. The tragic irony of this case is that Ms. Moralez herself was discriminated against based on her disability, rheumatoid arthritis, and that she is but one of several OFCCP employees currently suing the agency for disability discrimination. The defendant repeatedly delayed and ultimately denied Ms. Moralez' requests for reasonable accommodation, thereby rendering it increasingly difficult for her to perform the essential functions of her job until she was compelled to apply for and secure a disability retirement effective September 2006.

## II. STATEMENT OF DISPUTED AND UNDISPUTED FACTS

Francisca Moralez suffers from rheumatoid arthritis, an autoimmune disease, which has impacted all aspects of her life, including her ability to work. Ms. Moralez was first diagnosed with this disease in January of 2001, after a period of increasing difficulty walking and engaging in other normal activities. Declaration of Alberto Rocha. ¶ 3; Declaration of Francisca Moralez ¶ 2. Ms. Moralez began using two canes (see Moralez Dec. ¶ 18) and later a manual wheelchair to assist in her mobility. *Id.* at ¶ 34; Declaration of Marcey Shapiro ¶ 2. Due to the damage of her joints, particularly in her knees, but also in her ankles, feet, neck, shoulders, elbows, wrists, and fingers, Ms. Moralez was limited in any activity that required walking, bending, kneeling, sitting or standing for prolonged lengths, lifting or carrying. Moralez Dec., ¶ 24. These limitations directly affected Ms. Moralez' ability to function at work without accommodation. (See Exhibits to Shapiro Dec. and Moralez Dec.)

The progression of Ms. Moralez's disease did not go unnoticed at work. This is

1  unsurprising since her office is full of experts in the area of disability discrimination. (See, *e.g.*,

2  Exhibit 2 to the Declaration of Michael Sorgen, Smitherman Dep., 48-49; 10-15.)  As early as

3  December 2000, Angel Luevano, then District Director, offered Ms. Moralez accommodation

4  after noticing the difficulty she had moving around the office.  Moralez Dec. ¶ 2.  Ms. Moralez

5  began working from home two or three days per week, and continued to do so on a regular basis

6  until June 2004.[1]  Beginning in February of 2002, Ms. Moralez was provided with an automatic

7  stapler and three hole punch due to pain in her wrists, fingers, elbows, and shoulders. She was

8  also permitted to keep her work laptop at home, assigned cases closer to home to minimize

9  driving time, and provided other accommodations such as improved ergonomics of her

10  workstation, pushing her in her wheelchair and permitting her to work from home part time.

11  Rocha Dec., ¶ 3, 5 and 13, Moralez Dec., ¶ 15, 48.

12      Notably, Ms. Moralez was not required to submit medical documentation for these early

13  accommodations because her disabling conditions were obvious, as were the positive effects that

14  accommodation would have in enabling her to continue her good job performance. (Sorgen Dec.,

15  Exh. 2: Smitherman Depo., 25-26, 29:8-30:3, 95, 106:6-17; Rocha Dec.  ¶ 3-9, 13) As Ms.

16  Moralez's physical condition worsened, she informed her supervisors of her condition and

17  requested that her desk be raised to the correct ergonomic height for her use while sitting in an

18  office chair.  However, this request was not accommodated until a year later, and only after Ms.

19  Moralez filed a union grievance. (Moralez Dec., ¶ 10, Sorgen Dec., Exh. 2, Smitherman Depo.

20  34:6-35:12, 40:3-10.)

21      By March of 2005, Ms. Moralez required additional reasonable accommodation in order

22  to continue working.  On March 14, 2005, with the encouragement of her supervisor Dr. Rocha,

23  Ms. Moralez submitted a notice of intent to utilize leave under the Family Medical Leave Act.

24  Moralez Dec. ¶ 20 and Exh.1.   In a "Certification of Health Care Provider" form attached to

---

[1] After June of 2004, Ms. Moralez was only allowed to work from home sporadically because Sarah Nelson, the new Assistant Regional Director, instructed her immediate supervisor, Dr. Alberto Rocha, to no longer permit Ms. Moralez to work at home.  Rocha Dec. ¶ 5; Moralez Dec. ¶ 15.

that document, Ms. Moralez' physician indicated that Ms. Moralez did not require "ongoing

absence" but had times of intense flare-ups and would not be able to work "during [such] periods

of incapacity." Declaration of Dr. Marcy Shapiro ¶ 3, Exh. 1. Dr. Rocha believed that utilizing

this leave would facilitate Ms. Moralez' job performance in an environment where the Acting

District Director and higher level managers were known to be hostile toward people with

disabilities. (See Rocha Dec. ¶ 6-7, 9, 11, 15; see entire Declaration of Francisca Moralez.)

Shortly thereafter, Ms. Moralez mailed a formal, written request for reasonable

accommodation under the Federal Rehabilitation Act to William Smitherman, then Deputy

Regional Director of the OFCCP. Moralez Dec., ¶ 21-24 and Exh. 2 (March 28, 2005 letter to

William Smitherman). In her letter, Ms. Moralez expressly invited Mr. Smitherman to engage in

a productive dialogue about alternative ways she might be accommodated at work. Moralez

Dec., Exh. 2. Specifically, Ms. Moralez asked for various forms of reasonable accommodation,

notably:

(1)     a motorized scooter when her disability worsened so that she could not

comfortably ambulate. Her second level supervisor Angel Luevano had offered a motorized

scooter some years before, but Ms. Moralez had declined it at that point, not wanting to

unnecessarily burden the Agency;

(2)     to be allowed to work from home several days a week as she had successfully had

in the past; and

(3)     to be relieved of assignments where there was no elevator as she could not climb

stairs without assistance.

The requests above were set forth in the March 28, 2005 letter that she addressed to Mr.

Smitherman (see Moralez Dec. Exh. 2) or by direct request to Sarah Nelson. Moralez Dec. ¶ 13.

However, in stark contrast to the interactions with her direct supervisors when Ms. Moralez first

became disabled, these requests were met only with bureaucratic stonewalling. Sorgen Dec.,

Exh. 1; Moralez Dec., ¶ 25-50. All of these requests were either denied outright or not

processed and accommodated in a timely manner. As she made additional requests for

accommodation, OFCCP not only failed to take action but revoked or refused accommodation

1   she had in the past.  Over a year later, OFCCP had still not accommodated Ms. Moralez'

2   requests, justifying its delay and inaction by insisting that the "experts" in Washington review the

3   request.  *Id.* ¶ 27; Sorgen Dec. Exh. 2 pp. 97-100.  Thus she was still suffering extreme and

4   increasing physical discomfort 18 months later, from no longer being allowed to work from

5   home, from having to ambulate with a manual wheelchair, and from the unremitting harassment,

6   hostility and humiliation she faced in the workplace.  Moralez Dec., ¶ 37-43, 46-8.

7           Ms. Moralez' direct supervisor, Dr. Rocha, could and would have supported Ms.

8   Moralez' request, but he was intentionally "kept out of the loop," with regard to accommodating

9   Ms. Moralez' needs.  (Rocha Dec., ¶ 6 )  Indeed, when questioned at his deposition, Mr.

10  Smitherman had little recollection of the March 28 letter, or of discussing it with anyone,

11  including Dr. Rocha. (Sorgen Dec. Exh. 2, 30:10-25, 33:10-34:5.)

12          Ms. Moralez' disability and her need for accommodation were obvious to everyone

13  around her at work, including those individuals in the organization who were authorized to make

14  decisions about and provide reasonable accommodations.  (See, *e.g.*, Rocha Dec., ¶ 3-4.)  Mr.

15  Smitherman testified that he made the final determination on requests for reasonable

16  accommodation. (Sorgen Dec. Exh. 2, 76:19-77:1, 98:18-24.)  He admits that Ms. Moralez had

17  informed him that she suffered from "severe arthritis," and he knew that "some days she has

18  good days and some days she has bad days." (*Id.* at 29:25, 30:2-3.)  In response to the question

19  of whether he had "any doubts as of March 28, 2005 [the date of the written request for

20  reasonable accommodations] that Francisca Moralez was an individual with a disability," Mr.

21  Smitherman testified, "Based on our conversations of her having arthritis, no." (*Id.* at 50:22 -

22  51:1.)

23          In Mr. Smitherman's opinion, both her disability and her need for reasonable

24  accommodation were obvious at that time (*id.* at 73:6-12, 106:15-17), stating, "I'm sure [a

25  motorized scooter] would have been of use to [Ms. Moralez] in moving around the office and

26  getting from one place to another."  Yet he considered it a "specialized request" that he should

27  refer to higher-ups for consideration.  (*Id.* at 97-100.)  Mr. Smitherman also recognized that

28  working at home even several days per week was common practice in the agency (*id.* at 58:18-

1   60:10), and that "flexi-place" was so appropriate as to be included within the collective

2   bargaining agreement *(id.* at 91-92). But instead of engaging in the required "interactive

3   process," Mr. Smitherman conspired with high level management "experts" to find an excuse to

4   stall decision-making and unreasonably to require Ms. Moralez to provide additional medical

5   documentation for what was an obvious ongoing disability. *Id.* at 62-64, 106-07; Exh. 1 to

6   Sorgen Dec. (email messages dated March 30-April 1.) Though Ms. Moralez believed it was

7   unnecessary (Moralez Dec. ¶ 28-29), she did provide the requested documentation. (Exhibits 2-3

8   to Dec. of Dr. Shapiro.) Ms. Moralez first provided a handwritten letter *(id.),* but when Mr.

9   Smitherman complained that he could not read it (though it was quite legible) and that it lacked a

10  signature (though it was on the doctor's office letterhead), Ms. Moralez provided a typewritten,

11  signed version of the letter. *(Id.;* Moralez Dec. ¶ 36 and Exh. 4.)

12         Mr. Smitherman has since disclaimed responsibility or even any recollection of Ms.

13  Moralez' letter to him. (Sorgen Dec. Exh. 2 at 30:10-25, 33:10-34:5, 62-64, 134-135.) He also

14  failed to show up at the first internal EEO mediation without even notifying Ms. Moralez, and

15  stonewalled at the following mediation, which lasted all of ten minutes. *(Id.* at 117-120; Moralez

16  Dec. ¶ 35-36.) Defendants purposefully kept Ms. Moralez' only advocate, Dr. Rocha, "out of

17  the loop." (Rocha Dec. ¶ 6.) Defendants' ultimate failure to engage in an interactive process was

18  the May 3, 2005 deferral/denial from Trent Williams, Acting District Director. (Moralez Dec. ¶

19  27 and Exhibit 3.)

20         Moreover, Director Sarah Nelson, Ms. Moralez' then supervisor, refused to relieve Ms.

21  Moralez of her work assignment at a site that did not have an elevator (itself a violation of the

22  ADA), which forced Ms. Moralez to ask her fellow employees to help her up and down the

23  stairs. Moralez Dec. ¶ 13. This dramatically evidences OFCCP supervisors' and managers'

24  hostility towards people with disabilities. Ms. Moralez consistently received good performance

25  evaluations. *Id.* ¶ 40, Rocha Dec. ¶ 2. Plaintiff has presented sufficient evidence of the

26  unrelenting and egregious failure of the OFCCP managers to act in good faith, to engage in a

27  meaningful interactive process and to respond to her need for reasonable accommodation for her

28  disability. Moralez Dec. *passim.* These repeated failures caused Ms. Moralez extreme mental

1    distress, depression, insomnia, anxiety, and exacerbation of the physical symptoms of her

2    disability.  Moralez Dec. *passim*; Sorgen Dec. Exhs. 3 and 4; Shapiro Dec., Exh. 4 and ¶ 5.

3    Consequently, she was forced to apply for disability retirement in September 2006.

4         Ms. Moralez' rheumatoid arthritis was further aggravated by defendant's conscious

5    disregard of said condition, which led to several secondary issues which also impacted Ms.

6    Moralez' work.  She frequently missed work, sometimes to go to medical appointments, but

7    more often simply because she could not physically endure the pain that continued to increase as

8    she could not obtain the requested accommodation.  Depression, anxiety, and sleep deprivation,

9    stemming both from her arthritic pain and from defendant's insensitivity and callous treatment,

10   caused Ms. Moralez to become more forgetful, inattentive and disorganized when she was at

11   work.  (See May 17, 2006 Letter of Marcey Shapiro, M.D., Exh. 4 to Shapiro Dec. and the

12   March 17, 2008, Clinical Summary by Ms. Moralez' treating therapist, Gail Hunt, Exh. 3 to

13   Sorgen Dec.)  Ms. Hunt corroborated the above statements based on weekly therapy sessions

14   commencing in February 2006 and a series of "Beck" and "DASS" tests that monitored stress

15   and anxiety levels throughout 2006 and 2007.  (*Id.* at pp. 5-8.)

16        Ms. Hunt came to the conclusion Ms. Moralez "suffered extreme emotional distress"

17   during the time that she was employed by OFCCP at the ODO.  (Sorgen Dec. Ex. 4, pp. 30:8-

18   31:3.)  In Ms. Hunt's expert opinion, defendant treated Ms. Moralez in a "very abusive" manner,

19   "disregarded" and "disrespected" her, and created and maintained a "hostile work environment."

20   (*Id.* at pp. 30-41.)   In February of 2006, Ms. Moralez was suffering from "extreme" depression,

21   "which was brought on by what was happening at work."  (Sorgen Dec. Exh. 4, pp. 120:23-4;

22   Sorgen Dec. Exh. 3, at 5.)  However, in the period after Ms. Moralez left the workplace, Ms.

23   Hunt observed a dramatic decline in the severity of Ms. Moralez's condition.  (*Id.* at pp. 118-

24   123; Sorgen Dec. Exh. 3, pp. 5-9.)

25        By October 2007, while Ms. Moralez was still experiencing symptoms, those symptoms

26   had declined to a level of "borderline," a much lower level according to generally accepted tests

27   in the field.  (Sorgen Dec. Exh. 4, pp. 121:18-23; Sorgen Dec. Exh. 3, pp. 5-8.)  In her clinical

28   summary of Ms. Moralez, Ms. Hunt states that,

1

2

3

4

5

> These changes [the decline in severity of Ms. Moralez's stress, anxiety, and depression levels] are greater than one can usually expect from psychotherapy alone, particularly when testing done multiple times in the previous four months remained in the same range (*Extreme and Severely Extreme*.)  The fact that Ms. Moralez's scores did not drop more than a few points in the first three months of psychotherapy is an indication, in this clinician's experience, that the stressor lays outside of the client's control.  Given that the only significant change between April and June of 2006 was the change in employment status, the drop in scores is attributed to that.

6    (Sorgen Dec. Ex. 3 at 7.)  (Emphasis in original.)  Ms. Hunt also notes that Ms. Moralez appears

7    to have accepted her rheumatoid arthritis without complaining about it and "works hard to make

8    the best of her life." (*Id.* at 8.)

9

10

11

12

**III.  DEFENDANT NOT ONLY REFUSED TO REASONABLY ACCOMMODATE PLAINTIFF'S DISABILITY, BUT CREATED AND MAINTAINED A WORK ENVIRONMENT THAT WAS HOSTILE TO ALL DISABLED EMPLOYEES, COMPELLING HER CONSTRUCTIVE DISCHARGE**

13    It is undisputed that Francisca Moralez is disabled in that her rheumatoid arthritis is a

14   physical impairment that substantially limits her ability to perform major life activities, including,

15   but not limited to, working, walking, and performing manual tasks.  After nearly ten years of good

16   performance at the OFCCP, Ms. Moralez demonstrated that she was qualified for her position and

17   was willing and able to perform the essential functions of her job and that defendants could have

18   provided reasonable accommodation without any undue burden.

19

20

**A.    By Erecting Insurmountable Bureaucratic Barriers, Defendant Refused to Provide Accommodation to Facilitate Plaintiff's Continued Employment**.

21    "Each agency is strongly encouraged to implement practices that will *reduce*

22   *bureaucratic barriers* that could make it difficult for individual offices to provided effective

23   accommodations."[2]  These principles are illustrated in two recent cases.  In reversing summary

24   ─────────────────

25

26

27

28

[2] "Policy Guidance On Executive Order 13164: Establishing Procedures To Facilitate The Provision Of Reasonable Accommodation," Office of Legal Counsel, EEOC (October 20, 2000), *available at* http://www.eeoc.gov/policy/docs/accommodation_procedures.html (last visited September 15, 2008.)  (Hereinafter "Policy Guidance.").  This document, created by the EEOC Office of Legal Counsel, explains the requirements of EO 13164, which requires federal agencies to establish written procedures for processing requests for reasonable accommodation. The

Plaintiff's Memorandum in Opp. to D's MSJ

Case No. C073807 EDL                                  7

judgment in *Smith v. Henderson* 376 F.3d. 529 (6th Cir. 2004), the Court noted that the Postal Service had permitted plaintiff Smith's predecessor an accommodation that Smith had requested to alleviate the effects of her rheumatoid arthritis and that, therefore, the same could have been done for her without posing undue hardship. *Id.* at 537-538. In *Bremer v. Gutierrez*, a District of Columbia federal jury awarded $3 million, to Lisa Bremer, a federal lawyer at the Department of Commerce who had successfully worked at home two days a week to accommodate her multiple sclerosis. The Department revoked her accommodation without cause and was found to have violated the Rehabilitation Act on August 10, 2005. (D.D.C. Aug 10, 2005) (No. 103-1338).

Here, Ms. Moralez requested a motorized scooter to improve her mobility while at work, and reinstatement of her previously authorized flexible schedule to allow her to work from home. Moralez Dec. ¶ 24 and Exh. 2. Her immediate supervisor, Dr. Rocha, agreed that those accommodations were appropriate and would not be an undue hardship. Rocha Dec. ¶ 5. However, Ms. Moralez' supervisors were determined not to "set a precedent" of accommodating disabled employees. Sorgen Dec. Exh. 1. Moreover, contrary to EEOC guidelines, Ms. Moralez faced *increased* barriers to the implementation of these or alternative appropriate accommodations, as her repeated requests for accommodation were stonewalled by her supervisors. Moralez Dec., ¶ 20-36. Unlike the instant case, the Department of Commerce had approved and purchased a motorized scooter for *Bremer* in 1996. *Id.* As in this case, defendant in *Bremer* demanded medical documentation, despite knowing of the plaintiff's disability, before it would continue her telecommuting schedule. *Id.*

**B.    Defendant Acted in Bad Faith, Unreasonably Delaying and Obstructing the Interactive Process and Refusing to Communicate With Plaintiff**

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA [as well as the Rehabilitation Act] to engage in an

document is structured in a question-and-answer format, with frequently asked questions answered by the EEOC, which recommends the proper agency action.

1   interactive process with the employee to identify and implement appropriate reasonable

2   accommodations." *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137 (9th Cir.

3   2001) (quoting *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *vacated on*

4   *other grounds sub nom U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).)  The interactive

5   process required by law "should identify the precise limitations resulting from the disability and

6   potential reasonable accommodations that could overcome those limitations."  29 C.F.R.

7   §1630.2(o)(3).  "The interactive process requires communication and good-faith exploration of

8   possible accommodations between employers and individual employees, and neither side can

9   delay or obstruct the process.  *Id.*; *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130,

10  1135 (7th Cir. 1996) ("A party that obstructs or delays the interactive process is not acting in

11  good faith.  A party that fails to communicate, by way of invitation or response, may also be

12  acting in bad faith.")  "Employers, who fail to engage in the interactive process in good faith,

13  face liability for the remedies imposed by the statute if a reasonable accommodation would have

14  been possible." *Humphrey*, 239 F.3d at 1137-8.

15          Here, it cannot reasonably be disputed that defendant's managers were aware of Ms.

16  Moralez' condition, need and subsequent requests for accommodation.  Rocha Dec. ¶ 3; Sorgen

17  Dec. Exh. 2, 25-26, 29:8-30:3, 95, 106:6-17; Moralez Dec. ¶ 7-19.  As such, defendant was

18  required to engage in the good faith interactive process with Ms. Moralez.  However, defendant

19  unreasonably delayed and obstructed the interactive process for over a year, ignoring Ms.

20  Moralez' repeated requests for accommodation, unreasonably requiring Ms. Moralez to sign a

21  blanket medical release (in contravention of EEOC guidelines, discussed below), and ultimately

22  refusing Ms. Moralez's requests for reasonable accommodation.  (Moralez Dec. ¶ 27-36 and

23  Exh. 3.)  Defendant's managers repeatedly refused to communicate with Ms. Moralez regarding

24  her requests to engage in the interactive process, as even Ms. Moralez' simple requests to

25  discuss accommodations were ignored.  (Moralez Dec. ¶ 7-9, 25-26, 28-29, 34-37, 41-42.)

26  Although reasonable accommodation was clearly possible, defendant's managers unreasonably

27  delayed and obstructed the interactive process repeatedly before ultimately refusing

28

1    accommodation.

2        **C.    Defendant Cannot Show that Its Employment Decisions Were Made For Legitimate, Non-discriminatory Reasons.**

3

4        EEOC Guidelines indicate that agencies may "designate an office to oversee the agency's

5    reasonable accommodation process...[which] would develop expertise [about requests] and be a

6    resource for individuals with disabilities and agency decision makers." (*Policy Guidance*, *supra*.

7    See also *Exec.Order 11246* and Sorgen Dec., Exh. 2, 12-13.) The guidelines contemplate a

8    well-coordinated effort, which "imposes the fewest burdens on individuals with disabilities and

9    permits the most expeditious consideration and delivery of the reasonable accommodation."

10   (*Policy Guidance* at question 7.)[3] The Guidelines further indicate that while agencies "should

11   authorize first-line supervisors to approve requests for reasonable accommodations wherever

12   possible," agencies may also "designate a particular office to handle specialized requests." *Id.* at

13   questions 8, 9.[4]

14        The instant case represents an unacceptable departure from these guidelines. What is

15   even more frightening is that the OFCCP is an agency *directly charged with enforcing these*

16   *guidelines.* Ms. Moralez' periodic requests for accommodations had been met without much

17   difficulty during the early stages of her disability. But once she requested reinstatement of

18   "flexi-place" schedule and the previously offered motorized scooter, defendant began requiring

19   extra procedures and unnecessary medical documentation, claiming that it considered Ms.

20   Moralez' request for a motorized scooter both "specialized" and unprecedented. (Compare

21   Smitherman's deposition testimony at Sorgen Dec., Exh. 2, 97-100, with 106 where Mr.

22   Smitherman recognized the need for and benefits of a motorized scooter.) As in *Bremer, supra*,

23   defendant had no excuse for not continuing Ms. Moralez' ability to successfully work several

24

25   _____

26        [3]Quoted from the EEOC's response to Question 7 of the document, "Should Agency Procedures be Flexible?"

27

28        [4]Questions 8 and 9 of the Policy Guidance document ask who may approve requests for reasonable accommodation and who may process said requests.

1    days a week from home (*Id.* at pp. 58-60). Further, defendant could have, but failed to engage in

2    an interactive process to find a suitable alternative to providing a motorized scooter, on either a

3    temporary or permanent basis.

4        **D.    Pursuant to EEOC Guidelines, an Employer Cannot Ask for Medical
            Documentation If Both the Disability and the Need for Reasonable
5            Accommodation Are Obvious**

6

7        On July 6, 2000, President Clinton signed Executive Order 13164, which requires each

8    federal agency to establish written procedures for processing requests for reasonable

9    accommodation.  At the time of Ms. Moralez's March 28, 2005 request, she was not aware

10    whether the Department of Labor ("DOL") had written procedures, but the DOL follows the

11    EEOC enforcement guidance for reasonable accommodation and undue hardship under the

12    Americans with Disability Act ("ADA").  The EEOC Enforcement Guidance states in pertinent

13    part: "An employer cannot ask for documentation when: (1) both the disability and the need for

14    reasonable accommodation are obvious..." (*Policy Guidance* at Question 16.)[5]

15        There was abundant testimony that Ms. Moralez' disabilities and her need for

16    accommodation were obvious.  Mr. Smitherman, then Deputy Regional Director of the OFCCP,

17    even admitted that he was aware that Ms. Moralez' disability was sufficiently severe to impair her

18    mobility and that the requested accommodation would clearly have helped her.  (Smitherman

19    depo. 73:6-12, 106:15-17, stating, "I'm sure [a motorized scooter] would have been of use to

20    [Ms. Moralez] in moving around the office and getting from one place to another.") The agency

21    therefore should have granted her requests for accommodation without the medical

22    documentation it demanded, which plaintiff procured not just once but twice.  First she submitted

23    an FMLA certificate and a handwritten note from her physician, Dr. Marcey Shapiro, on the

24    doctor's letterhead.  (Shapiro Dec., Exh. 2.)  Mr. Smitherman cavalierly rejected the note as

25    illegible and unsigned.  When Ms. Moralez then tendered a typewritten version, signed by her

26

27

28        [5]Question 16 advises agencies when they may or may *not* request medical information in
        connection with a request for reasonable accommodation.

Plaintiff's Memorandum in Opp.to D's MSJ
Case No. C073807 EDL                    11

1   physician (Shapiro Dec., Exh. 3), the Agency still demanded that she sign a blanket medical

2   release, which she rightfully refused as an invasion of her privacy.

3       Since her disability and the need for accommodation were obvious, OFCCP should have

4   granted without further documentation her requests for the motorized scooter, modified schedule

5   and non-assignment to sites without elevator or handicap access.

**IV. DEFENDANT CONSTRUCTIVELY DISCHARGED PLAINTIFF BY
EXACERBATING HER PHYSICAL DISABILITY AND BY CREATING AND
MAINTAINING A HOSTILE WORK ENVIRONMENT THAT INFLICTED SEVERE
EMOTIONAL DISTRESS, RENDERING HER UNABLE TO CONTINUE WORKING
AND FORCING HER TO SECURE DISABILITY RETIREMENT BENEFITS**.

9       To establish a prima facie case of discrimination under Section 501 of the Rehabilitation

10  Act, plaintiff must show: a) she was an individual with a disability b) who was otherwise

11  qualified to perform her job, and c) who was discriminated against solely because of her

12  disability. *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002).

13      The element of discrimination is some "adverse employment action," defined as

14  "materially adverse change in the terms or conditions of employment because of employer's

15  conduct." *Mitchell v. Vanderbilt University,* 389 F.3d 177, 182 (6th Cir. 2004). Constructive

16  discharge as an actionable "adverse employment action" under the Rehabilitation Act. "If a

17  plaintiff can demonstrate facts sufficient to prove constructive discharge, then the plaintiff has

18  satisfied the prima facie requirement that she suffered an adverse employment decision."

19  *Hurley-Bardige v. Brown*, 900 F. Supp. 567, 572 (D. Mass. 1995).

20      In a claim of disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. §

21  791, *et seq.*, "[t]he existence of a constructive discharge 'depends upon the facts of each case

22  and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of

23  the employer's conduct upon the employee.' " *Smith v. Henderson*, 376 F.3d 529, 532 (6th Cir

24  2004) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). In *Kent v. Derwinski*,

25  790 F. Supp 1032 (E.D. Wash. 1991)[6], a federal district court in this Circuit held that "[t]he test

26

27  _____

28      [6] The *Kent* case has no subsequent history.

for constructive discharge is whether, judging frm the totality of the circumstances, a reasonable person would feel that she was " ' forced to quit because of intolerable conditions.' " *Id*. at 1040 (quoting *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987).[7]

Thus, by its very nature, the question of whether or not an employee was constructively discharged is a question of fact, and as such, a question best left for trial and the finder of fact. *See Feliciano-Hill v. Principi*, 439 F.3d 31, 40 (1st Cir. 2003) (where, at trial, a battle of experts ensued over whether or not plaintiff with rheumatoid arthritis had been constructively discharged, "[t]he question whether a work environment is sufficiently hostile to create liability is best left to a jury.")  Similarly, the question here is whether defendants' refusal to accommodate plaintiff's disability and their harassment and humiliation of Ms. Moralez caused her such mental and physical pain, anguish and stress, that a reasonable person would feel forced to quit under such circumstances.  As such, it is a question of fact for the jury and inappropriate for summary judgment.

In *Kent*, a case with strikingly similar facts to this matter, a disabled employee brought a claim under the Rehabilitation Act against her employer, the Veterans Administration Medical Center ("VAMC"), alleging that VAMC's failure to reasonably accommodate her constituted a constructive discharge.  The plaintiff in *Kent* had a disability, but was otherwise qualified for the position she held at an in-house laundry facility.  Ms. Kent's disability was readily apparent to VAMC at the outset of her employment, and she consistently received satisfactory performance evaulations from her supervisor (though she was constantly subjected to verbal harassment regarding her disability from co-workers).  Ms. Kent's original supervisor did not tolerate any verbal harassment directed toward Ms. Kent.  But a new supervisor did nothing to prevent or suppress the taunting and verbal harassment by co-workers and even subjected Ms. Kent to

---

[7] Defendant cites to *Watson* in their papers, as well as a number of Ninth Circuit cases involving claims of discrimination.  However, none of the cases cited in the Defendant's moving papers discuss constructive discharge in a *disability discrimination* context.  As such, those cases are not on point where a disability was the basis for the discrimination and refusal of reasonable accommodation the reason for the constructive discharge.

inappropriate discipline by criticizing Ms. Kent for behavior caused by her disability. After numerous attempts to have the situation reasonably accommodated by VAMC, "no significant improvements" had been or were likely to be made in the immediate future. *Id.* at 1041. While VAMC had given the newer supervisor, as well as Ms. Kent's co-workers training and counseling regarding how to properly treat handicapped workers, the court still held that "VAMC had failed to make adequate accommodations for Ms. Kent's handicap. The lack of accommodations created the intolerable work situation, which resulted in a constructive discharge of Ms. Kent." *Id.* at 1034.

The undisputed facts indicate that Ms. Moralez asked for various forms of reasonable accommodation. Moralez Dec., ¶ 7-10, 13, 21-24 and Exh. 2. All of the requests were either denied outright or not processed in an adequate manner, as time and time again Defendant unreasonably delayed any accommodation or (in violation of the EEOC guidelines) unreasonably required Ms. Moralez to provide superfluous medical documentation before moving forward with any accommodation. Moralez Dec. ¶ 25, 27-32. After eighteen grueling months without any accommodation and being given the bureaucratic "run-around," Ms. Moralez continued to suffer extreme physical discomfort as her condition further deteriorated, partially from having to ambulate with her manual wheelchair, which only exacerbated her condition. Moralez Dec. ¶ 47; Shapiro Dec. ¶ 2, 5.

Consequently, like Ms. Kent, Plaintiff had no choice but to apply for disability retirement in September 2006, as she could no longer maneuver the manual wheelchair (that she had rented with her own finances) around her workplace without unbearable pain. Moralez Dec., ¶ 46-47. Ms. Moralez's disability had always been readily apparent to her co-workers and supervisors, who previously had offered her minimal accommodations. Moralez Dec., ¶ 2; Rocha Dec., ¶ 3-4; Sorgen Dec., Exh. 2 25-26, 29:8-30:3, 95, 106:6-17. OFCCP not only failed to take action with respect to the request for a motorized wheelchair, but actually revoked or refused accommodations that it had provided Ms. Moralez in the past, and still had intentionally not accommodated Ms. Moralez's requests for over a year. OFCCP then attempted to justify its

1   unreasonable delay and inaction by insisting that the so-called "experts in Washington" had to

2   review the request.  Sorgen Dec., Exh. 2 95:22-96:8.  As in *Kent*, the "lack of accommodations

3   created the intolerable work situation, which resulted in a constructive discharge" of Ms.

4   Moralez.  Even more striking is that OFCCP, contrary to its very mission, created the intolerable

5   work situation by targeting Ms. Moralez and other disabled employees.  Moralez Dec., ¶ 6-17,

6   19-44.

7          Another instructive case is *Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004), where the

8   Sixth Circuit reversed an order for summary judgment granted by a district court in favor of the

9   defendant-employer, the United States Postal Service ("USPS").  The plaintiff in *Smith* alleged

10  that she was constructively discharged on account of her disability in violation of the

11  Rehabilitation Act.  On appeal, "the central issue [was] whether the USPS's alleged rescission of,

12  or refusal to provide, a reasonable accommodation converted her resignation into a constructive

13  discharge." *Id*. at 534.

14         The plaintiff in *Smith* suffered from rheumatoid arthritis, as does Ms. Moralez.  When

15  Ms. Smith made a request for accommodation, the defendant initially placed a limit on the hours

16  plaintiff was required to work, no more than eight hours per day and no more than forty hours

17  per week, as suggested by Ms. Smith's treating physician.  Ms. Smith was later promoted and

18  the limitation on her hours was rescinded.  Soon, Ms. Smith was forced to work ten to twelve

19  hour days, contrary to her medical restriction.  Indeed, at one point, Ms. Smith was forced to

20  work for thirty days in a row without a day off.  The extra hours were required by the defendant,

21  despite having clear knowledge of the plaintiff's disability.  USPS refused to allow Ms. Smith to

22  delegate her "non-essential accounting duties," even though an employee who formerly held the

23  position had been allowed to do just that.  *Id*. at 532.  After repeated unsuccessful attempts to

24  have her prior accommodation reinstated," 'exhausted and in constant pain,' Smith resigned her

25  position," and applied for disability retirement benefits.  *Id*.

26         The *Smith* court held that the refusal and/or revocation of these accommodations resulted

27  in "the foreseeable consequence that Smith's health would markedly deteriorate." *Id*. at 538.

28

1  The court further held that "a reasonable jury could conclude that the USPS knowingly and

2  deliberately 'turned its back' on Smith, and therefore, the USPS could foresee that Smith would

3  be compelled to quit her job in order to preserve her health." *Id.* The court then reversed the

4  lower court's order for summary judgment for the defendant with respect to the constructive

5  discharge claim.

6       Ms. Moralez, like Ms. Smith, was not accommodated, and in fact OFCCP refused and/or

7  revoked prior accommodations that she had previously been granted or offered; namely, the

8  refusal to provide motorized wheelchair that had previously been offered, and the revocation of

9  her ability to work from home. Ms. Moralez, like Ms. Smith, suffered from rheumatoid arthritis,

10  and plaintiff's physical condition deteriorated to the point were she was only able to ambulate

11  with the use of two canes, and later, only with the "aid" of a manual wheelchair, which only

12  exacerbated her arthritic condition. Moralez Dec. ¶ 47; Shapiro Dec. ¶ 4-6. Ms. Moralez made

13  repeated requests for a motorized wheelchair, which would have, according to documents

14  provided to defendant by Ms. Moralez's treating physician, Dr. Marcey Shapiro (Shapiro Dec.,

15  Exh. 2-4), enabled Ms. Moralez to continue working indefinitely, without enduring extreme

16  physical pain, or exacerbating her condition. Shapiro Dec. ¶ 2, 4-6 and Exh. 3. Ms. Moralez's

17  prior accommodation of being allowed to work from home under the "flexi-place" policy was

18  revoked in June 2004 by Sarah Nelson, then-acting District Director of the ODO. Moralez Dec.

19  ¶ 15. Here, just as egregiously as in *Smith*, not only was there a failure to accommodate

20  (plaintiff's requests for a motorized wheelchair), but also a prior accommodation was revoked,

21  the Defendant having clearly been aware of Ms. Moralez's disability and the need for the specific

22  accommodation. In short, defendant not only "turned its back" on Ms. Moralez when it was

23  clearly foreseeable that she would be forced to quit her job in order to preserve her health, it

24  intentionally made her life miserable in order to make her quit, and that's precisely what

25  happened.

26       Another case on point is *Benaugh v. Ohio Civil Rights Com'n*, 278 Fed.Appx. 501 (6th

27  Cir. 2008). In *Benaugh*, the plaintiff brought claims against her employer under the

28

1  Rehabilitation Act.  The plaintiff prevailed at trial, the defendant's motion for judgment as a

2  matter of law was denied, and the defendant then appealed.  The issue in *Benaugh* was whether

3  the plaintiff "left [her job] voluntarily or was forced to leave early by defendant's failure to

4  provide reasonable accommodation."  *Id.* at 513.  The plaintiff, Ms. Benaugh, was an

5  investigator for the Ohio Civil Rights Commission ("OCRC").[8]  Ms. Benaugh was responsible

6  for handling the OCRC's most complex and sensitive discrimination cases and was by all

7  accounts very good at her job.  Ms. Benaugh suffered from both asthma and sarcoidosis, and her

8  disabilities often caused her to have an asthma attack whenever she was subjected to extreme

9  temperature changes.  Ms. Benaugh was at some point moved from an office which contained a

10  window and a climate control unit, to another office that did not have either; during the same

11  period that her sarcoidosis was worsening.  Ms. Benaugh then made a request that she be moved

12  back to her previous office or one like it, as she was suffering more frequent asthma attacks, and

13  provided OCRC with a note from her treating physician indicating the need for a workspace with

14  "climate control."  The request was denied, and OCRC provided a space heater as an alternative

15  accommodation.

16        Ms. Benaugh's condition continued to deteriorate, and although she provided additional

17  notes from her physician and made additional requests to change offices, her requests were

18  denied (even though there were vacant climate-controlled offices at various times during the

19  period in which the plaintiff's requests were denied).  Time continued to pass and Ms. Benaugh

20  remained in the same office, with her medical condition becoming more and more aggravated.

21  Ultimately, Ms. Benaugh "temporarily ceas[ed] performance of her duties due to respiratory

22  disabilities, i.e. Sarcoidosis and Asthma."  *Id.* at 506.  Ms. Benaugh never returned to work and

23  applied for and received disability retirement benefits shortly thereafter.  Ms. Benaugh claimed

24  that she was constructively discharged.

25

26  ───────────────

27        [8]  Ironically, the OCRC (like the OFCCP) is charged with enforcing the laws of its
    jurisdiction that prohibit discrimination on the basis of disability, among other forms of
28  discrimination.

Plaintiff's Memorandum in Opp.to D's MSJ
Case No. C073807 EDL                    17

1    The *Benaugh* court noted that the defendant-employer had made some accommodations,

2    such as allowing Ms. Benaugh to engage in "breathing treatments" in the workplace and was

3    allowed to use personal leave and vacation time when her medical conditions rendered her unable

4    to work. *Id.* at 512. Still, the court found that "[w]hile failure to give an employee an exterior

5    office would not normally be sufficient as a matter of law to establish constructive discharge, this

6    is not a typical constructive discharge case because plaintiff's claim was that the defendant's

7    actions denied plaintiff reasonable accommodation and forced her to take disability retirement

8    early." *Id.* at 510. The court held that the evidence presented at trial was "sufficient to create a

9    question of fact whether defendant made plaintiff's working conditions so intolerable by failing to

10    provide reasonable accommodation that a reasonable person in her shoes would have felt

11    compelled to go on disability." *Id.* Accordingly, the court denied the defendant's appeal.

12    Here, defendants did raise plaintiff's desk (after three separate requests), and allowed her

13    to work from home with her assigned laptop for a time (an improvement in conditions which,

14    notably, was later revoked), but defendants ultimately failed completely to provide plaintiff

15    reasonable accommodations which would have allowed her to continue working indefinitely.

16    Moralez Dec. ¶ 47; Shapiro Dec. ¶ 4-6 . Defendants had previously offered to provide plaintiff

17    with a motorized wheelchair seven years earlier (without any request for medical records of any

18    kind), when plaintiff felt that her condition did not require such an apparatus, yet it refused to do

19    so when her disability actually required such an accommodation. These refusals made plaintiff's

20    working conditions so painful and intolerable that she was reasonably compelled to take disability

21    retirement. Moralez Dec. ¶ 15-16, 18, 21-22, 24, 43, 46, 47-50.

## V. DEFENDANTS' FAILURE TO REASONABLY ACCOMMODATE PLAINTIFF WAS NOT A SINGLE INSTANCE BUT A SERIES OF FAILURES OVER THE COURSE OF SEVERAL YEARS

25    OFCCP's refusal to timely process Ms. Moralez' request and accommodate her disability

26    involved several different requests and spanned several years, until she was forced to seek

27    disability retirement because she could no longer cope, physically or emotionally. While

28    defendants claim in their papers that this was a "single isolated incident of alleged

Plaintiff's Memorandum in Opp.to D's MSJ
Case No. C073807 EDL                    18

discrimination," (Def's MPA, 7:23-24) that is simply not the case.  In fact, Ms. Moralez was subjected to a continuous and outrageous pattern of discriminatory treatment on account of her disability. Moralez Dec. ¶ 6-7, 9-11, 13-20, 25-31, 35-46, 50.  In December 2002, after Mr. Luevano, Plaintiff's initial supervisor retired, Ms. Moralez requested that her desk be raised (for the first time), however, her new supervisor was instructed to tell Plaintiff to make her requests directly to Mr. Smitherman.  Moralez Dec. ¶ 7.  Ms. Moralez obediently complied, asking him personally if her desk could be raised (her second request to simply have her desk raised).  Moralez Dec. ¶ 8.  Mr. Smitherman never responded.  Ms. Moralez then emailed him the same request, and again received no response.

Ms. Moralez was forced to make do and diligently did her best while continuing to work in excruciating pain.  Moralez Dec., ¶ 8.  In October 2003, Ms. Alice Young took over the Acting District Director position, and in December 2003, Ms. Moralez again requested in writing accommodations be made to her desk, because by this time, it was incredibly painful and difficult for Ms. Moralez to work with her desk so configured.  At this point, having exhausted other options, Ms. Moralez filed a grievance, and only then her desk was raised, approximately one year after she made her initial request, even though EEOC policy requires handling all reasonable accommodation requests within 14 days.  Moralez Dec., ¶ 10.

Within two weeks of Sarah Nelson taking over Ms. Young's position in June 2004, Ms. Moralez was assigned to inspect a site where the building did not have an elevator.  Moralez Dec., ¶ 13.  Due to the stress and difficulty of reviewing sites without elevators, and the fact that there are a multitude of possible sites that Ms. Moralez could review without difficulty, Ms. Moralez called Ms. Nelson and requested that she be removed from that particular review due to her disability.  Moralez Dec., ¶ 13.  Ms. Nelson, despite knowing the pain, difficulty, and embarrassment that the review was causing Ms. Moralez, flatly refused. *Id.*  As a result, Ms. Moralez suffered the indignity and humiliation of being helped up the stairs by other compliance officers. *Id.*  Soon after, in June 2004, Ms. Nelson instructed Dr. Rocha that Ms. Moralez would no longer be allowed to work from home, as she had been allowed to prior to Ms. Nelson's

1    arrival.  Moralez Dec. ¶ 15.  In November 2004, Ms. Moralez requested administrative leave to

2    exercise her right to vote, because with her disability, it takes her longer to get to the polls and

3    vote than some people.  Ms. Nelson also denied that request. Moralez Dec., ¶ 17.  By this time,

4    Ms. Moralez was only able to ambulate with the aid of two canes, her physical disability clearly

5    evident to all those who came into contact with her.  Still, Ms. Nelson denied knowledge of Ms.

6    Moralez's disability. Moralez Dec., ¶ 18.

7        Ms. Moralez also served as the Union Steward for her office, and in that capacity she

8    observed that she was not the only person with a disability whose requests for accommodation

9    were falling on deaf ears.  As Union Steward she became aware of the denial or disregard for the

10   requests for accommodation of her co-workers[9].  As Ms. Moralez continued to represent other

11   employees with disabilities at meetings requesting reasonable accommodations, defendant

12   continued to overwhelmingly deny these requests.  Moralez Dec., ¶ 14, 19.

13       In March 2005, Ms. Moralez requested in writing to Mr. Smitherman (Moralez Dec., ¶

14   22 and Exh. 2) the motorized wheelchair that she had been offered by defendants seven years

15   prior, as her condition now required it, as well as a request to reinstate her ability to work from

16   home.  This included her Form WH 380, which clearly documented Ms. Moralez'

17   condition and disability.  The document required Dr. Shapiro to respond to questions regarding

18   the essential functions of Ms. Moralez's position, however, defendant curiously never responded

19   to Dr. Shapiro's request for this essential information. Shapiro Dec., ¶ 3.

20       When Trent Williams took over for Ms. Nelson in April 2005, he approached Ms.

21   Moralez and indicated that the two of them would meet to discuss her request for

22   accommodation.  Moralez Dec. ¶ 26.  That meeting never took place.  Moralez Dec. ¶ 26.  Ms.

23   Moralez followed up with an email to Mr. Williams, (Moralez Dec., ¶ 26), but he never

24   responded.  Moralez Dec. ¶ 26.  Ms. Moralez then followed up with an email to Mr. Smitherman

25   regarding her discussion with Mr. Williams and *again* got no response.  Moralez Dec. ¶ 26.

26

27

28       [9]  It is noteworthy that two of these co-workers, Mr. Wade and Mr. Gaytan, have also
     filed suit against OFCCP.

1    Eventually, on or around May 5, 2005, Ms. Moralez received a memo from Mr. Williams

2    (Moralez Dec. ¶ 27, Exh. 3) which requested that she sign an unreasonably broad medical release

3    and provide more documentation related to her request for accommodation.  Ms. Moralez

4    willingly provided the specific documentation related to her disability, but refused to sign the

5    release, feeling (and rightfully so) that it was unnecessary and unreasonable and intended to

6    dissuade her from seeking further accommodation.  As if the unreasonable delay and bureaucratic

7    barriers weren't enough, Ms. Moralez then endured a number of discriminatory and harassing

8    incidents with Mr. Williams.  Mr. Williams flatly refused to communicate with Ms. Moralez  in

9    her role as union steward, refused (with no justification) to certify plaintiff's timesheet and

10    verbally threatened her that she would not be paid.  Moralez Dec., ¶ 38.  Mr. Williams repeatedly

11    made Ms Moralez feel "extremely harassed and humiliated . . . because [she] was disabled."

12    Moralez Dec., ¶ 37.  On one occasion, he verbally abused her for not bringing her laptop into the

13    office from her vehicle, forcing her to return to her vehicle (which required the use of two canes

14    at that time) without any assistance from willing co-workers. *Id.*  Ms. Moralez constantly felt

15    that Mr. Williams was "trying to make my job very difficult for me." *Id.*

16    This is hardly a single isolated incident.  Defendants repeatedly refused or wilfully

17    ignored plaintiff's reasonable requests for accommodation, and when she continued to try to

18    engage in an interactive process, her supervisors became increasingly hostile toward her.  This

19    hostility, combined with the severe physical difficulties brought on by her disability (and

20    exacerbated by defendant's inaction and conscious disregard) caused Ms. Moralez to reach a

21    level of pain and emotional stress that no reasonable person should have to endure.  She had no

22    other choice but to seek disability retirement.

23                              **V.  CONCLUSION**

24

25    For the foregoing reasons, plaintiff has established that there are triable issues of fact as

26    to whether she was constructively discharged.  Therefore, this Court should deny defendants'

27    //

28    //

1    motion in its entirety.

2

3

    Dated: September 16, 2008          Respectfully submitted,

4

5                                      LAW OFFICES OF MICHAEL S. SORGEN

6

7                                      By: _____/s/_____

                                             Michael S. Sorgen

8                                            Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28