**EXHIBIT 1**



**Williams, Trent W - ESA**

| | |
|---|---|
| **From:** | Smitherman, William D - ESA |
| **Sent:** | Friday, April 01, 2005 1:35 PM |
| **To:** | Williams, Trent W - ESA |
| **Cc:** | 'gilliland.woody@dol.gov' |
| **Subject:** | RE: Francisca Moralez Request for a Scooter & Flexi place |

Okay

-----Original Message-----
**From:** Williams, Trent W - ESA
**Sent:** Thursday, March 31, 2005 3:02 PM
**To:** Smitherman, William D - ESA
**Cc:** 'gilliland.woody@dol.gov'
**Subject:** RE: Francisca Moralez Request for a Scooter & Flexi place

Bill, we have been in contact with Pam Gibbs in DC. She is preparing a letter in our behalf regarding this matter. I do understand that we must proceed with caution and make sure we get it right.

-----Original Message-----
**From:** Smitherman, William D - ESA
**Sent:** Thursday, March 31, 2005 2:38 PM
**To:** Gilliland, W W - ESA; Williams, Trent W - ESA; Nelson, Sarah - ESA
**Subject:** RE: Francisca Moralez Request for a Scooter & Flexi place

I agree with Woody and Roz completely on this issue. Trent, you should be very careful to follow agency/RO hierarchy on this type or request. Please work closely with me and especially Roz on your responses to such request from staff in the ODO.

-----Original Message-----
**From:** Gilliland, W W - ESA
**Sent:** Wednesday, March 30, 2005 8:51 AM
**To:** Williams, Trent W - ESA; Nelson, Sarah - ESA
**Cc:** Smitherman, William D - ESA
**Subject:** FW: Francisca Moralez Request for a Scooter & Flexiplace

This is good advice from Roz. Please keep Roz copied on everything regarding this matter.

It's more important to process this request correctly than quickly. Case assignments can be reassigned. Also, I would not set a precedent of providing flexi place to an employee that is not able to perform the essential functions of the job.

-----Original Message-----
**From:** Itelson, Roselynn - OASAM [mailto:Itelson.Roselynn@dol.gov]
**Sent:** Wednesday, March 30, 2005 8:41 AM
**To:** Gilliland, W; Smitherman, William
**Cc:** Dorrell, Kate - ESA; Gibbs, Pamela - ESA
**Subject:** Francisca Moralez Request for a Scooter & Flexiplace

Woody,

USA00723

**EXHIBIT 2**

1    IN THE UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3     SAN FRANCISCO DIVISION

4      ---oOo---

5 FRANCISCA MORALEZ,

6   Plaintiff,

7 vs.      No. CV 07-3807(EDL)

8 ELAINE L. CHAO, SECRETARY OF
 THE UNITED STATES DEPARTMENT
9 OF LABOR; UNITED STATES
 DEPARTMENT OF LABOR EMPLOYMENT
10 STANDARDS ADMINISTRATION,

11   Defendants.
        /

12

13

14

15   DEPOSITION OF WILLIAM SMITHERMAN

16

17

18

19   Taken before MARK CHILDRESS

20    CSR No. 7773

21    January 25, 2008

22

23

24

25

1       A.   College graduate.

2       Q.   From...?

3       A.   Indiana University.

4       Q.   Do you have a bachelor's degree?

5       A.   Bachelor's of science.

6       Q.   In what?

7       A.   Labor relations, Indiana University; paralegal

8  certification from Indiana University; mediation

9  certification from EEOC, the American Institute of

10 Mediation.

11      Q.   Any advanced degrees?

12      A.   No.  Hours toward it, but no.

13      Q.   And when did you first begin your employment

14 with the Federal Government?

15      A.   I believe it was '78 or '79.  It's been awhile.

16      Q.   Did you have any employment, full-time

17 employment, between obtaining your bachelor's degree and

18 your work with the Federal Government?

19      A.   Yes, with the Federal Government.

20      Q.   So then that was in '78, '79 or later?

21      A.   Yes.

22      Q.   So could you just outline for me what have been

23 your positions with the Federal Government since you

24 started as a Federal employee?

25      A.   Compliance officer.

1      Q.   What agency?

2      A.   Its current agency.

3      Q.   Always with the Department of Labor?

4      A.   Correct.   Sorry.   Excuse me.   No.   With the

5   Department of Defense.   And then there was a

6   consolidation and then it became part of the Department

7   of Labor.

8      Q.   When was that?

9      A.   I don't recall the date.   It's been some time

10   ago.

11      Q.   And so for how many years did you work as a

12   compliance officer?

13      A.   Till 1994.

14      Q.   And that was both in the Department of Defense

15   and the Department of Labor?

16      A.   Yes.

17      Q.   What were your functions as a compliance

18   officer generally?

19      A.   I investigated complaints, conducted compliance

20   reviews and ensured that contractors, Federal

21   contractors, were in compliance with the Executive Order

22   11246.

23      Q.   Which has been amended a number of times during

24   your tenure?

25      A.   Correct.

Page 12

1    Q.  And so this is compliance.  What does Executive

2    Order 11246 entail?

3    A.  Executive Order 11246 was passed by the

4    president.  It's an executive order of course.  And it

5    is an order that provides the oversight of Federal

6    contractors and the responsibility to evaluate Federal

7    contractors who do business with the Government in

8    regard to their compliance with the provisions of the

9    executive order not to discriminate against any

10   individual for protective reasons.

11   Q.  So the Executive Order 11246 is designed to

12   implement in the Federal sector and as to Federal

13   contractors' compliance with certain Federal statutes?

14   A.  Well, that's the amendment.  The order itself

15   is one of nondiscrimination and set aside -- The

16   executive order was actually set aside under the

17   president at that time to measure or to make sure that

18   there was no discrimination in the Federal services.

19   Q.  So we're talking about discrimination in

20   employment?

21   A.  Yes.

22   Q.  So do you know if Executive Order 11246 is

23   designed to implement Title Seven?

24   A.  It is.

25   Q.  Also the Americans with Disabilities Act?

1      A.   It does.

2      Q.   The Rehabilitation Act?

3      A.   It does.

4      Q.   Any other statutes that you can think of that

5   are implemented by Executive Order 11246?

6      A.   Veterans Act is also included.  Also is

7   included provisions of nondiscrimination for women.

8   That was amended in 1972.

9      Q.   Isn't that Title Seven?

10     A.   Well, that's part of Title Seven.  There's

11  different amendments under Title Seven.

12     Q.   Okay.  What we're talking about is

13  discrimination in employment; is that right?

14     A.   Yes.

15     Q.   Do you review compliance of Federal contractors

16  as to any other kind of discrimination besides

17  employment?

18     A.   No.

19     Q.   So then what happened in 1994 that caused you

20  to cease working as a compliance officer?

21     A.   I was promoted.

22     Q.   To what?

23     A.   Assistant district director.

24     Q.   Of what agency?

25     A.   Same agency.

Page 14

1    Q.  And at this time it's now the Department of

2    Labor?

3    A.  Yes.

4    Q.  And is there any particular area within the

5    Department of Labor?

6    A.  Office of Federal Contract Compliance Programs,

7    current position.

8    Q.  And how long did you serve as assistant

9    district director?

10   A.  One year.

11   Q.  And then in '95 were you promoted again?

12   A.  Yes.

13   Q.  What was your position then?

14   A.  District director.

15   Q.  What district?

16   A.  Los Angeles, California.

17   Q.  When you were assistant district director, was

18   that also Los Angeles?

19   A.  No.  It was Indianapolis, Indiana.

20   Q.  So you moved to California in '95?

21   A.  Yes.

22   Q.  And how long did you work as the district

23   director in Los Angeles?

24   A.  Until 2000.

25   Q.  And then?

Page 15

1     A.   I was promoted to deputy regional director.

2     Q.   So I take it then that the region encompasses

3   certain districts.

4     A.   Yes.

5     Q.   So regional director, or deputy regional

6   director, is a promotion from being a district director?

7     A.   It is.

8     Q.   So how many districts are there --

9          Well, what region were you in as of 2000?

10     A.   The Pacific region, the current region.

11     Q.   And that encompasses what districts?

12     A.   Los Angeles; San Francisco, which is now called

13   the greater San Francisco Bay Area district office; San

14   Diego; Seattle; San Jose.  I think that's all.

15     Q.   There's no district in Oregon?

16     A.   No.

17     Q.   And there's no district outside of the West

18   Coast states, California and Washington?

19     A.   Yes.

20     Q.   But those are not part of the Pacific region?

21     A.   Yes, they are.

22     Q.   Oh.  So then I was trying to find out, how many

23   districts are there in the Pacific region?

24     A.   I just gave them to you.  To my best

25   recollection.  I hope I didn't miss one.

Page 25

1    Q.   Did you ever observe that she was walking with

2    the assistance of a cane or two canes?

3    A.   Yes.

4    Q.   Do you recall when you first observed that?

5    A.   I don't really recall.  It could have been -- I

6    don't know.  When you say when, I'm just not sure.

7    Casual observations that you make, that I made or would

8    have made, would have been casual observations.

9    Q.   Well, do you recall if any such casual

10   observation would have occurred in Oakland?

11   A.   Yes.

12   Q.   Yes, it did?

13   A.   It would have, yes, could have, yes.

14   Q.   But you don't recall ever asking anything about

15   Francisca Moralez to Angel Luevano after such a casual

16   observation of her?

17   A.   No.

18   Q.   Now, how often did you observe or encounter

19   Francisca Moralez during your work -- during the time

20   you were on detail as the acting district director?

21   A.   How often?

22   Q.   Yes.

23   A.   Repeat the question again.

24   Q.   How often did you have occasion to observe or

25   encounter her?

1    A.  It would have been on a daily basis whenever

2  she and I were in the office together possibly.

3    Q.  Did you ever have occasion to work with her on

4  any compliance issues?

5    A.  I reviewed her work on one or two occasions,

6  yes.

7    Q.  Were you her supervisor or her second-level

8  supervisor?

9    A.  I was her second-level supervisor as district

10  director, acting district director.

11    Q.  Did you ever participate in any evaluation of

12  her performance?

13    A.  Explain participation.

14    Q.  Did you ever review and sign off approval or

15  disapproval of a written evaluation of her performance?

16    A.  As acting, I would have.  If I did -- If my

17  signature is on her performance evaluation, then I would

18  have done that.

19    Q.  Do you specifically recall that you have?

20    A.  I'd have to see it.  If I was there and a

21  performance came up and my name is there, then I did.

22    Q.  Well, did you have occasion to know how well

23  she performed?

24    A.  Some, yes.

25    Q.  So could you tell me specifically what

1    Q.  Do you know if she got that training?

2    A.  I thought she did, I think she did, yes.

3    Q.  So did you play any role in helping her to get

4  that training?

5    A.  Yes.  I conducted some of it.

6    Q.  I see.

7    A.  For the entire office.

8    Q.  Did you ever talk to her about whether she had

9  a disability?

10    A.  Talk to her about whether she had a disability?

11  What do you mean?

12    Q.  Did you ever ask her why she used a cane?

13    A.  No.

14    Q.  Did you ever ask her --

15        Did you ever see her in a wheelchair?

16    A.  Yes.

17    Q.  Did you ever ask her why she used a wheelchair?

18    A.  No.

19    Q.  Did anyone ever tell you that she had

20  degenerative rheumatoid arthritis?

21    A.  She may have, but I don't know if she described

22  it the way you did.

23    Q.  Well, what do you recall about how she

24  described it?

25    A.  That she had arthritis, severe arthritis.  And

1    the way she expressed it to me on different occasions,

2    at least on the occasion I recall, that some days she

3    has good days and some days she has bad days.

4        Q.  Do you remember when you had that discussion or

5    what prompted it?

6        A.  No, I don't remember when I had the discussion.

7        Q.  So let me mark this as Exhibit 1.  This is the

8    first deposition we're taking in this case.

9        A.  Okay.

10               (Plaintiff's Exhibit 1 was marked for

11               identification.)

12        MR. SORGEN:  I have a two-page document dated

13    March 28, 2005, and it purports to be a letter from

14    Francisca Moralez to William D. Smitherman, and it has a

15    Bates number on it:  USA00728 to 729.

16        THE WITNESS:  What was the year of the

17    document?

18        MS. FITZGERALD:  You only have one copy,

19    Michael?  You don't have multiple copies as I did?

20        MR. SORGEN:  The witness can use the court

21    reporter's copy, and that copy is for you.  And I should

22    have a copy for my client.

23        MS. MORALEZ:  I have one, yeah.

24        THE WITNESS:  Okay.  So she did tell me then.

25    I didn't remember this document.

1    don't remember how I received it.

2        Q.   Okay.   But you do now remember having read this

3    document?

4        A.   Yes, I do now, yes.

5        Q.   You just don't remember who gave it to you?

6        A.   No, I don't.

7        Q.   Now, I take it then you read this document at

8    the time you received it.

9        A.   Yes, I did.

10       Q.   And you would have received it sometime around

11   March 29, 2005?

12       A.   I would imagine I would have received it on

13   this date.

14       Q.   Do you recall if you discussed it with anyone

15   after receiving and reading it?

16       A.   I can't remember.   As I said, I didn't remember

17   even receiving this one.   I can't recall.

18       Q.   So at the time that you first got this letter

19   of March 28, 2005 that Francisca had addressed to you,

20   had you already observed her walking with a cane or

21   canes?

22       A.   I could have, yeah.

23       Q.   Had you already observed her in a wheelchair at

24   work?

25       A.   Yes, possibly, yes.

1    Q.  Had you had any discussions with anyone from

2   OFCCP prior to March 28, 2005 about Francisca Moralez's

3   disability?

4    A.  Prior to?  I don't recall.  I may have, I could

5   have, but I don't recall.

6    Q.  Do you ever remember an incident in around 2002

7   when you were working in Oakland and Francisca Moralez

8   herself asked you to raise her desk as a reasonable

9   accommodation?

10   A.  Yes.

11   Q.  Did she ask that verbally?

12   A.  Yes.

13   Q.  Did you have any discussion with her about why

14  she wished to have her desk raised?

15   A.  As I recall, when we talked about it, she said

16  she was having difficulty working on her desk and doing

17  her work and she asked if something could be done about

18  raising her desk and other areas.  And I think she and I

19  or either -- I followed her out of the office and went

20  and looked at her work station.

21      I think some of the conversation we had about

22  her being able to work at her desk centered around some

23  other things that she wanted us to consider.  And it had

24  to do, I guess, with something maybe with the keyboard

25  or whatever else it was.

1      Because I remember now when I walked in her

2   office, in her desk area, cubicle more specifically, I

3   made the remark that -- and we laughed and chuckled --

4   how do you find anything in here?  Because it was full

5   of papers, cases that she had been working on I guess.

6      Q.   When she worked in this cubicle, did she work

7   sitting in a wheelchair?

8      A.   She probably did.  At some point in time, yeah.

9      Q.   At that point when you were both working in

10  Oakland in around 2002, did she have a wheelchair?

11     A.   She may have, she may have been working from

12  her wheelchair.

13     Q.   Do you recall any other discussion prior to

14  March 28, 2005 with regard to Francisca Moralez's

15  ability to work given her physical condition?

16     A.   State that again.

17          MR. SORGEN:  Could you read that back, please?

18               (Record read.)

19          THE WITNESS:  We may have talked about maybe

20  her difficulty in doing something on a particular day,

21  just casual conversation, or she might have talked to me

22  about something.  I don't recall any specific time

23  during that time that we did.

24  BY MR. SORGEN:

25     Q.   So other than raising her desk, do you recall

1    to get her desk raised?

2        A.   I don't know.

3        Q.   Would it surprise you if she were to say that

4    she didn't get her desk raised while you were out there

5    in the Oakland office, but that it was Alice Young who

6    did it?

7        A.   No, I don't think it would surprise me, because

8    during, I guess, the changeover between us, that was

9    something that I instructed Alice to continue to do.

10   Yeah.

11           MR. SORGEN:  Can we take a five-minute break?

12           MS. FITZGERALD:  Of course, if that's what you

13   would like.

14                   (Recess taken.)

15   BY MR. SORGEN:

16       Q.   I'd like to ask a few questions about Exhibit

17   1, sir, Exhibit 1, which is that March 28, 2005 letter.

18       A.   M-hm.

19       Q.   So Francisca begins by stating:  "Given the

20   retaliatory and hostile work environment that I'm

21   currently experiencing...."  Now, do you recall having

22   any particular reaction to her opening statement in this

23   letter?

24       A.   Yeah.  It was an allegation.

25       Q.   Well, did you know anything about a retaliatory

Page 48

1      Q.   Okay.  So as a compliance officer some of your

2   work involved looking generally at the contractor's

3   compliance.  Did some of your work also involve

4   responding to discrimination complaints by employees of

5   that contractor, or reviewing them?

6      A.   Yes.

7      Q.   So what portion of your work as a compliance

8   officer involved specific individual complaints of

9   discrimination as opposed to generalized compliance

10  review?

11     A.   Less than ten percent.

12     Q.   Did you ever have occasion to deal with a

13  disability discrimination complaint by a person alleging

14  that he or she had not obtained a reasonable

15  accommodation for disability when you worked as a

16  compliance officer?

17     A.   Yes, I would have investigated.

18     Q.   Do you know how many times you dealt with a

19  matter involving reasonable accommodation of a disabled

20  person?

21     A.   Several times at least, yes.

22     Q.   I'm trying to know if it's fair to say that you

23  can be considered an expert on a subject such as

24  reasonable accommodation for a disabled person under the

25  Federal anti-discrimination laws.  Would it be fair to

1    say that you have an expertise in that area?

2        A.   Yes.

3        Q.   Can you tell me what your understanding is

4    about the law requiring reasonable accommodation?

5        A.   That would be -- reasonable accommodation would

6    fall under the Individuals With Disabilities Act.  And

7    it has provisions that would indicate that no Federal

8    contractor should discriminate against an individual who

9    is identified as a qualified individual with

10   disabilities.

11       Q.   What does the right to reasonable accommodation

12   entail, assuming that you've got a person who has a

13   qualified or recognized disability?

14       A.   It would entail certification, verification of

15   that individual's disability, their being recognized as

16   a qualified individual with a disability on record.

17       Q.   Well, what would reasonable accommodation

18   involve?  What does it mean, reasonable accommodation?

19       A.   To reasonably accommodate under the act, under

20   our rules and regulations, would mean that the

21   contractor would provide accommodations to assist an

22   individual in performing the functions of their duty.

23       Q.   And to what extent would the contractor be

24   required to do that, assuming the person is a qualified

25   disabled person?

1       A.   To the extent that the accommodation would in

2   fact provide the opportunity for that person to perform

3   in their position, perform their duties.

4       Q.   Well, so would the contractor always be

5   required to provide that reasonable accommodation if it

6   would enable the person to perform the essential duties?

7       A.   It would except where the exceptions may be

8   noted in the act itself.

9       Q.   Such as what exceptions?

10       A.   Exceptions under qualifications would be those

11   that an individual would have to demonstrate that the

12   acts that they perform in their job are -- would enhance

13   their performance or opportunity to -- equal employment

14   opportunity under the act to perform their job, that the

15   individual themselves or group of individuals would be

16   provided access to and not denied opportunities for

17   consideration of promotions, training, et cetera.

18       Q.   So now going back to Exhibit 1, still in that

19   first paragraph, Francisca then says, in the first

20   sentence:  "...as an individual with a disability at the

21   Oakland District Office."

22           So did you have any doubt as of March 28, 2005

23   that Francisca Moralez was an individual with a

24   disability?

25       A.   Based on our conversations of her having

1    arthritis, no.

2        Q.  Now, she says, still in the first paragraph, "I

3    have been advised to submit this letter directly to

4    you."

5            Do you know who advised her to submit the

6    letter directly to you?

7        A.  (Shakes head.)

8        Q.  Did you ever ask her?

9        A.  No.  I don't recall.

10       Q.  Did you have any understanding of why anyone

11   would advise Francisca Moralez to submit a letter

12   directly to you involving her complaint of a retaliatory

13   and hostile environment?

14       A.  Repeat that question.

15           MR. SORGEN:  Could you read that back, please?

16               (Record read.)

17           THE WITNESS:  Possibly, yes.  It could have

18   been because I made it clear pretty much to staff

19   members, all staff, that if an individual has a concern,

20   whether it be programmatic or whether it be for a

21   protective reason, that they in fact felt uncomfortable,

22   that they were being discriminated against, that they

23   report it immediately to the manager, their immediate

24   supervisor more specifically, or they had the option to

25   file a grievance or take any other action as necessary.

1   discrimination?

2       A.   Yes.

3       Q.   Okay.   Do you recall any meeting that you had

4   with Francisca Moralez other than the mediation on her

5   complaint of disability discrimination?

6       A.   Say that again.

7       Q.   Do you recall any other meeting besides --

8   about her complaint of disability discrimination besides

9   the mediation?

10      A.   I just said a moment ago that I did, that we

11  may have talked about her -- you said mobility and how a

12  chair may help her.

13      Q.   Did you talk about her working two or three

14  days a week at home?

15      A.   Yes.

16      Q.   What do you recall about the discussion you

17  had?

18      A.   I told her it's possible, it's possible that it

19  could be -- it would continue to be considered.   She had

20  worked at home before.

21      Q.   Oh, because I think when we talked about the

22  motorized scooter, you said that was the first time

23  anyone had ever requested a motorized scooter at work.

24  Is that right?

25      A.   Yeah, that I was involved in.

Page 59

1      Q.  But the request for working at home two or

2  three days a week, that was not the first time anyone

3  had ever requested that?

4      A.  No.

5      Q.  In fact is it fair to say that lots of people

6  are allowed to work at home --

7      A.  Yes.

8      Q.  -- two or three days a week?

9      A.  On occasion, depending upon the request.

10     Q.  But that's not unusual at all?

11     A.  No.

12     Q.  And that's also done as a reasonable

13  accommodation for people with a disability?  Do you know

14  that to have been done as a reasonable accommodation for

15  others before Francisca Moralez requested it in this

16  letter?

17     A.  You asked me two questions.  Which one do you

18  want me to answer?

19     Q.  Well, I changed my question.  So the second

20  question is, and I'll just repeat it again so it's

21  clear --

22     A.  Thank you.

23     Q.  -- do you know of anyone for whom working at

24  home was done as a reasonable accommodation to a

25  disability prior to March 28, 2005?

Page 60

1     A.  I don't know.  I'd have to look at our files,

2  consult that information.

3     Q.  Well, do you recall offhand anyone for whom

4  working at home was done as an accommodation to sickness

5  or disability?

6     A.  I would imagine so, yes.  It probably has been

7  in different offices, that request made by managers, and

8  they have the authority to be able to grant that.

9  That's part of a daily assignment consideration for

10  individuals who work on various cases.

11     Q.  I'd like to know if you recall the names of

12  anyone who received that kind of dispensation to work at

13  home two days a week, three days a week.

14     A.  No, I don't know.

15     Q.  Do you know somebody named Bertina (phonetic)

16  Roberts?

17     A.  No, I don't know anybody named Bertina.

18     Q.  I'm sorry.  Berlene Roberts.

19     A.  Yes.

20     Q.  Do you know if Berlene Roberts was ever allowed

21  to work at home two or three days a week?

22     MS. FITZGERALD:  Michael, I'm going to direct

23  him not to answer any questions that have to do with

24  anyone other than Francisca, because that information

25  about Ms. Roberts' circumstance, whatever it may be, is

Page 62

1          Because I'm sure it's going to come up again.

2          MS. FITZGERALD:  I would imagine it will.

3          MR. SORGEN:  Because one of the elements in any

4    discrimination case is differential treatment.

5          MS. FITZGERALD:  That's true, but to my

6    knowledge, and as I read the complaint, Ms. Moralez is

7    not claiming she was treated differently than any other

8    individual with a disability or issue.  I think we need

9    to be clear on that.

10         MR. SORGEN:  I think that's an inherent claim

11   in any disability discrimination case.

12         MS. FITZGERALD:  I don't read it that way, but

13   we can talk about it later.

14         MR. SORGEN:  It's certainly evidentiary if

15   other people were given accommodation and she wasn't.

16   That would be evidence, that would be relevant

17   comparative evidence.

18         MS. FITZGERALD:  I'm not sure about that, but

19   we can talk about it, sure.

20   BY MR. SORGEN:

21      Q.  Now going back to Exhibit 1, we're in the third

22   paragraph, the last sentence.  Ms. Moralez states in her

23   letter to you:  "I also welcome any ideas you may have

24   for a reasonable accommodation on my behalf."

25         So did you ever have any discussion with

1     Francisca Moralez about providing her a reasonable

2     accommodation in response to her request here?

3         A.  Other than the furtherance of our conversation

4     about her working at home and a request for a chair and

5     the review and evaluation of her working conditions in

6     the office and her cubicle --

7         Q.  So is it your testimony, sir, that you and

8     Francisca Moralez had a conversation about her March 28,

9     2005 letter?

10        A.  About this letter you mean?

11        Q.  Right.

12        A.  At the time it was provided to me?

13        Q.  Yes.

14        A.  I don't recall, because I don't recall how I

15    got the letter, if it was -- I don't know if it was -- I

16    can't recall if it was hand delivered.  I just don't

17    remember from 2005 how the letter came to me and what

18    happened around that at that time.

19        Q.  But it is your testimony, sir, that you had

20    conversation with Francisca Moralez about her request to

21    work at home for two or three days a week?

22        A.  Yes, I recall that.

23        Q.  Do you recall having a discussion with her

24    about her request for an electric scooter?

25        A.  Yes.

Page 64

1      Q.  But do you recall whether that discussion that

2   you had with her occurred before or after March 28,

3   2005?

4      A.  I don't recall.  Again, it could have, but I

5   don't recall.  I'd have to see documents to refresh my

6   memory about any meetings, any conversations that were

7   held.  And I may be able to be prompted from that to

8   recall, and I'd be glad to talk about it, but I just

9   don't recall.

10     Q.  Do you recall if you had in-person conversation

11  with her about her request for reasonable accommodation?

12     A.  Yes.  You asked me that before.

13     Q.  Okay.  So yes, your answer is yes?

14     A.  Yes, we talked about her request for several

15  things, again, about her working conditions in her

16  office.  She asked for any assistance in being able to

17  help her work better in her office, in her office space,

18  to which I said, "Yes, I'll take a look at it."

19          You asked me earlier about that and I explained

20  to you that I did consider that and as a result from

21  that her desk was raised.  I believe she got an

22  articulated or some type of keyboard tray.  Her lights

23  were adjusted.  Something else happened.  You'd have to

24  ask her or check the record on all the things we did to

25  make that accommodation for her.

1   representatives, in this case Roz Itelson.  The

2   determination as to the policy, the procedures, the

3   requirements, et cetera, would have been known by them.

4   They would have advised me with some recommendation as

5   to its contents and its actions.

6       Q.  Okay.  Did you think that -- As of March 28,

7   2005, was it your opinion that Francisca Moralez's

8   disability was obvious?

9       A.  Yes.

10      Q.  And was her need for reasonable accommodation

11  obvious as of that time?

12      A.  It would have been.

13      Q.  Now, then the next part, going back to Exhibit

14  1, the last three lines here, after they talk about

15  obvious, we're talking about the EEOC determination, it

16  says:  "...or the individual has already provided the

17  employer with sufficient information to substantiate

18  that she has an ADA disability and needs the reasonable

19  accommodation requested."

20      Now, my question is, sir, were you aware of any

21  medical information that Francisca Moralez had already

22  provided the agency regarding her need for reasonable

23  accommodation prior to March 28, 2005?

24      A.  I don't recall if she submitted something.  It

25  would have come through -- been submitted to her

1    resources department and any other individuals expert in

2    the condition of making the determination as to whether

3    or not an individual is qualified for such accommodation

4    request.

5        Q.  So, in other words, it goes to the various

6    people that you talked about, Pam Gibbs or Roz Itelson,

7    for their review, recommendation, but you make the

8    decision?

9        A.  No.  It would go to their review, and they

10   would make a recommendation based on whatever facts and

11   information they had.  They would then come back and

12   tell me, here's what our recommendation is.  And in some

13   cases they would give guidance, in many cases, they

14   would give guidance as to the steps that I should take

15   next.  If they felt in their recommendation that more

16   documentation would be needed, I would convey that to

17   Francisca, which I did, or any other individuals who

18   would have any number of concerns.

19       Q.  But it was within your responsibility to make

20   the final determination for the agency on whether you

21   were going to grant or deny a requested reasonable

22   accommodation?

23       A.  You could say that, yes.  The qualification to

24   my "yes" would be that I would respond in kind to the

25   recommendations and the suggestions provided to me by

Page 77

1    the individuals who would review such documents.

2        Q.   Now, were you involved in hiring Sarah Nelson

3    to be the acting director of the Oakland district

4    office?

5        A.   Yes, I was involved from the standpoint of

6    reviewing the selection that had been made by the

7    regional director.

8        Q.   Did you have any role in bringing -- any other

9    role in bringing Sarah Nelson to the Oakland district

10   office?

11       A.   No.   That's a decision that was made by the

12   regional director.

13       Q.   Did you ever -- Were you aware of any direction

14   that Sarah Nelson had to get rid of employees at the

15   Oakland district office?

16       A.   No.

17       Q.   You had worked on an assignment for

18   approximately one year at the Oakland district office,

19   right?

20       A.   Yes.

21       Q.   What was your -- Did you have any particular

22   opinion or perception about the Oakland district office

23   and its role in the district?

24       A.   Yes.

25       Q.   In the region I mean.

1    job."

2        A.   Where are you?

3        Q.   I'm in Gilliland's message.

4        A.   Okay.

5        Q.   Did you agree with that statement completely?

6        A.   I don't know what I said then to that, if

7    anything.

8        Q.   I'm asking you if in your statement that you

9    agree with Woody and Roz completely on this issue --

10       A.   Again, let me qualify that my complete

11   agreement is the last paragraph of this document that

12   you're referring to.

13       Q.   About deferring to the experts?

14       A.   Yes, sir.

15       Q.   But did you have any discussion with -- other

16   than these e-mails -- any discussion with Woody

17   Gilliland about whether providing flexi place would set

18   a precedent?

19       A.   I don't recall, I don't recall that.

20       Q.   So what is flexi place as you understand it?

21       A.   Flexi place is the -- it's written in the

22   collective bargaining agreement, referred to as the CBA,

23   and it discusses what the terms of flexi place are for

24   employees doing work of the agency.  And flexi place

25   details how that is to be used.

Page 92

1      Q.   Well, does flexi place mean working at home a

2  couple days a week?

3      A.   It could.  Or a whole week or whatever.  It

4  depends upon the severity of the difficulty of the

5  assignments given to whomever.  In this case it would be

6  compliance officers.

7      Q.   So flexi place means flexibility as far as the

8  location in which the employee performs?

9      A.   Yes.

10     Q.   Did you see that as setting a precedent?

11     A.   Again, I don't know what I saw then because I

12 was just copied on it.

13     Q.   But I'm wondering if you felt that providing

14 Francisca Moralez the ability to work at home two or

15 three days a week would have, in March 2005, set a

16 precedent.

17     A.   Well, you've asked me a question that I'm not

18 quite sure what you're asking me.  If you're asking me

19 about flexi place being appropriate for Francisca or any

20 specialist to work at home, my answer is yes.

21     Q.   I'm asking you if it would set a precedent,

22 meaning, I was trying to think about your testimony

23 earlier about other people who had been permitted to

24 work at home --

25     A.   M-hm.

1  period of time, was she able to perform the job of a

2  compliance officer?

3      A.  I'm hesitant to give you an answer on that

4  because it's almost impossible to separate her from her

5  condition.

6      Q.  Now, in your message to Trent Williams you

7  state:  "Trent, you should be very careful to follow

8  agency/regional office hierarchy on this type or (sic)

9  request.  Please work closely with me and especially Roz

10  on your responses to such request from staff in the

11  Oakland district office."

12          So, first of all, could you identify for me who

13  Trent Williams is and what his position was?

14      A.  Trent Williams was the acting district director

15  apparently during this period.

16      Q.  And why in your opinion, sir, should he be very

17  careful to follow the agency/regional office hierarchy

18  on this request for reasonable accommodation?

19      A.  Because in my opinion I didn't have an answer

20  for such a request made by Francisca on the issue of a

21  scooter.

22      Q.  But why should he be so careful to follow the

23  hierarchy?  What was there about this situation that

24  required special care?

25      A.  Because the people in Washington were

1    to a simple request for reasonable accommodation?

2       A.  The situation itself in the request and

3    accommodation.  Again, I had not been acquainted with

4    such a request and what to do about it from the

5    standpoint of authorizing the use of a scooter, purchase

6    of whatever it was.

7       Q.  Now, we previously looked at Executive Order

8    13164, which was to establish procedures to facilitate

9    the provision of reasonable accommodation.  It's Exhibit

10   2.

11      A.  All right.

12      Q.  Now, my question, sir, is, in the OFCCP was

13   there any rule or policy that you had to go through the

14   ESA office in Washington and defer to the experts before

15   granting any reasonable accommodation requests?

16      A.  That was a practice that that's what we did.  I

17   was instructed to do that, and I think every manager who

18   assumes that role and responsibility as part of

19   management training, wherever it may have been received,

20   is explained the importance of executing their duties

21   and to secure the recommendation and advice of

22   individuals within the agency, be they attorneys or

23   professional staff in human resources, in making

24   decisions regarding the normal flow of business or any

25   other situations.

1    Q.  Was this about all decisions or was there sort

2  of a special protocol to go through Washington on any

3  request for reasonable accommodation of a disability?

4    A.  Well, let me separate your question.

5        The first part of it would have been, possibly.

6        The second part of it would have been somewhat,

7  yes, because we make decisions based on case-by-case

8  bases and we may not be privy to rulings, decisions,

9  practices, policies that have been issued by the

10  national office.  So consequently it would be

11  appropriate for a manager at my level or above to follow

12  the hierarchy.

13    Q.  So at this time you were the deputy regional

14  director?

15    A.  Yes.

16    Q.  And Woody Gilliland was the regional director?

17    A.  Yes.

18    Q.  Now, did you or Mr. Gilliland have the

19  authority to grant a request for reasonable

20  accommodation to an OFCCP employee within your region

21  without going through Washington?

22    A.  I would have to say yes, depending upon the

23  request, depending upon the request for that particular,

24  or a particular, accommodation.

25    Q.  So what was there about Francisca Moralez's

1    request that made you feel that it was advisable to get

2    the opinion of the experts in Washington and defer to

3    them?

4        A.  Because Ms. Moralez requested a -- What is it

5    referred to properly?

6        Q.  Motorized scooter?

7        A.  Motorized scooter.

8        Q.  What was there about that request that caused a

9    problem?

10       A.  I answered that question a couple of times

11   before.  I'll certainly be glad to answer it again.  I

12   was not familiar with the procedure to authorize the use

13   of an item like a motorized scooter.

14       Q.  Did you have any idea as of March and April

15   2005 what a motorized scooter would cost?

16       A.  I may have, I may not have.  I'm not sure.  Let

17   me think.  I might have looked it up online.

18       Q.  Do you have any recollection what it would

19   cost?

20       A.  No.

21       Q.  Did you have any idea around that time how a

22   motorized scooter would facilitate Francisca Moralez in

23   performing her duties?

24       A.  Well, I assumed it would make it, hopefully,

25   easier for her to perform in her duties and that it

1    would get her around in the office and it may have been

2    of some assistance to her in that way.

3        Q.  I guess one difference between that and a

4    wheelchair is a wheelchair is something you operate

5    manually and the motorized scooter would get her around

6    without her exerting her own force of her arms and

7    shoulders and so on.  Did you check with anybody about

8    how the motorized scooter might benefit her?

9        A.  I think I may have talked with Roz, and Pam

10   Gibbs may have made a comment about it, Kate Dorrell

11   perhaps.  But that's why they wanted to research and

12   look at other information, medical information.

13            MR. SORGEN:  Let me mark as Exhibit next in

14   order -- Would that be 6?

15            THE REPORTER:  Yes.

16            MR. SORGEN:  -- a one-page Bates stamped

17   USA738.

18                    (Plaintiff's Exhibit 6 was marked for

19                    identification.)

20   BY MR. SORGEN:

21       Q.  Have you ever seen Exhibit 6 before, sir?

22       A.  No, not to my knowledge.

23       Q.  Do you recognize the handwriting?

24       A.  No, I don't, I don't recognize the handwriting.

25       Q.  See there's a reference, the third line down,

1    this response, was it unclear to you what the nature and

2    extent of her disability was?

3        A.  Repeat that question, please.

4            MR. SORGEN:  Could you read that back, please?

5                (Record read.)

6            THE WITNESS:  I think it referred back to my

7    answer before on that.  I know she had arthritis.  And

8    when the claim was filed, the rheumatoid and whatever

9    else was the first I knew about that.

10   BY MR. SORGEN:

11       Q.  Was it unclear to you in May 2005 how the

12   requested accommodation, a motorized scooter, would

13   assist Ms. Moralez in performing the essential functions

14   of her position?

15       A.  I answered that before as well and I said I'm

16   sure it would have been of use to her in moving around

17   the office and getting from one place to the other, yes.

18       Q.  So did you agree with the gist of Mr. Williams'

19   response to Ms. Moralez that he couldn't really make the

20   decision to grant her reasonable accommodation without

21   further medical documentation?

22       A.  If that's what he was advised by Roz Itelson

23   and other individuals involved in the recommendation, I

24   would say yes.

25       Q.  But did you have your own opinion about whether

1    further medical documentation was necessary?

2        A.  No.

3        Q.  Do you know if any of those who were involved

4    in handling Francisca Moralez's request, that includes

5    you, Woody Gilliland, Trent Williams, Roz Itelson, did

6    any of you ever talk to her direct supervisor about the

7    disability she was experiencing, the impact it had on

8    her ability to perform and the benefits to be gained

9    from the reasonable accommodation she requested?

10       A.  I can only speak for myself, and that goes back

11   to my answer before.

12       Q.  Do you know if any of the other three talked to

13   Alberto Rocha about any of those matters?

14       A.  I don't know if perhaps they did.  I guess they

15   would have said, "I'm going to talk to Al about it."  So

16   it's a possibility they could have done that.

17       Q.  But you don't know one way or the other if they

18   did?

19       A.  Not offhand.  Unless I saw some documents or

20   something that were shared between individuals,

21   whatever, I don't recall.

22       Q.  Now, at this time when you were the deputy

23   regional director, what was Dr. Rocha's position?

24       A.  He was the area -- Excuse me.  He was assistant

25   deputy director.

1    A.  Her?

2    Q.  -- to Francisca Moralez that the doctor's note

3  contained no signature?

4    A.  Yes.  I said that earlier.

5    Q.  You said that to her at the meeting?

6    A.  I may have.

7    Q.  Now, was this a mediation meeting on her EEO

8  complaint?

9    A.  If it was, you wouldn't have this document.  So

10  it must not have been.  I don't recall that that was.

11  It says anticipation of the mediation today.

12    Q.  So the mediation --

13    A.  At 2:00 o'clock.

14    Q.  -- was a mediation of her request for

15  reasonable accommodation?

16    A.  It would have been.

17    Q.  And did you have such -- Did you attend such a

18  meeting?

19    A.  Yes, I did.

20    Q.  And who else was in attendance?

21    A.  The mediator for sure, and I can't recall who

22  else was in the meeting.

23    Q.  Francisca Moralez was there?

24    A.  Other than Francisca, yes.

25    Q.  So you don't recall anyone other than the three

1   of you?

2       A.  Not offhand.

3       Q.  And do you recall how long that mediation

4   lasted?

5       A.  No.

6       Q.  Do you recall if you successfully resolved the

7   issues?

8       A.  No.

9       Q.  Do you recall that this was the second

10  mediation scheduled?

11      A.  Yes.

12      Q.  And the first mediation, that no one showed up

13  from the agency; is that correct?

14      A.  I don't know about anybody else, but I wasn't

15  there.

16      Q.  Well, did you know about a first mediation that

17  had been scheduled for July 5?

18      A.  Yes, I did.

19      Q.  So do you know why nobody from the agency

20  showed up?

21      A.  I know why I didn't show up.

22      Q.  Why?

23      A.  Because I had a conflict that particular day

24  and was out of the office.  And I called the mediator

25  and told the mediator that I would not be able to come

1   to this mediation.

2       Q.  And was there anyone else in your office who

3   could have gone to the mediation in your stead?

4       A.  I don't know.  At the time, I don't know.

5       Q.  How much notice did you give the mediator

6   before the meeting that you wouldn't be there?

7       A.  I don't recall.  You'd have to look at whatever

8   notes might have been kept.

9       Q.  Would you have any notes of your contact with

10  the mediator in advance of the first mediation

11  session --

12      A.  No.

13      Q.  -- as to when you called?

14      A.  (Shakes head.)

15      Q.  Is it fair to say -- Was the mediator named

16  Zenon Brena in the August 22 meeting?

17      A.  Yes.

18      Q.  And Zenon Brena is employed with OASAM?

19      A.  To my knowledge, yes.

20      Q.  So this was an internal mediation within the

21  OFCCP?

22      A.  Yes.

23      Q.  Oh, in the first meeting that you couldn't go

24  to, did you try to notify Francisca directly that you

25  wouldn't be there?

1    A.  No.

2    Q.  Were you not talking with her at that time?

3    A.  What do you mean by that question?

4    Q.  Well, why didn't you notify her?

5    A.  Because it was a mediation and the mediator was

6  handling the mediation.  And so I told the mediator that

7  I wouldn't be there, and that's protocol.

8    Q.  So the only reason you didn't tell Francisca

9  directly that you couldn't make it was the protocol?

10   A.  (Nods.)

11   Q.  So at the mediation did you make any statement

12  to the effect that you could not read the letter from

13  Dr. Shapiro?

14   A.  I can't talk about the mediation.  That was a

15  mediation separate, the contents and discussions in the

16  mediation.

17   Q.  Well, let's ask about it right now.  Just look

18  at the letter that's attached from Dr. Shapiro.  Can you

19  read that?

20   A.  Some.  Some I can't.  Some words I can make

21  out, some I can't.

22   Q.  Can you read the part at the end of the first

23  paragraph that says "a motorized scooter is necessary

24  for her to be able to adequately perform her job"?

25   A.  Let me find it.

1    A.  No.

2    Q.  Do you have any idea whether she sought the

3  disability retirement because she had been unable to get

4  a reasonable accommodation?

5    A.  No.

6    Q.  But you were aware of all that when you wrote

7  your affidavit on December -- signed your affidavit on

8  December 14, 2006 that you did not recall -- that you

9  were not aware that she had been discriminated against?

10    A.  Yes.

11    Q.  Now, you state in response to number 4 in this

12  affidavit, now it's on page 3, the last sentence says:

13  "Once an employee provides information to their

14  immediate supervisor, the practice of the agency to

15  forward such information to OASAM for evaluation, as

16  soon as possible."

17    A.  Okay.

18    Q.  Is that a fair statement, that that was the

19  practice?

20    A.  Yes.

21    Q.  So is it fair to state that an employee who

22  requested reasonable accommodation cannot just get it

23  from the supervisor or even from the regional director

24  without having first an evaluation from the OASAM?

25    A.  No.

1    Q.  So this practice to forward the information to

2  OASAM for evaluation, when are exceptions made to that

3  practice?

4    A.  It would probably be on simple matters as

5  routine as asking for an accommodation of a keyboard,

6  which we routinely do, for a light to be placed on a

7  cubicle on one of the desks.

8    Q.  Having the ability to work at home one or two

9  or three days a week, isn't that routine for disabled

10  employees of the OFCCP?

11    A.  I don't know.  When you say routine, I don't

12  know how you define "routine" in that manner.  I know

13  that all employees under flexi place, depending on their

14  work assignments, have the opportunity to request that

15  they take their work home.

16       I do know that the manager, in league with that

17  person who makes the request, the employee, decides how

18  long they may be out, the nature of the work being

19  worked upon.

20       When that person returns, management has the

21  right to see the work to verify that it was completed

22  during the time that the person was out of the office.

23    Q.  So would Francisca Moralez's direct manager

24  have had the authority to allow her to work at home two

25  or three days a week as a reasonable accommodation?

**EXHIBIT 3**

Gail P. Hunt, LCSW, BCD

PSYCHOTHERAPY, CONSULTATION AND ASSESSMENT
BOARD CERTIFIED DIPLOMATE IN CLINICAL SOCIAL WORK

3030 Ashby Avenue . Suite 111
Berkeley, California 94705
PHONE 510-841-3002
FAX: 925-254-3741

CLINICAL SUMMARY
FRANCISCA MORALEZ
March 17, 2008

I.    REASON FOR SUMMARY

Ms.Moralez's attorney, Michael Sorgen, Esq., for purposes pertaining to a pending lawsuit, requested a summary of my clinical work with Francisca Moralez.

II.   TREATMENT DATES

- Date of First Visit:  February 2, 2006
- Frequency of Sessions:  Weekly
- Treatment is Ongoing

III.· PRESENTING PROBLEM

Francisca presented herself for treatment due to problems she was having at work. A previous male district director and two past female district directors had made things difficult for her and for other disabled workers at her job site. Francisca was under a lot of stress at work and was looking for help dealing with the physical and emotional ramifications of her stress as well as for help in deciding what to do about her job. She had applied for "reasonable accommodation" at work in the form of, one: a motorized wheelchair to use at the office and, two: the ability to work from home. There were no signs that her employer(s) intended to respond positively to this request. Instead, she felt harassed, misunderstood, and frightened. Francisca was quite anxious, depressed and even suicidal at our first meeting.

IV.   DSM IV–TR MULTI-AXIAL DIAGNOSIS

| | | |
|---|---|---|
| Axis 1: | 308.3 | Stress, Acute Situational Disturbance |
| | 296.22 | Major Depressive Disorder, Single Episode, Moderate (R/O Severe), w/Atypical Features |
| | V62.2 | Occupational Problem |
| Axis II: | V71.09 | No diagnosis on Axis II |
| Axis III: | 714.0 | Rheumatoid Arthritis |
| Axis IV: | | Occupational Problems |

|        |    |               |
|--------|----|---------------|
| Axis V: | 53 | GAF (2006)    |
|        | 72 | GAF (Current) |

## V.    RELEVANT HISTORY

*Family Background:* Francisca grew up in rural Michigan. Her father worked blue-collar jobs, while her mother stayed home to care for the children. There were seven children. Francisca was the fifth child born.

Francisca grew up in a near-poverty environment. Nine people lived in a two-bedroom rented house. Tempers sometimes flared due to the stress of overcrowding, insufficient food, and an insecure financial future. Nevertheless, Francisca had a positive relationship with her mother and siblings growing up. Her father was home rarely, as he worked long hours. When he was home, he was usually sleeping.

*Education:* After graduating high school, Francisca left home at age seventeen. She knew she was bright, though academic achievement was never particularly encouraged in her household.

Francisca put herself through college and then through law school by virtue of working full time, grants, scholarships, and educational loans.

*Health:* Francisca was diagnosed with rheumatoid arthritis in January 2001. Before that, she describes herself as being in good to excellent health.

*Employment:* Francisca worked for OFCCP beginning in 1997. From approximately 1999 until 2004, Francisca worked from home three days per week.

In mid-2004, a new acting director was appointed. This director was apparently known to staff as a "hatchet-manager." Francisca experienced a lot of anxiety about the future of her job. At this time, she was walking with two canes.

Several instances occurred under this management that communicated to Francisca that she was not safe at her job.[1] She feared being fired. At least three disabled workers and veterans had asked for "reasonable accommodation" for various disabilities without success. Those workers and Francisca believed that the new acting director was looking for reasons to terminate their employment. During this director's tenure (06/2004 – 04/2005), Francisca wrote a letter asking for reasonable accommodation. During this time, she also filed an Unfair Labor Practice for egregious conduct on the part of this acting director. This manager also went to great lengths to publicly humiliate Francisca by criticizing her appearance and alleging that she had body odor.

---

[1] One example of this occurred almost immediately. The district director sent Francisca to assist in a compliance evaluation. However, upon arrival Francisca saw that there was no elevator and she needed to get to the second floor. Francisca informed the director that is was extremely difficult for her to get to the second floor and asked to be removed from the team, but the director refused. Two men had to assist her up the stairs each day

In approximately September 2004, two disabled workers who had requested reasonable accommodations were fired. Francisca felt increased anxiety as she assumed that a similar fate awaited her if she were to make a similar request.

A new acting district director was hired in April 2005. Francisca was optimistic that things might change under this new director. However, if anything, the situation worsened. Francisca experienced the new acting district director as being "rude, abusive and harassing" towards her and others[2]. Her arthritis symptoms, already increased under the tenure of the previous acting district director, worsened still.

Francisca began using a wheelchair full-time at work in 2005. Due to the amount of moving from place to place, she needed to do both inside the office and during onsite reviews, Francisca's hands, wrists, shoulders, knees, and arms ached and became quite painful at work. She began to wear thick gloves on her hands. After work, she placed alternating hot and cold packs on her hands and arms to help with the pain. She requested a motorized wheelchair as a reasonable accommodation.

Francisca had several altercations with this district director in 2005. In May 2005, she filed an informal complaint of discrimination. The next week, this acting district director threatened to not pay Francisca.[3] Francisca's symptoms continued to be stress-driven and much worse after work, particularly following any interaction with the acting director. [4]

In July of 2005, the Agency did not appear for a scheduled mediation regarding Francisca's request for accommodation and gave no advance notice of their intent to not appear. Requests for more medical documentation immediately followed, despite the fact that Francisca had already provided what seemed like more-than-adequate documentation.[5] In an effort to comply, however, Francisca provided additional documentation from her doctor, including a letter from the doctor documenting the need for an electric scooter.

A second mediation was scheduled for August 2005. This mediation lasted only ten minutes. One of the participants complained that he could not read the doctor's letter; Francisca read it aloud. In that same month, Francisca filed a formal complaint of disability discrimination. Two weeks later, she was asked yet again for more medical documentation regarding her need for a motorized scooter.

In December 2005, Francisca's case was dismissed. In January 2006, she sent a Notice of Appeal to the EEOC. She was having an extremely difficult time at work getting around. She began to feel frightened that she would not be able to continue to work without the accommodation requested.

The tenure of the male acting director ended in approximately October 2005. He was

---

[2]  For example, during a staff meeting in May 2005, he said, "Nobody deserves the salary they are being paid and I wouldn't walk a case of anyone's across the street."

[3]  In April 2005, he refused to sign the timesheet she prepared during her leave-time and forced her to retrieve her laptop from her van even though walking with two canes was extremely difficult. He did not offer to assist her

[4]  Told to me by Francisca and confirmed during a phone call to her roommate in April 2006

[5]  Francisca brought me a list of the documentation she provided

followed by an "abusive" female acting director who also targeted Francisca by means of "harassment and intimidation because of her disability." Francisca often noted that this director "repeatedly lied about conversations" between herself and Francisca and "used that to submit false documentation" against Francisca as a means to "harass, intimidate and undermine her job performance."

In May of 2006, Francisca took twelve weeks from work under the Family Medical Leave Act (FMLA). At the time, she submitted the appropriate forms to the agency regarding her need for medical leave under FMLA. The agency again demanded more medical documentation that was seemingly unnecessary and served to create more anxiety for Francisca. Eventually the agency re-evaluated their demands and Francisca remained on medical leave without providing further medical documentation. During that time, she filed for Disability Retirement. She did not return to work.

## VI. PSYCHOLOGICAL TESTING ADMINISTERED

REASON FOR ASSESSMENT: Clients who exhibit or have reported[6] high difficulty before or during treatment are routinely administered one or more test measurements. Not only does this give me a baseline number, it also helps to pinpoint focal points of difficulty.

The following tests were administered to Ms. Moralez:

- BECK DEPRESSION INVENTORY[7] on: *02/02/06, 02/16/06, 03/22/06, 04/24/06, 06/05/06, 11/13/06, 04/09/07, and 10/08/07.* Results follow:

---

[6] Before their first appointment, new clients receive a lengthy questionnaire which includes multiple self-report items re: mood state

[7] The BDI, one of the most widely used tools for measuring for depression, is a 21 item self-report rating inventory measuring characteristic attitudes and symptoms of depression *(Beck et al., 1961).*

| RANGE | LEVEL OF DEPRESSION | FRANCISCA | |
|---|---|---|---|
| | | SCORE | DATE |
| 40 + | EXTREME | 42 | 02/02/06 |
| 31 – 40 | SEVERE | 38 | 02/16/06 |
| | | 35 | 03/22/06 |
| | | 33 | 04/24/06 |
| 21 – 30 | MODERATE | 26 | 06/05/06 |
| | | 22 | 11/13/06 |
| | | 24 | 04/09/07 |
| 17 – 20 | BORDERLINE | 20 | 10/08/07 |
| 11 – 16 | MILD | | |
| 0 – 10 | NORMAL | | |

B. DASS–Depression/Anxiety/Stress Scale[8] on 02/02/06, 03/22/06, 06/12/06, and
10/08/07. Results follow:

---

[8] The DASS is a set of three self-report scales designed to measure the negative emotional states of depression, anxiety, and stress. Lovibond, S.H. & Lovibond, P.F., "Manual for the Depression Anxiety Stress Scales," 2nd Ed. Psychological Foundation, Sydney, 1995.

| SCALE FOR: | 1. DEPRESSION | Francisca Depression Score | 2. ANXIETY | Francisca Anxiety Score | 3. STRESS | Francisca Stress Score |
|---|---|---|---|---|---|---|
| INTERPRETATION: | SCORE RANGE | | SCORE RANGE | | SCORE RANGE | |
| Normal | 0 - 9 | | 0 - 7 | | 0 - 14 | |
| Mild | 10 -13 | 10/08/07 score: 12 | 8 - 9 | | 15 - 18 | |
| Moderate | 14 - 20 | 06/05/06 score: 15 | 10 - 14 | 10/08/07 score: 11  06/05/06 score: 14 | 19 - 25 | 10/08/07 score: 21  06/05/06 score: 24 |
| Severe | 21 - 27 | 03/22/06 score: 25 | 15 - 19 | | 26 - 33 | |
| Extremely Severe | 28+ | 02/02/06 score: 30 | 20+ | 02/02/06 score: 24  03/22/06 score: 22 | 34+ | 02/02/06 score: 38  03/22/06 score: 36 |

## VIII. DISCUSSION OF RESULTS

As evidenced by the above tables, Francisca entered treatment on February 2, 2006 with extremely high scores on both the Beck and the DASS. Her initial score on the Beck was 42 and the DASS, 30, both in the *Extreme Range* of Depression. People with scores of this type often evidence suicidal thoughts and feelings. Ms. Moralez reported such thoughts, but did not have a plan.

Also on 02/02/2006, the DASS evidences scores in the *Extremely Severe* range on both the Anxiety and Stress Scales. The Anxiety Scale assesses autonomic arousal, skeletal muscle effects, situational anxiety, and subjective experience of anxious affect. The Stress Scale is sensitive to levels of chronic non-specific arousal. It assesses difficulty relaxing, nervous arousal, and being easily upset/agitated, irritable/over-reactive and impatient.[9]

On 02/15/2006, one sees that scores on all of the Scales comes down by several points. This is a common result for people entering psychotherapy. The act of simply doing something about the problem coupled with the experience of being understood, reduces symptoms by some margin. Nevertheless, Ms. Moralez's scores remain in the *Severe* and *Extremely Severe Range* for all measures.

Results on the Beck and DASS on 03/22/06 demonstrate a minor drop, still leaving her in the *Extreme and Severely Extreme* Ranges. Beck testing on 04/24/06 remains in the *Extreme Range* for Depression.

Most significant, however, is the large drop in scores on June 05, 2006. Ms. Moralez took a twelve-week leave of absence from her employment in May 2006. By the first week of June, her scores on all of the Scales dropped considerably. Her score on the Beck dropped by 10 points, moving her into a low score on the *Moderately Depressed* Range. Her scores on the DASS

---

[9]  http://www.psy.unsw.edu.au/Groups/Dass/

dropped similarly. The Depression Scale dropped by 7 points, moving her into the *Moderate Range.* Her score on the Anxiety Scale dropped by 8 points, moving her into the *Moderate Range* for Anxiety. Finally, her score on the Stress Scale also dropped by 8 points, moving her into the *Moderate Range* for Stress.

These changes are greater than one can usually expect from psychotherapy alone, particularly when testing done multiple times in the previous four months remained in the same range *(Extreme and Severely Extreme.)* The fact that Ms. Moralez's scores did not drop more than a few points in the first three months of psychotherapy is an indication, in this clinician's experience, that the stressor lays outside of the client's control. Given that the only significant change between April and June of 2006 was the change in employment status, the drop in scores is attributed to that.

Over the course of the next sixteen months, Ms. Moralez's scores continued to drop, albeit less dramatically. However, she moved from the *Moderate* to the *Borderline Range* of Depression on the Beck and into the *Mild Range* for Depression on the DASS. Her scores on the *Anxiety and Stress Scales* dropped as well, putting her on the cusp of mild for Anxiety and Stress.

The slightly higher scores on the *Anxiety* and *Stress Subscales* as compared to *Depression,* which by October 2006, was in the *Borderline Range,* are believed to be due to the lawsuit filed by Ms. Moralez.


IX. DISCUSSION

As previously mentioned, Ms. Moralez entered psychotherapy due to the problems she was experiencing at work. She was under tremendous stress at the time. She experienced the following symptoms:

- suicidal thoughts
- insomnia
- irritability
- poor concentration
- loss of memory
- increased pain
- apathy
- severe anxiety
- severe depression
- loss of interest in activities and friends
- difficulty getting up in the morning
- both increased and decreased appetite

Ms. Moralez's stress level at work had increased dramatically with the arrival of new acting district directors, beginning in 2004 and continuing through 2005. She reported higher than normal discomfort in her joints on days she interacted with these directors. When asked what her pain level was on those days, Ms. Moralez reported that it was sometimes as high as a nine on a scale of 0 to 10, with 10 being the highest.

Once Ms. Moralez left her employment and the stress level declined, her pain level decreased. She now reports a pain level of three to five on most days. Nevertheless, she misses working, including being actively engaged in helping people as well as the collegial atmosphere she enjoyed before 2004. She has plans to volunteer to do pro bono work once her lawsuit is settled.

Striking to this clinician is that in the two years she has been seeing her, Ms. Moralez has never once complained about her rheumatoid arthritis. Despite the sudden onset of arthritis inn 2001, rather late in life, Ms. Moralez appears to have accepted it; she works hard to make the best of her life. Even when she could no longer walk to my office with two canes, Ms. Moralez never complained. In discussions surrounding her physical disability, Ms. Moralez always remains optimistic. She strongly believes that she will overcome her arthritis and works hard to bring about that result (i.e. she exercises several times per week in a nearby pool, eats food that is healthy and nutritious, works hard to maintain a positive attitude, has regular massage appointments and maintains an active personal and social life, to name a few.)

Ms. Moralez is extremely independent and self-sufficient. Having grown up in such a large family, and one that included many hardships, Ms. Moralez learned to survive on her own. As mentioned, she put herself through both college and law school. She has repaid her educational loans. Ms. Moralez does not have a helper of any kind. Although she and her roommate are friendly, they go their separate ways and can go several days without seeing one another. Her roommate works full-time and Ms. Moralez rarely, if ever, asks her roommate for help, preferring to be completely independent.

Ms. Moralez now has an electric power chair and makes the most of it. In fact, she travels from her home in Castro Valley to my office in Berkeley via her electric scooter and BART, traveling over a mile to and from BART, no matter how inclement the weather. She always arrives on time and with a smile on her face. She manages to travel to multiple sites via her chair and BART and thoroughly enjoys her outings. She also maintains a small herb and vegetable garden on the deck of her apartment, reads voraciously, visits friends, and is becoming somewhat of a gourmet cook.

Ms. Moralez actively engages in her psychotherapy, as she does in her life. She reads, listens to tapes, and often brings me new and interesting material she has discovered. Her spiritual life and practice is important to her and she implements parts of a spiritual practice on a regular basis.

Ms. Moralez has overcome multiple, extreme hardship in her life. She is the consummate survivor, however, and will continue to work hard, no matter what life brings her way. She is the antithesis of a victim. Her enthusiasm, intelligence, motivation, and depth of spirit make her an ideal psychotherapy client.

Respectfully submitted:

Gail P. Hunt, LCSW, BCD

**EXHIBIT 4**

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3    - - - - - - - - - - - - - - - - - - - -

 4    FRANCISCA MORALEZ,                 )

 5                   Plaintiff,          )

 6    vs.                               ) No. C 07 3807 EDL

 7    ELAINE L. CHAO, SECRETARY OF THE  )

 8    U.S. DEPARTMENT OF LABOR; U.S.    )

 9    DEPARTMENT OF LABOR, EMPLOYMENT   )

10    STANDARDS ADMINISTRATION,         )

11                   Defendants.        )

12    - - - - - - - - - - - - - - - - - -

13

14         DEPOSITION OF GAIL P. HUNT, LCSW, BCD

15               FRIDAY, AUGUST 1, 2008

16

17

18

19

20

21          BEHMKE REPORTING & VIDEO SERVICES

22      BY:   SANDRA LEHANE, RPR, CSR NO. 7372

23             160 SPEAR STREET, SUITE 300

24          SAN FRANCISCO, CALIFORNIA 94105

25                    (415) 597-5600
```

1    consultations with a medical doctor?

2        A.  I never spoke with her doctor.

3        Q.  Okay.  How about notes of consultations with

4    a psychiatrist?

5        A.  I never spoke with a psychiatrist.

6        Q.  About Ms. Moralez?

7        A.  Mm-hmm.

8        Q.  Okay.  Ms. Hunt, you have been Francisca's

9    treating therapist from February '06; is that correct?

10       A.  Yes.

11       Q.  And you're aware that in her lawsuit --

12   that's what brings us here together today -- a lawsuit

13   against the Department of Labor, she's made a claim

14   that she suffered emotional distress.  Is that

15   correct?  You're aware of that?

16       A.  Yes.

17       Q.  Okay.  And have you formed any opinions

18   based --about Ms. Moralez' allegations of emotional

19   distress?

20       A.  That's very vague.  Can you be more specific?

21       Q.  Yes.  Do you have an opinion as to whether

22   Francisca Moralez suffered emotional distress during

23   the time at which she was employed by the Oakland

24   district office of OFCCP?

25       A.  Yes.

Page 31

1        Q.   What is that opinion?

2        A.   I think she suffered extreme emotional

3   distress.

4        Q.   Do you have any other opinions?

5        A.   About the level of emotional distress?

6   I think it was occasionally very abusive.

7        Q.   All right.   Anything else?   Any other

8   opinions?

9        A.   I -- I mean, I can just elaborate on those,

10  but I think that says it.

11       Q.   All right.   Well, my first question to you

12  is, what are the opinions?   And then I'd like to

13  backtrack and then --

14       A.   Okay.   Ask me why?

15       Q.   Yes, each and every basis for those opinions.

16            So are there any other opinions, other than

17  the fact you said, I believe, she suffered extreme

18  emotional distress?

19       A.   I think there was very poor communication.

20       Q.   Okay.

21       A.   I think she was disregarded.

22       Q.   All right.   Anything else?

23       A.   I think she was disrespected.

24       Q.   Do you have any other opinions?

25       A.   No.

Page 32

1          Q.  All right.  Why don't we start from the top,

2     then.

3              You said, I believe, that it was -- I think

4     the word you used was "extreme" emotional distress.

5          A.  Mm-hmm.  Mm-hmm.

6          Q.  Tell me why you believe that or how you

7     formed that opinion.  What's the basis of your

8     opinion? I guess is what I'm getting at.

9          A.  Okay.  That's a big question.

10         Q.  Well, we have plenty of time, so take your

11    time.

12         A.  When I first saw Francisca, she was one of

13    the more distressed clients I've seen in 31 years of

14    practice.

15         Q.  Why do you say that?

16         A.  She could barely form a sentence.  It was

17    very difficult for her to give me any kind of coherent

18    picture.  Now, I'm a pretty fast read so I could

19    follow her, but it was very apparent, and I, you know,

20    made a mental note that she was distracted; that she

21    was -- that she was suffering.  She cried through much

22    of the first -- well, the first few sessions.  And she

23    came in because of what was happening at work, which

24    is unusual.  People generally come because of what's

25    happening in relationships.

 1          And I don't remember -- it doesn't matter

 2     which sessions, you know, but as -- over time, as the

 3     story emerged, and it -- you know, it emerged over

 4     time, the incidents that she described to me were --

 5     were very distressing and her distress was evident.

 6     She was very, very, very upset.  And when I first saw

 7     her, she was suicidal.

 8          Q.  Anything else?

 9          A.  I think -- I think I've answered the first

10     question.

11          Q.  Okay.  That's -- I'm just wondering if there

12     was anything you would like to add.  Feel free to add

13     later if something occurs to you.  You can stop me.

14          A.  Okay.

15          Q.  You can always give me additional

16     information.

17          All right.  I guess the next thing you

18     mentioned was your opinion that you felt -- I guess

19     it's the work environment -- was that what you were

20     saying? -- she was subjected to was very abusive.

21          A.  Yes, I think it was abusive.  I think it was

22     a hostile work environment.

23          Q.  Tell me why.

24          A.  Well, beginning in 2004, she -- the --

25     a supervisor came on board that was quite abusive.

 1    And the first month that she was there, maybe the

 2    first week, she sent Francisca to some sort of hearing

 3    that, when Francisca arrived, there were, I think, two

 4    sets of stairs she had to get up which were

 5    impossible.  She couldn't do it.  So she called back

 6    to the supervisor and asked to be relieved from that

 7    duty, and the supervisor refused.  Had no interest in

 8    how Francisca was going to get up the stairs.

 9            There was no elevator.  Francisca also

10    requested that a report be made about the absence of

11    the elevator because there should have been one there,

12    and she refused to do that, also.  So two men had to

13    kind of literally carry her up the stairs every day of

14    this hearing.

15            There were other incidents like that, both

16    with that supervisor and with other supervisors, and

17    it was just clearly a hostile work environment.

18    People were being let go.  Disabled people were being

19    let go.  Requests for work accommodation were being

20    denied.  Francisca's request for work accommodation

21    was given very short shift.

22            This is sort of an answer to the question of

23    bad communication.

24            One of the meetings that she attended, no one

25    showed up.  It was very disrespectful.  Another time,

 1    it lasted five minutes.  Another time, someone said

 2    "Oh, I can't read this doctor's note," and threw it

 3    over to Francisca.

 4            She wasn't given time to vote.

 5            At one point, a supervisor -- this is when it

 6    was a male supervisor -- asked where a notebook

 7    computer was.  And Francisca said that it was in her

 8    van, and he made her go out to get it.  You know, it's

 9    not easy for her to get around.

10            That's -- that's the end of my answer.

11    Q.  Okay.  You mentioned that -- very poor

12    communication.

13            Is there anything else you would like to add

14    other than what you've just described?

15    A.  Well, this wasn't discussed.  I mean, she was

16    asking for accommodation.  It wasn't discussed.

17            I think another -- another person who was

18    there at the time, I think he had been a former

19    supervisor, Al Rocha.  Was being really targeted.

20    And, you know, Francisca witnessed all of this.  She

21    witnessed, you know, what was happening behind

22    people's backs and the ways that people were being --

23    trying to be let go of, and it was a frightening and

24    hostile situation.

25    Q.  When you say a "hostile work environment,"

1    what do you mean by that, exactly?

2        A.  It was a lack of regard for other people on

3    the part of the supervisors.

4        Q.  And is that what you mean when you say you

5    have an opinion that she was disregarded?

6        A.  Yes.

7        Q.  Okay.

8        A.  And that her requests were disregarded.  Her

9    request to have her desk raised was disregarded.

10       Q.  Now, when you say her requests for

11   accommodation and her -- you just mentioned the

12   request to have her desk raised -- they were

13   disregarded, or I think you also said with respect to

14   her accommodation, it wasn't discussed --

15       A.  There were -- I think there were meetings

16   around her request for a medical scooter, for a

17   request for a scooter.

18           In terms of asking to have her desk raised,

19   as far as I understood it -- and I'm not sure that

20   this is accurate, but as I understood it, that's a

21   fairly minor thing to accomplish.  And she made --

22   had to make multiple requests for that.

23       Q.  And was that ever provided to her?

24       A.  I'm not sure.

25       Q.  All right.  You mentioned an incident in

1   which a supervisor made her -- she was at a hearing,

2   you mentioned, and there were stairs and she had to --

3        A.   They sent her to a hearing to represent, she

4   and another gentleman.  I asked Francisca, "Were there

5   other people that could have gone in your stead?"  And

6   she said, "Absolutely."  I said, "Was it necessary

7   that you were there?"  She said she didn't think so.

8   I said, "So did you think, then, that your supervisor

9   was sending you there just to make your life

10  difficult?"  And she -- she may not have used those

11  words, but it was that kind of phrase, that the

12  supervisor was doing it knowing what she was doing,

13  and that she was going to make this extremely

14  difficult for Francisca, who couldn't possibly get up

15  those stairs.

16       Q.   Now, did she tell you anything else, or any

17  other incidents in which she felt this supervisor was

18  trying to make her life miserable?

19       A.   Oh, there are many.  They don't come to mind,

20  but I have them in the chronology if you would like me

21  to review that and tell you.

22       Q.   I've reviewed the chronology.  I just

23  wondered, as you sit here today, if there's anything

24  else that comes to mind.

25       A.   That I remember?  That I recall?

1      Q.   Mm-hmm.

2      A.   It's been a while since I wrote the report

3   and since I went over the chronology.

4          Well, up until the supervisor came on in

5   June '06, Francisca had been allowed to work at home

6   three days a week.  The new supervisor did not allow

7   that anymore.  That made it very difficult for the

8   disabled people.  The disabled people who had been

9   allowed to work from home were no longer allowed to do

10  that, which made things much for difficult for them.

11         I think that Francisca felt that Hispanics

12  and disabled people were being targeted specifically.

13  I don't have, necessarily, incidents to back that up;

14  I just know that was her feeling.

15         I believe Al Rocha was Hispanic.  At one

16  point, they attempted to transfer him to Oregon, which

17  he thought was retribution because they had asked him

18  to resign a position that he held.  And I think it was

19  the head of -- he was the head of -- I don't know that

20  I'm going to get this right, but he was the head of a

21  group of --that I think was Hispanic-oriented.  They

22  asked him to resign as the chairman of that group and

23  he refused, and then they attempted to transfer him to

24  Oregon.  He didn't go.

25         I think two other people were let go during

```
 1    this time.  And so there was also a lot of fear on
 2    Francisca's part.  "Am I next?"  "Am I going to be
 3    fired?"  People were calling this female supervisor
 4    the hatchet manager.  Scuttlebutt was, she had come on
 5    board in order to get rid of some of the people,
 6    particularly the disabled, the disabled people.
 7        Q.  Is there anything else you recall that she
 8    told you about her work environment that led you to --
 9        A.  Not at present.
10        Q.  I'm just -- may I just --
11        A.  I understand.
12        Q.  One thing I just wanted to say, it's easiest
13    for the court reporter if I finish my question before
14    you answer.  I know it's unnatural, but if we could
15    try to follow that protocol, I think we would all be
16    better off.
17            (Telephone interruption.)
18            MR. SORGEN:  I'm sorry.
19    BY MS. FITZGERALD:
20        Q.  You also mentioned it was your opinion that
21    Ms. Moralez was disrespected.
22        A.  Mm-hmm.
23        Q.  Is there anything else you would like to tell
24    me about how you formed that opinion?
25        A.  Other than what I've already said, no,
```

1  nothing that comes to mind at present.

2      Q.  And other than those opinions you've already

3  expressed, are there any other opinions that come to

4  mind as we sit here today, at this moment?

5      A.  Just my experience of sitting with her week

6  after week, of how distressed she was, of how abused

7  she felt, how disregarded she felt, how unimportant

8  she felt, how disrespected she felt.  It was very,

9  very painful for her.  Very painful for her.

10      Q.  How did the pain that she was experiencing

11  manifest itself to you?

12      A.  She had -- she was very depressed.  It was

13  hard for her to get around at all.  She just didn't

14  feel like doing anything.  The friends she had been

15  seeing, she wasn't seeing.  She described herself as

16  more irritable.  She was having a very hard time

17  sleeping.  In fact, on the nights when there would be

18  an incident at work that had emotional punch to it,

19  she came home in quite a bit more pain and would find

20  herself awake all night, wrestling with pain.

21      Q.  When you say "pain," emotional pain or

22  physical pain?

23      A.  Physical pain.

24      Q.  I see.

25      A.  The arthritis in her knees got much, much

1    worse when the stress was increased.

2        Q.   All right.

3        A.   She was losing weight and gaining weight,

4    just her whole diet was thrown off.

5            There were days that she called to say,

6    "I just can't get myself to the office" -- you know,

7    "I just can't get there," and we would have a phone

8    appointment.  But it was just too much for her to get

9    going.

10       Q.   Okay.

11       A.   She was generally exhausted all the time.

12   Was very sad.  She was suffering.

13       Q.   Anything else that comes to mind?

14       A.   No.

15       Q.   Okay.  You mentioned you may have had some

16   phone appointments with Ms. Moralez.

17       A.   Mm-hmm.

18       Q.   Would those be reflected in the notes, if you

19   had taken notes?

20       A.   No.  In fact, generally, if I'm on a phone

21   appointment, I don't even take notes, because it's

22   hard enough for me to be very -- I want to be very

23   present when I'm on the phone, and if I'm doing that

24   and writing as well -- for some reason, it's just much

25   harder for me to take notes.  So if there was a phone

1          MR. SORGEN:  Time out for just one second.

2     May we go off the record?

3               (Discussion off the record.)

4     BY MS. FITZGERALD:

5          Q.  Ms. Hunt, in your clinical summary, under the

6     Roman numeral IV, "Diagnoses," you also mentioned

7     major -- well, actually, I'm sorry, let me just back

8     up.  And before we leave your first diagnosis, which

9     was -- what would they call -- in there, you have a

10    number of conditions, if you will, listed.

11         A.  Mm-hmm.

12         Q.  What are -- how do they play as a whole?  Are

13    they different elements of a single diagnosis?  Are

14    they all just descriptions of --

15         A.  Well, 308.3 is acute stress disorder.

16         Q.  Right.

17         A.  I have reframed it to indicate that she does

18    not have a stress disorder; she has an acute

19    situational disturbance.

20         Q.  And then the next -- under that next

21    condition that you've mentioned here is "major

22    depressive disorder, single episode, moderate" --

23         A.  "Rule out" is "R/O."

24         Q.  -- "severe with atypical features."

25         A.  Mm-hmm.

Page 119

1      Q.  What is that, exactly?  What does that refer

2    to?

3      A.  Well, these numbers represent those words.

4    So 296 is major depressive disorder.  "2" is -- in the

5    fourth digit represents single episode, and the next

6    "2" represents moderate.  And I've put "rule out

7    severe" because when you're thinking that -- when

8    you're trying to decide between two and you've chosen

9    one but you're on the fence, then that's the way that

10   you phrase it.

11         The features of a major depressive disorder

12   are repeated major depressive episodes.  Just --

13   a depressive episode is something short-term;

14   a depressive disorder are numerous depressive episodes

15   that begin to create a major depressive disorder.

16         (Telephone interruption.)

17         THE WITNESS:  And not only in the testing,

18   but also in her countenance and in her -- the way that

19   she carried herself and what was happening in her

20   life, this woman had -- this diagnosis is accurate.

21   BY MS. FITZGERALD:

22     Q.  All right.  Any other diagnostic features of

23   major depressive disorder that were present here?

24     A.  Well, let me -- this is very disruptive.

25         MR. SORGEN:  I'm sorry about that.  Cell

Page 120

1    phones.  Somebody told me it was bad to keep turning

2    it on and off.

3              THE WITNESS:  Would you stop talking, please.

4              MR. SORGEN:  Okay.

5              THE WITNESS:  Thank you.  I'm trying to focus

6    here.

7              One of the things that I noticed -- I noticed

8    that I underlined here, and I remember doing this --

9    episodes of major depressive disorder often follow a

10   severe psychosocial stressor.

11   BY MS. FITZGERALD:

12       Q.  And when you say "underlined," you're

13   referring to your DSM that you're looking at?

14       A.  Right, as I was thinking about Francisca.

15       Q.  All right.

16       A.  "Studies suggest that psychosocial events

17   (stressors) may play a more significant role in the

18   precipitation of a first or second episode of major

19   depressive disorder."

20             As far as I know, given -- and looking with

21   Francisca, at her life -- and, you know, we go through

22   someone's life pretty fully -- she has not had major

23   depressive disorder in the past.  This was brought on

24   by what was happening at work.  And I don't think at

25   present I would still give her that diagnosis.

Page 121

1          Let me see her testing.

2          (Witness examines document.)

3          No, at this point I would no longer give her

4    that diagnosis.  This is in relationship to 2006,

5    certainly 2006.

6          Let me see.  When did this start to change?

7          (Witness examines document.)

8          Well, let's see.  By June, she's at 15.  Let

9    me look at the back here.

10         I'm sorry, Michael.  I just was feeling --

11         MR. SORGEN:  I'm surprised you were

12   testifying while I wasn't even in the room.

13         THE WITNESS:  I wasn't.  I was waiting for

14   you to get back.

15         MR. SORGEN:  That was my way of apologizing

16   for the interruption.

17         That's all right.  Go ahead.

18         THE WITNESS:  Yeah, by October of '07 she's

19   in borderline, which is still -- people are still

20   experiencing depressive symptoms.  Zero to --

21   actually, 5 to 9 is considered kind of what is normal.

22   It's saying here zero to 10, but I also think --

23   I think of it more as 5 to 9.

24   BY MS. FITZGERALD:

25         Q.  I'm sorry, this is the Beck?

Page 122

1       A.   Oh, this is the Beck, yeah.

2       Q.   Okay.

3       A.   So by October she was in borderline, so

4    that's no longer major depressive disorder.  So I

5    would no longer say that she has that, and that's the

6    purpose of the single episode number "2," 296.2.

7       Q.   And so just so I'm clear, it's your opinion

8    that the major depressive disorder lasted from in or

9    about February of '06, when you first started therapy,

10   until October of '07, when she was borderline, as on

11   the Beck?

12      A.   You know, I would need to go back and review

13   my notes and I don't have them.  So I can't answer

14   that with any kind of certainty without looking at my

15   notes.

16      Q.   And that would be your handwritten notes?

17      A.   Yes.

18      Q.   What would be indicated in the handwritten

19   notes that would allow you to answer the question?

20      A.   It would remind me what was happening in her

21   life, how well she was functioning, what she was doing

22   outside of her home, what kind of activities she was

23   engaged in.

24      Q.   And that was in October of '07?

25      A.   No.  I would need -- in order to tell you

Page 123

1    when I think that diagnosis changed, I would need to
2    look at my clinical notes.
3        Q.  All right.
4            MR. SORGEN:  Can I ask a question that would
5    help maybe clarify this?
6            MS. FITZGERALD:  Of course.
7            MR. SORGEN:  I notice on the Beck depression
8    inventory that you've been just looking at that it was
9    severe from February to April 24, but you've got the
10   level of depression as moderate beginning June 5, '06,
11   and going into April '07.
12           THE WITNESS:  Yes.
13           MR. SORGEN:  So my question is this:  Can you
14   have a moderate level of depression and still have a
15   major depressive disorder?
16           THE WITNESS:  Yes.
17           MR. SORGEN:  Okay.
18           THE WITNESS:  Absolutely.
19           MR. SORGEN:  Okay.
20           THE WITNESS:  It depends on how much it's
21   affecting your life.
22           MS. FITZGERALD:  Okay.
23       Q.  Now, I have your handwritten notes here and
24   we can go over them at some point, if not today, next
25   time.  So perhaps when we get to that point --