Michael S. Sorgen (State Bar No. 43107)
Joyce Kawahata (State Bar No. 113159)
LAW OFFICES OF MICHAEL S. SORGEN
240 Stockton Street, 9th Floor
San Francisco, CA 94108
Telephone:   (415) 956-1360
Facsimile:   (415) 956-6342

Attorney for Plaintiff
FRANCISCA MORALEZ

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCA MORALEZ,<br><br>    Plaintiff,<br><br>vs.<br><br>ELAINE L. CHAO, SECRETARY OF THE U.S. DEPARTMENT OF LABOR; U.S. DEPARTMENT OF LABOR, EMPLOYMENT STANDARDS ADMINISTRATION<br><br>    Defendants. | Case No.: C 07-3807 (EDL)<br><br>**DECLARATION OF FRANCISCA MORALEZ IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: October 10, 2008<br>Time: 2 p.m.<br>Courtroom: E, 15th Floor |

I, Francisca Moralez, declare as follows:

1. I was hired by Angel Luevano, District Director, as a Compliance Officer with the Office of Federal Contract Compliance Office (OFCCP), Oakland District Office (ODO) in September 1997. Before that time, I had worked at the Mexican American Legal Defense and Educational Fund as a paralegal for one year. I became a Compliance Officer with the OFCCP because of its mission, to protect the employment rights of Federal Contractor employees and to make sure that such contractors practiced affirmative action.

2. In January 2001, I was diagnosed with rheumatoid arthritis ("RA"). As a result, I had difficulty walking and standing at work among other physical actions. Mr. Luevano offered to buy me a power chair when he became aware of my physical impairments. I was very impressed that he offered to do that. He stated that he personally was committed to assisting

1  individuals with disabilities and that it was obvious to him that I was having trouble walking.  He
2  did not request any medical documentation.  I declined his offer because at that time,
3  approximately seven years ago, I felt that I did not need a power chair to perform my job.  I did
4  not want the agency to expend any funds on a power chair that I did not need.

5      3.    Around July 2002, Mr. Luevano informed me that he was taking an early
6  retirement in October 2002.  He had been with the agency for approximately 30 years.  He
7  informed me that William Smitherman, Deputy Regional Director with the support of Woody
8  Guilliland, Regional Director were harassing him and targeting him for termination and that he
9  could read the writing on the wall.  He confided to me that Smitherman and Gilliland had
10  prejudices towards disabled employees and that neither liked the fact that he had hired two
11  disabled veterans recently, E.K. Wade and Richard Gaytan.  Luevano also informed me that
12  Gilliland and Smitherman were putting pressure on him to terminate another disabled employee,
13  Gregory Hunt, because he had missed too much work due to his asthma.

14      4.    Luevano went on to warn me that I should be careful, that Woody Guilliland and
15  Bill Smitherman were aware that I was disabled and had trouble walking, and that Smitherman
16  had specifically asked him what was wrong with me after the Chevron Corporate Management
17  Review conference which I had been a part of.  Luevano told me that he had endured a lot of
18  flack from Guilliland and Smitherman about hiring Rocha, a Hispanic, because he had passed up a
19  black female applicant.  He expressed concern for me and what would happen to me and for
20  Wade, Gaytan, Hunt and Rocha.

21      5.    I was quite shocked by Luevano's disclosures, especially in light of what the
22  mission of the Agency is, i.e., to enforce Title VII and the Americans with Disabilities Act
23  ("ADA"), among other statutes, regulations and mandates.  A part of me didn't want to believe
24  what Luevano told me that day and I am sad to report that his warning was correct.

25      6.    From October 2002 until I left my employment with the agency in May 2006, I
26  observed a pattern of discrimination and retaliation that existed toward me and other employees in
27  the ODO who were disabled, Hispanic, and who had filed EEO complaints or affiliated with or
28  supported those who were or had done so.

Moralez Decl. in Opp. to Defendants' Mot. for Partial Summary Judgment Case No. C073807 EDL

7. A pattern of discrimination began to emerge towards me two months after Luevano's departure. Smitherman had been assigned to serve as Acting District Director at the ODO after Luevano left and he served in that capacity from approximately October 2002 until September 2003. In December 2002, I needed my desk raised due to my physical impairments. I discussed this issue with Dr. Rocha who was now my direct supervisor. He told me that he did not have the authority to grant my request and that I should make my request to Smitherman.

8. About December 2002, I asked Smitherman that my desk be raised as a reasonable accommodation. I emailed him this request and he never responded. When my request was ignored I was frightened, as Luevano's warnings reverberated in my mind. When Smitherman was at the ODO, I avoided letting him see me walk as much as possible. If he conducted a staff meeting, I would make sure I was sitting down before it began so he wouldn't see my difficulty walking, and I made sure to stay seated until he left the conference room so he wouldn't see me walk thereafter. I became afraid of Smitherman and I tried as much as possible to not ask for reasonable accommodation, especially directly to him. I simply suffered with my desk and tried to do my job as well as I could given the circumstances.

9. Also, from approximately October 2002 through September 2003, two other disabled employees began requesting reasonable accommodation. It was very disconcerting to me that they were also ignored and denied by Smitherman and Regional Director, Woody Gilliland. I was concerned for myself and for other disabled employees in the office. We were a unit in the ODO. Whenever something negative happened to one employee it affected everyone, especially with regard to the disabled employees who were requesting reasonable accommodation. The denials and ignoring of our requests for reasonable accommodation created a chilling effect.

10. In October 2003, Alice Young became the new Acting District Director at the ODO. I thought that perhaps I would try again with my reasonable accommodation request hoping for a better result, as it was getting almost impossible for me to sit at my desk and do work. Around December 2003, I made a reasonable accommodation request in writing to Young. She did not respond. Left with no other choice, I filed a grievance and my desk was eventually raised. But the message was loud and clear: You will not get your reasonable accommodations

1  granted by anyone other than Dr. Rocha.  The only reasonable accommodation requests that
2  Rocha could grant were very small ones that didn't need any approval from Gilliland, Young or
3  Smitherman.  Dr. Rocha seemed to operate in an atmosphere of fear, as if he granted my requests
4  in secret.
5     11.    Young served as Acting District Director from October 2003 until June 2004.  I
6  served as Union Steward and thereby became aware during that time that Wade and Gaytan
7  continued to make reasonable accommodation requests that were routinely denied and/or ignored.
8  A definite pattern of intentional discrimination was emerging at the ODO that affected those
9  disabled employees requesting reasonable accommodation.
10    12.    As Union Steward, I assisted them as we struggled against management's
11 discriminatory actions, and filed EEO complaints and/or grievances to assert their rights.
12 Smitherman intentionally created intolerable working conditions for those requesting reasonable
13 accommodations by simply ignoring or denying such requests.  During Young's tenure, Wade was
14 forced to take leave for several weeks because his working conditions became intolerable.
15 Smitherman and Young regularly failed to abide by the Agency's own rule that required that a
16 reasonable accommodation request should be dealt with within 14 days.
17    13.    In June 2004, Young's tenure as Acting District Director ended and Sarah Nelson
18 from the Phoenix Area Office replaced her.  Nelson was known as a hatchet manager, so Wade
19 and Gaytan expressed and I felt deep apprehension regarding her presence in the ODO.  Within
20 two weeks of her arrival, Nelson assigned me to assist other compliance officers doing an onsite
21 visit.  Upon my arrival at the facility, I found that there was no elevator, thus creating great
22 difficulty for me to get up two flights of stairs.  On the first day, Gaytan and other compliance
23 officers had to assist me up the stairs to conduct the review.  I called Nelson and requested that I
24 be removed from this review due to the lack of an elevator and my difficulty in getting up the
25 stairs.  She refused to release me or to cite the contractor for not having an elevator on its
26 premises as required by the ADA.  During the conversation, Nelson came across as very cold and
27 non-empathetic.  I was stunned by her refusal to remove me from the review given my physical
28 impairments, and I could plainly see that a pattern of discrimination towards me and others was

escalating.

14. Early in Nelson's tenure, both Wade and Gaytan continued to ask for reasonable accommodations, but were ignored or denied. With Nelson's appearance in the office, the stress level went up for everyone. She openly harassed Wade and Gaytan especially and wrote them up for their performance of work that they had been performing satisfactorily before her arrival. She belittled them, she attacked them and created intolerable working conditions for them, and even for Rocha because he assisted disabled employees. Witnessing this happen to my co-workers and to my supervisor created great anxiety for me.

15. During autumn 2004, Nelson also told Rocha that I could not be allowed to work at home anymore. I had been working at home approximately 3-4 times a week before her arrival. Rocha had allowed me to do so as a reasonable accommodation and because this was a bargained benefit of the Collective Bargaining Agreement. As I had work to justify working at home, it had been allowed. No longer being able to work at home created an enormous amount of stress for me. It aggravated my RA immensely in that I now had to do much more walking and standing at the ODO from autumn 2004 until I was forced to retire in May 2006.

16. By October 2004, I was in very bad shape physically due to my inability to work at home on a regular basis and the stress in the office. By this time, Gaytan had been fired, allegedly based on his job performance. Wade voluntarily resigned asserting intolerable work conditions. Both individuals are currently in federal court suing the OFCCP as I am.

17. In November 2004, I requested a brief administrative leave to vote due to my physical impairment and Nelson denied the leave. It is at this time that I became extremely concerned for my job. I contacted two attorneys for some assistance in requesting reasonable accommodations but it did not work out.

18. In January 2005, Nelson verbally counseled me for my leave usage. I protested that I was disabled. She denied knowing that I was disabled although I had informed her of such when she started at the ODO in June 2004. This was very upsetting to me. I felt that Nelson continued and intensified Smitherman's pattern of discrimination and that she had Smitherman's approval and encouragement. I was in very bad shape physically due to my inability to work at

1   home on a regular basis and the stress in the office. By then, I was walking with two canes.

2   19.    Also in early 2005, Nelson wrote up Gregory Hunt, another disabled compliance officer for his leave usage as well. As the union steward representing all ODO compliance officers, I informed Nelson that much of the leave Hunt used was covered under the Family and Medical Leave Act ("FMLA") and that by writing Hunt up, she was violating the FMLA, but she would not back down. Around this time, Hunt requested reasonable accommodation but the Agency did not respond within fourteen days as required and did not engage in a productive interactive process. I represented Hunt as his union steward at a meeting with Nelson to discuss his request to work part time at home because of his asthma, but Nelson would not consider accommodating his disability. I could plainly see that Nelson had already gotten rid of two disabled employees requesting reasonable accommodation, and she was now specifically targeting Hunt and myself for discrimination due to our disabilities.

20.    Around March 2005, Rocha conveyed that Nelson also planned on disciplining me for leave usage. He strongly urged me to get certified for FMLA. I took his advice and on March 14, 2005, I submitted a letter to Dr. Rocha (A true and correct copy of which is attached hereto as Exhibit 1) and Form WH 380 which was supported by my doctor. (See Shaprio Dec. Exh. 1.) Rocha later told me that when he submitted the Form WH-380 to Nelson and explained what it was, that she got angry and tossed the form aside on her desk. (Rocha Dec. ¶ 7)

21.    At this time, Dr. Rocha and I also discussed my need for reasonable accommodation. I told him that I was having great difficulty walking and standing and that all this stress with Nelson especially was aggravating my condition. We discussed my need to work at home and my need for a motorized scooter. He informed me that I should make my reasonable accommodation request in writing to Smitherman, because he did not have the authority to approve my requests. I made this request to Smitherman on March 28, 2005 (a true and correct copy of which is attached hereto as Exh. 2).

22.    With my March 28, 2005 letter to Smitherman, I included the Form WH 380 which I had previously submitted to Dr. Rocha. The form stated, in part, the following:

> Patient has severe rheumatoid arthritis with degeneration in knees and feet and shoulders. Some days pain is worse (flares) and it takes her a long time to do activities of daily living ("ADL's") in the a.m. She requires periodic medical visits for this condition, episodically, when flaring she may require full or partial days off from work, or she may be late to work secondary to her condition. Condition is ongoing and not expected to resolve. (Shapiro Dec. Exh. 1.)

23. I felt that the medical documentation regarding my RA in the Form WH 380 documented the fact that I suffered from this disease and supported the fact that I was substantially limited in ability to walk, stand and conduct ADL's. On Form WH 380, my doctor indicated that she needed to see the essential functions of the job in order to assess the answer to question no. 7 (b) and explain what would have assisted me in performing the essential functions of my job. The Agency never responded to her request. (See Shapiro Dec. ¶ 3.)

24. My March 28, 2005 letter to Mr. Smitherman stated the following:

> Since I suffer from rheumatoid arthritis, I have difficulty walking, sitting down, raising up from a sitting position, climbing stairs, walking down stairs, and lifting/carrying items over two (2) pounds while at work in the Oakland District office or while I'm at work onsite at any given company. Any job task that requires any of the aforementioned physical movement can be difficult or extremely difficult for me to perform depending on my physical condition on any given day. An electric scooter would assist me in accomplishing any job task that involves the aforementioned physical actions... The ability to work at home for two to three days per week would also assist me in performing the essential function of my job. I also welcome any ideas you may have for a reasonable accommodation on my behalf. (Exh. 2.)

25. Regardless of what I had written in my letter or what medical documentation I had provided, the agency did not want to accommodate my needs but instead created intolerable working conditions for me in order to force me to quit. Within 24 hours of Smitherman's receipt of my reasonable accommodation requests, he shared it with Gilliland, Regional Director, who directed his subordinates to "*. . . .not set a precedent of providing flexi place to an employee that is not able to perform the essential functions of the job.*" (Sorgen Decl. Exh. 1). This statement from the highest ranking OFCCP official in Regional 9 reflected the pattern of hostility and discrimination against me. Gilliland's denial of my request was immediate and did not involve an interactive process even though I had invited the agency to discuss other possibilities for accommodation.

26. Smitherman never considered my request to work at home seriously either. Nor did Trent Williams the new Acting District Director of the ODO. Instead, the Agency managers

conspired to come up with ways to deny, defer or ignore my requests without engaging in the interactive process, such as by asking for more medical documentation. *Id.* On April 6, 2005, Williams approached me in my cubicle and indicated that we would sit down and discuss my March 28, 2005 request for reasonable accommodation. This never happened; so toward the end of April, I sent Williams an email and asked when we would meet. He never responded. I then followed up with Smitherman with an email that informed him that Williams had never met with me to discuss my request but Smitherman never responded either. I felt really defeated. I couldn't get higher OFCCP management to sit and talk with me about my request. I was dealing with an Agency which was supposed to enforce the ADA but I was getting nowhere.

27. On May 5, 2005, five weeks after I had made my request, I finally received a denial from Williams that ordered the following (a true and correct copy is attached hereto as Exhibit 3):

    1.    Complete attached medical release form authorizing the PHS to review the documentation, and

    2.    Provide documentation prepared by a licensed medical professional explaining:

        a)    the nature, extent, and duration of your disability
        b)    how the disability affects your ability to perform the essential functions of your job (or limits your ability to enjoy the benefits and privileges of your employment); and
        c)    what accommodation you are requesting and how that requested accommodation will overcome specific limitations placed upon you by your disability.

28. My doctor had already provided ample information regarding the nature, extent, and duration of my disability. My March 28, 2005 letter had explained in detail what accommodation I requested and how it would help overcome the specific limitations placed upon me by my disability. My doctor had requested a list of the essential functions of my job but the Agency had never provided it to her.

29. My disability was obvious and what I needed was obvious. All the Agency had to do was talk with my direct supervisor, Rocha, to make that determination, but they never did so. (See Rocha Decl.¶ 6.) I had provided the three items listed above to the best of my ability.

30. After I had provided all the supporting information, I did not understand why the

Agency also needed me to sign a blanket medical release form. It seemed as if the Agency could have made an assessment of my needs without looking at my complete medical file. However, they wanted me to sign a blanket medical release, which I was afraid to do and which would invade my medical privacy. I was very concerned with my medical privacy regarding issues unconnected with my disability.

31. Since I had already provided medical documentation that showed I had a diagnosis of RA with severe degeneration in both knees, and that it was visible and apparent that I had a substantial limitation in my ability to stand and walk, I felt the agency's request for me to sign a blanket medical release violated the law and was a means by which to harass and intimidate me as it had other co-workers in my office who had disabilities. I had also consulted with an attorney who advised me not to sign a blanket medical release form. I felt the request was an attempt to perpetuate the pattern of discrimination against me.

32. I spoke with Pam Gibbs of DOL's Employment Standards Administration Washington D.C. EEO Unit and I told her that the blanket medical release gave the agency the ability to look at my whole medical file, which I felt was unnecessary and invaded my privacy. I offered to provide her further specific information regarding my disability from my doctor but she said they needed the blanket medical release and claimed that this was standard DOL policy. It seemed like the Agency and its EEO Unit were determined to behave in an manner not conducive to an interactive process.

33. I had also witnessed Gaytan and Wade provide their complete medical files to the Agency and/or its Public Health Service. It is my belief that the more medical information the Agency had about these disabled veterans, the more they wanted to get rid of them as employees. My physical condition continued to worsen not only from the stress but from the lack of reasonable accommodation.

34. In May 2005, I filed an informal EEO complaint hoping that we could resolve this matter. I was then having great difficulty walking and succumbed to using a manual wheelchair that I had rented specifically for work. On June 1, I sent Pam Gibbs an email hoping to resolve this issue but she did not respond. During this time, I also assisted Gregory Hunt with his

1 reasonable accommodation request. We got nowhere with his request as the pattern of
2 discrimination continued as to my co-worker as well.

3     35. On July 5, 2005, I went to San Francisco to attend an Agency EEO mediation with
4 a hope to resolve this matter. It was extremely difficult for me to make the journey from Oakland
5 to San Francisco. When I arrived, the mediator informed me that Smitherman was not in
6 attendance. The mediator contacted Smitherman by phone and announced that he was in Los
7 Angeles. Smitherman had not even had the decency to let us know he wasn't coming that day.
8 The mediator had also scheduled mediations that day for Rocha and Hunt. To me, this was
9 another indication of the Agency's pattern of discrimination towards myself and others.

10     36. In August 2005, we scheduled a second mediation. By this time, I had provided
11 the Agency with specific additional medical documentation from my treating physician regarding
12 my need for an electric scooter and the request to work at home. Smitherman complained that he
13 couldn't read it so I read it to him at the mediation. Although it was on my doctor's letterhead,
14 he pointed out that it was handwritten and lacked a signature. I agreed to go back to my doctor
15 and get a typed report with her signature. Even so, within ten minutes of that mediation,
16 Smitherman indicated that the Agency would not purchase me an electric scooter. We did not
17 discuss my needs. He simply denied my request. There was no interactive process. In
18 September, I provided Smitherman with the typed doctor's note as I had promised but still I did
19 not get any response from him (a true and correct copy is attached hereto as Exhibit 4).

20     37. During this time, I also had several extremely unpleasant episodes with Trent
21 Williams at the ODO. In April 2005, Williams harassed me for not bringing my laptop into the
22 office. I explained to him that Rocha had allowed me to keep it at home because it is too difficult
23 for me to carry it as I walk with two canes, but he insisted that I go out and get it from my van. I
24 told him this wasn't physically possible and that I needed assistance. He confronted me openly in
25 the office and yelled at me. I felt extremely harassed and humiliated by him and that it was
26 specifically because I was disabled. It seemed like he was trying to make my job very difficult for
27 me. I became very frightened at this time for both my job and my health.

28     38. From April 2005 until October 2005, I experience the following retaliatory,

hostile, harassing and discriminatory incidents with Williams:

- He accused a co-worker of tape recording a staff meeting and threatened to fire him.
- He refused to discuss the matter with me as union steward in the office.
- He ordered me to come talk with him even though I was busy with important business and threatened that if I didn't, I shouldn't bother coming into work the next day.
- He refused to certify my time sheet and told me I wouldn't get paid.
- He accused me of misusing my leave by the way I filled out my timesheet.
- He removed me from an extremely important corporate management review without any explanation.
- He pulled all my cases and had them on his office floor and told me in a threatening manner that he was reviewing them.
- He wrote an accusatory memo regarding the Smart and Final review that contained incorrect information in an attempt to make me and my supervisor, Dr. Rocha, look like we weren't doing our job.

39. In all these incidents, Williams was extremely sarcastic and threatening. I was really afraid of this guy. Sometimes he came into the office smelling of alcohol and I didn't trust what he might do. He also told stories openly in the office to Berlene Roberts and KathyAnn Batiste about his drunken escapades. I felt strongly that his behavior towards me was motivated by my request for a reasonable accommodation and that he treated me differently because I was disabled. I could not figure out any other reason why. I had never before been treated in such an openly demeaning manner as this by any other Agency manager.

40. After Williams' tenure ended as Acting District Director the next Acting District Director at the ODO was Leigh Jones. She assigned case work to the non-disabled compliance officers much more readily that she did to me or to Gregory Hunt, another disabled compliance officer. I had hoped for a reprieve of sorts, but instead she became highly critical of different

1  aspect of my work that heretofore had never been reviewed by any previous managers. In fact,

2  throughout my nearly 10 years with OFCCP I had consistently received satisfactory evaluations.

3      41.  I also discussed my need for accommodation with Jones but she responded in a

4  very uninterested manner. She told me that she knew nothing about it and if Smitherman felt I

5  needed an accommodation, he would grant it to me. I explained to her that it was extremely

6  difficult for me to move my manual wheelchair and that I really needed a motorized wheelchair of

7  some sort. She simply looked blankly at me. I felt defeated. I felt like there was nothing I could

8  do. I felt like the agency was really determined to make my work life as difficult as possible.

9      42.  Nor would Ron Hiraga, the next Acting District Director, ODO, assign me *any*

10  new case work. When I discussed with him my need for reasonable accommodation, he also

11  replied that he had nothing to do with it. Since he was in the chain of command, I told him that

12  he could discuss this with Smitherman, but he did not respond.

13      43.  By early 2006, I had become an emotional wreck and did not know what to do.

14  The stress of what was happening to me and my co-workers and direct supervisor was becoming

15  unbearable. I was depressed and suicidal and having extreme difficulty walking. The stress was

16  aggravating my RA immensely. I was hesitant to ask for any further reasonable accommodation

17  for fear of further retaliation. I decided to go into therapy to try and get some help from Gail

18  Hunt. I was very confused.

19      44.  Finally in May 2006, I felt compelled to go out on a medical leave. During the first

20  week of my medical leave, I received a phone call from Ron Hiraga, who requested additional

21  medical documentation to support my usage of medical leave under FMLA. I was flabbergasted

22  and wondered when this harassment would stop. I referred Hiraga to the WH 380 form, which I

23  had submitted earlier and explained that I had provided the Agency all the medical information

24  they needed.

25      45.  Later I learned that Hiraga had allowed compliance officer Berlene Roberts to

26  work at home from June 2007 to December 2007 for five days a week, week after week, and

27  month after month. Berlene Roberts supposedly was to have back surgery but was seen to be

28  walking quite normally by other compliance officers. I suspect that Roberts never identified

herself as an individual with a disability and this is part of the reason she was allowed to work at home.

46. Through my therapeutic sessions with Gail Hunt, I come to the conclusion that I had to apply for disability retirement which I did in May 2006. (A true and correct copy of my application is attached hereto as Exh. 5. See also supporting statement from my treating physician. Shapiro Decl. ¶ 6 and Exh. 4.) This was an extremely difficult decision for me to make as I had worked my whole life. I began working when I was eight years old in the field with my family. There had never been a time in my adult life that I had not worked. I had no one to rely on financially. When I left my job, I did not know if I would qualify for disability retirement. It was an extremely frightening time in that leaving my job created extreme anxiety and depression. I did not know what would happen, whether I would have health insurance or a financial means to survive.

47. When I had made my request in March 2005 for the power chair, I really needed it for the work place. When I rented my own manual wheelchair to use at work, it provided me a lot of relief regarding my knees and ankles. However, using that wheelchair still created immediate stress on my hands, wrists, shoulders and arms. From approximately August 2005 to May 2006, I had from moderate to extreme difficulty moving my wheelchair. When I eventually left my job in May 2006, I could no longer move my wheelchair while at the work place. On the day I left, I told my supervisor, Dr. Rocha, that I could no longer continue to work without reasonable accommodation. I told him I was going to take a medical leave and apply for disability during that time. He looked at me sadly and wished me good luck.

48. Not being able to work at home had also caused me great stress, especially without a motorized scooter of some sort. In 2003, I worked at home about 30% of the time. In 2004, that dropped to about 20%. In 2005, I worked at home only 50 hours that entire year, and in 2006 I did not work at home at all. Although Dr. Rocha stated in his deposition that he had complete discretion when allowing compliance officers to work at home, this was not true. He doesn't seem to recall that about January 2005, he told me that Nelson did not want me working

1  at home, and that she was now focusing her efforts on me and Hunt since she had gotten rid of
2  Gaytan and Wade. The record will show that in 2005 I only worked fifty hours at home.

3  49.   Although I had requested a power chair and to work at home as my reasonable
4  accommodation request, the power chair was obviously the most important and critical aspect of
5  that request. Had the agency provided me with a power chair, the need to work at home would
6  probably have subsided somewhat.

7  50.   After I was forced to leave my job in May 2006 until about the end of that year, I
8  had great difficulty coping with what had happened to me during the preceding four years. To
9  this day, I can not believe that an Agency charged with safeguarding the employment rights of
10 federal contractor employees, an Agency whose mission it is to enforce the ADA, would not
11 provide me with a power chair so I could have done my job. The cost to the Agency would have
12 been about $4000. But it wasn't about money. It was about getting rid of those whom they
13 perceive as asking for too much. It's about defendants' prejudice that disabled employees are a
14 nuisance, cause problems and can't be relied upon.

Executed on September 15, 2008 in San Francisco, California.

By: _____/s/_____
Francisca Moralez